IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| ZEPHERINE MILLER, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action No. 1:23-cv-02620-MEH |
| | § | |
| NATIONAL CREDIT SYSTEMS, INC., | § | |
| | § | |
| *Defendant*. | § | |

## DEFENDANT NATIONAL CREDIT SYSTEMS, INC.'S STATEMENT OF FACTS

Defendant National Credit Systems, Inc. ("Defendant" or "NCS") submits this statement of facts in support of its Motion for Summary Judgment.

### BACKGROUND FACTS

1.     The Connor Group, A Real Estate Investment Firm, LLC d/b/a The Connor Group ("TCG") managing and doing business as Alas Over Lowry Apartments ("AOL") pursuant to a collection agency Services Agreement placed a lease debt allegedly owed by Plaintiff (the "AOL-Miller Account") with NCS for collection on December 21, 2020. *See* Exhibit "A-3," entry at 12/21/2020 05:20:21 PM (CMT).

2.     As detailed herein, Plaintiff submitted disputes regarding the AOL-Miller Account to the consumer reporting agencies (such as Experian, Equifax, and Trans Union, collectively the "CRAs") in May–June 2021 (called an "indirect dispute) and directly to NCS in August 2021. *See* Exhibit "A" at ¶ 14.

3.     Thereafter, in December 2021, Plaintiff filed suit against TCG as a class action, including a claim seeking to declare the lease debt invalid (the "State Court Lawsuit") that was

eventually resolved following an Offer of Judgment that led to an Order of Judgment declaring the subject lease debt, thus the AOL-Miller Account, invalid. Exhibit "A-13" at 6 and 20.

<u>NCS Maintains Policies and Procedures to avoid collecting inaccurate or invalid debts</u>.

4.      NCS is a third-party debt collector that collects debts from responsible parties that allegedly breach lease agreements. Exhibit "A" at ¶ 4. NCS has specialized in lease debt collection services for over thirty (30) years. *Id*. Over that thirty-year period, NCS has developed and maintains policies and procedures to prevent collection efforts or data furnishing to consumer reporting agencies ("CRAs") on inaccurate or invalid debts, including the following:

- NCS requires the original creditor, or its property manager that hires NCS to collect its outstanding receivables (collectively referred to herein as an original creditor), to either provide to NCS or have available for NCS's review, a signed lease by the responsible parties, a lease application with the responsible parties' contact and personal information to help identify and verify the responsible parties, and provide a final account statement or other similar document, such as a tenant ledger, that provides a description of the charges due under the lease that comprises the alleged principal amount of the debt.

- NCS utilizes service agreements with its clients require the original creditor to represent that the debts provided to NCS for collection are accurate and/or include an indemnity provision, whereby, if the original creditor provides a debt to NCS for collection that is not accurate, the original creditor must indemnify NCS from any damages resulting from the inaccuracy.

- NCS, upon placement of a debt, sends an account acknowledgment communication requiring the original creditor to review the relevant account information, including the identity of the responsible parties and the amount of debt placed with NCS and inform NCS

of any inaccuracies then or in the future before NCS will take any collection action. NCS's client services representatives regularly work with original creditors to adjust or recall accounts when debts are modified, paid, or waived through this process.

- For every account placed, NCS requires a contact for addressing collections issues, including disputes or general questions about each specific debt. Each client provides a contact or contact(s) for disputes, either on a property, portfolio, or client basis. Clients may provide different contacts for certain types of inquiries.

- NCS, upon receipt of a direct or indirect dispute that qualifies as a level two investigation (such as documents supporting a contractual dispute, documents contradicting information in the batch file for the account, documents in support of fraud or identity theft, or documents questioning the validity or accuracy of the subject debt), emails the original creditor a form letter to alert the original creditor of the alleged debtor's dispute, explain the basis of the dispute including a copy of the dispute and supporting documentation, and requires a response from the original creditor regarding the dispute. The form letter informs the original creditor that a response is required to prevent NCS from ceasing collection and submitting a deletion request to the CRAs.

*Id.* at pp. 3–4.

5.      Such policies incentivize NCS's clients to avoid placing inaccurate or unverifiable debts. Between the documents that support these leasing debts (leases and account statements prepared by property managers familiar with the lease terms), NCS's service agreement terms, NCS's account acknowledgement, and NCS's dispute investigation procedures, NCS can reasonably rely on the accuracy of the debts placed for collection and such policies and procedures

are maintained to prevent any alleged violations of Federal Debt Collection Practices Act ("FDCPA"), including 15 U.S.C. §§ 1692e(2)(A) and 1692e(8). *Id*. at ¶ 5.

Evidence Supporting Bona Fide Error Defense in this Litigation

6.    Regarding the AOL-Miller Account, NCS had no intention of violating the FDCPA as shown by the fact that it followed the policies and procedures NCS maintains to prevent violations of FDCPA §§ 1692e(2)(A) and 1692e(8) as set out in Paragraphs 4 and 5 above. *Id*. at ¶ 6. The account documents (Lease Application, Lease, and Final Account Statement) were all provided by TCG as detailed below. *Id*. The Service Agreement with TCG contains the required indemnity provision, and the account acknowledgement form was sent to TCG without resulting in any issue regarding the account or validity of the AOL-Miller Account. *Id*.; Exhibits "A-1" and "A-2." TCG provided a contact email to receive communications, provide documents and information regarding its accounts, and assist in resolving disputes (alas@connorgroup.com) as shown in the communications attached as Exhibits "A-6" through "A-12" and "A-14" through "A-16." Exhibit "A" at ¶ 6. TCG's representative was active in providing documentation and information to ensure account accuracy. *Id.* In addition, on three different occasions involving three different disputes by Ms. Miller, NCS followed its dispute investigation procedures by forwarding its form letter to TCG along with copies of Ms. Miller's disputes and obtained responses from TCG all as detailed below. *Id*.

NCS' Policies Regarding Dispute Investigation

7.    It is NCS's policy to only provide accurate information to the CRAs. *Id*. at ¶ 7. Further, it is NCS's policy to conduct a reasonable investigation when a dispute is received, regardless of whether it is a direct dispute to NCS or indirect dispute received through ACDVs from the CRAs. *Id*. NCS trains its investigators, and in the case of contractors hired as specialists

for investigations such as Provana, such investigators receive separate training by Provana, to perform reasonable investigations, including the use of NCS's written policies and procedures which are described below. *Id*.

Indirect Disputes Received through ACDVs

8.     By way of background, for each dispute received by the CRAs from consumers, the CRA will review the consumer dispute received, determine the appropriate "dispute code" from a list of e-Oscar (the application used by all CRAs and data furnishers, such as NCS) dispute codes, then submit the ACDV to NCS for response. *Id*. at ¶ 8. If the consumer attaches relevant documents or information to support their dispute to the CRAs, then the CRAs, when submitting the ACDVs to the data furnisher will (typically) include a description or basis of the dispute and the supporting documentation from the consumer's dispute that would assist the data furnisher with its investigation. *Id*. Indeed, as a third-party collector, NCS routinely communicates with the original creditor when a dispute raises issues about the amount or validity of the debt. *Id*. From my thirty-five years in third party consumer debt collection operations, this is in compliance with industry standards and best-practices. *Id*.

9.     For a situation like the one presented in this Litigation where the alleged debtor claims that the amount owed is not correct, pursuant to its written policies and procedures to conduct a reasonable investigation of these indirect disputes received through ACDVs, NCS's administrative personnel and contractors that conduct the investigations, will review the following:

(a)     the Dispute Code provided by the CRA which is used to guide the investigation;

(b)     NCS's Account Notes for the subject debt which will include notes on the investigation of any previous disputes, communications between NCS and the debtor, and communications between NCS and the original creditor;

(c)     the documents in NCS's "batch file" for the subject debt such as the lease, final account or move-out statement, any lease application and supporting documents, any tenant ledger, and any communications between the debtor and original creditor;

(d)     any reasons for the dispute or relevant information as supplied by the ACDV;

(e)     any documents provided by the alleged debtor included with the ACDV, as well as previous documents supplied by the alleged debtor to NCS, all of which are kept in NCS's batch file for the subject debt; and

(f)     if warranted by the previous items, contact the original creditor, providing the original creditor with a form letter that describes the nature of the alleged debtor's dispute and requirements to perform an investigation of the dispute and return the results to the CRAs, including a summary of the debtor's dispute and a copy of any documents supplied with the ACDV in support of the dispute. The form letter requires the original creditor to review the dispute and verify or otherwise update NCS regarding any issues with the validity or accuracy of the alleged debt.

*Id.* at ¶ 9. Based on NCS's thirty years of experience investigating leasing debt disputes, this process has proven to be a reasonable investigation process. *Id.*

<u>Issue of Legal Disputes</u>

10.     For the situation presented in this litigation, NCS does not, and is not required under the framework of the FCRA, to train its collectors, investigators, or contractors to attempt to resolve legal or contractual disputes that are not objectively and readily verifiable. *Id.* at ¶ 10. For instance, as was applicable in Plaintiff initial disputes prior to the State Court Litigation against TCG described below, Plaintiff's dispute involved questions of contract interpretation that would

require a direct action between the TCG and Plaintiff. *Id.* Following resolution of the State Court Litigation, Plaintiff's dispute involved the applicability of a Judgment against TCG. Again, as a state court judgment, which could be subject to later proceedings and did not specifically reference AOL, it is more reasonable to rely on TCG to determine the applicability of the Judgment than have NCS's personnel and contractors determine that legal question. *Id.*

NCS' Collection of the AOL-Miller Account

11.     All activity taken with respect to a particular collection placement are noted and included on NCS's Account Demographics and Notes (the "Account Notes"). *Id.* at ¶ 11. All collectors, investigators, and contractors performing investigations are trained regarding NCS's collection software, WinDebt, including how to notate all activity taken with respect to a particular account and debt on the Account Notes. *Id.*; Exhibit "A-3."

12.     The placement of the AOL-Miller Account by TCG occurred on December 21, 2020. *Id.* at ¶ 12; *see* Exhibit "A-3." Pursuant to NCS's polices and procedures, that triggered NCS to email its Account Acknowledgment Report to TCG on December 22, 2020 to confirm the responsible party and amount due for the AOL-Miller Account before any collection activity. Exhibit "A" at ¶ 12; *see* Exhibit "A-2." On December 28, 2020, NCS began collection efforts by sending Plaintiff its FDCPA § 1692g compliant letter (the 1.3 Letter) and attempting collection communications. Exhibit "A" at ¶ 12; *see* Exhibit "A-3." NCS began furnishing information regarding the AOL-Miller Account to the CRAs on March 2, 2021. Exhibit "A" at ¶ 12; *see* Exhibit "A-3."

NCS' Investigation of Plaintiff's Disputes

13.     For any direct disputes, the information related to those disputes is fully contained in the Account Notes. Exhibit "A" at ¶ 13. For indirect disputes received through eOscar as

ACDVS, the information on all ACDV's can be downloaded from the eOscar application into a spreadsheet. *Id*. A true and correct copy of the spreadsheet containing all information on the ACDVs received on the AOL-Miller Account is attached as Exhibit "A-4" and the results of any investigations, including any communications with the Original Creditor for investigations are included in the Account Notes, Exhibit "A-3." *Id*.

14.     Plaintiff's first set of indirect disputes received from Experian, Equifax, and Trans Union (May–June 2021). On May 23, 26 and June 10, 2021, NCS received ACDVs from each of the CRAs containing the same dispute letter from Plaintiff dated May 8, 2021. *Id*. at ¶ 14; *see* Exhibit "A-4" at NCS-137 and one of the dispute letter copies attached to the ACDVs, a true and correct copy of which is attached as Exhibit "A-5." *Id*. at ¶ 14. The dispute codes used were 112 (claims inaccurate information) or 1 (not his hers). *Id*.; *see* Exhibit "A-4" at NCS-093. NCS followed its reasonable investigation protocol set out above in Paragraph 9. Exhibit "A" at ¶ 14. Because the dispute letter made an allegation that the Lease did not contain a security deposit at the time of signing including supporting documentation, that investigation included a verification request to TCG to verify the AOL-Miller Account. *Id*. at ¶ 14. On May 31, and again on June 1, 2021, NCS emailed its form letter (Client email 71) that is customized to provide a description of Plaintiff's dispute and a copy of the dispute to TCG to review and verify whether the AOL-Miller Account was accurate and valid. *Id*.; *see* Exhibit "A-6." TCG responded on June 3, 2021, to provide all of the documents to support the validity of the AOL-Miller Account, including the Lease, Application and Acknowledgement. Exhibit "A" at ¶ 14; *see* Exhibit "A-7." NCS followed up on that communication requesting a copy of the Final Account Statement ("FAS") that supported the amount due, for which TCG provided a copy to NCS on June 9, 2021. Exhibit "A"

at ¶ 14; *see* Exhibit "A-8." Such communications are also reflected on the Account Notes, Exhibit "A-3" on the 06/09/2021 entries at NCS-080. Exhibit "A" at ¶ 14.

15.     Plaintiff's direct dispute to NCS. On August 6, 2021, NCS processed a dispute letter from Plaintiff complaining about the same security deposit issue and attaching supporting documentation which triggered NCS to email NCS's form letter to TCG attaching a copy of a dispute letter from Plaintiff along with the supporting documentation. *Id.* at ¶ 15; *see* Exhibit "A-9." On August 11, 2021, TCG responded as follows:

| | |
|---|---|
| **From:** | Alas Over Lowry <alas@connorgroup.com> |
| **To:** | Legal <legal@nationalcreditsystems.com> |
| **Date:** | Wed, 11 Aug 2021 00:31:03 +0000 |
| **Attachments:** | 20210609123259765.pdf (18.02 kB); 20210603101424818.pdf (304.93 kB); 20210603100101356.pdf (240.41 kB); 450U6NG3.DOC (80.64 kB); 4510687-03.pdf (375.12 kB) |

Hello,

Zepherine was well aware of what the security deposit could be. She was also well aware that when signing the lease which was explained as a legally binding document that she would be responsible for the lease. Attached are copies of the lease, application acknowledgement form, application, ledger, and utilities addendum.

Thank you,

**Ben Glover**
Alas Over Lowry
Operations Manager
82 N Uinta Way
Denver, CO 80230
720-452-9055

Exhibit "A" at ¶ 15; *see* Exhibit "A-10"

16.     On August 14, 2021, TCG responded to NCS's inquiry whether the unit leased by Ms. Miller was re-rented to determine whether the AOL-Miller Account should be reduced for mitigation. Exhibit "A" at ¶ 16; *see* Exhibit "A-11."

17.     On September 21 and 25, 2021, TCG responded to another email from NCS regarding Plaintiff's dispute regarding the mitigation issue, for which TCG reviewed the account

and provided NCS with a revised Final Account Statement with a reduced balance. Exhibit "A" at ¶ 17; *see* Exhibit "A-12."

<u>Effect of Notating Plaintiff's Account as "Disputed"</u>

18.     As a result of Plaintiff's disputes, NCS marked the subject account as disputed by Plaintiff at least by August 6, 2021. Exhibit "A" at ¶ 18; *see* Exhibit "A-3" at entry on 08/06/2021. This notation adds the eOscar code "XB" to all information furnished to the CRAs as required by FDCPA § 1692e(2)(A) and e(8). Exhibit "A" at ¶ 18. Compliance code XB indicates that the account information is disputed by consumer under FCRA on all of its future credit submissions— it is "sticky"—meaning it is not removed with subsequent furnishings or as a matter of course. *Id*. When compliance code XB is furnished with an account on a credit report, that account is excluded from credit scoring. *Id*. Meaning, a consumer's credit score is not impacted positively or negatively by any account where compliance code XB is notated. *Id*.

19.     NCS is familiar with the XB codes and this mitigation policy, pursuant to its efforts to comply with the requirements of the FCRA, including the review of materials furnished by the CRAs, general industry resources, information from and the engagement of credit experts familiar with the credit scoring models and processes to assist NCS in complying with the FCRA. *Id*. at ¶ 19.

20.     <u>Plaintiff's second set of indirect disputes received from Experian and TransUnion (April 2023)</u>. On April 6 and 7, 2023, NCS received ACDVs from Experian and TransUnion containing the same dispute letter from Plaintiff dated March 23, 2023 using dispute codes 112 (claims inaccurate information) and 118 (disputes current balance).  *Id*. at ¶ 20; *see* Exhibit "A-4" at NCS-093, NCS-137. A true and correct copy of the dispute letter and attachments, including a Complaint from a State Court Lawsuit and Judgment against TCG, is attached as Exhibit "A-13."

The dispute sent by the consumer contained a Complaint against TCG that complained about a $28.00 fee and a $399.00 fee and an unpaid security deposit of $1,000. Exhibit "A-13" at 9. The Complaint did not identify the specific lease at issue in the Complaint, the date upon which it was executed, or provide other information. *See* Exhibit "A-13" at 6–19. In addition, the Order of Judgment did not identify any additional information concerning the lease at issue. *Id*. at 20. The dispute letter indicated that "the Apartment Complex [AOL] agreed that the lease they turned over to the Debt Collector was void and of no force or effect." Exhibit "A" at ¶ 20. Plaintiff's dispute letter also requested that the CRAs verify the dispute with TCG as follows:[1]

If you need to know anything about this lease, you can call or write the following people:

*Attorneys for Apartment Complex*
Greg Ostfeld
Greenberg Traurig
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
OstfeldG@gtlaw.com
312-476-5056

Lindsay Aherne
Greenberg Traurig
1144 15th Street, Suite 3300
Denver, CO 80202
ahernel@gtlaw.com
303-572-6500

*Apartment Complex Owner*
The Connor Group
10510 N Springboro Pike
Dayton, OH 45342
937-434-3095

*Apartment Complex Property Manager*
Alas Over Lowery
82 Unita Way
Denver, CO 80230
720-868-9157

Exhibit "A-13" at 2.

21.     NCS's investigative contractor, Provana combined with NCS's internal personnel coordinating communications with TCG, performed a reasonable investigation of Plaintiff's second set of indirect disputes by following NCS's procedure set out above in Paragraph 9 and shown by the Account Notes. Exhibit "A" at ¶ 21; *see* Exhibit "A-3" at NCS-083, 084 at entries 04/14/2023 through 05/01/2023. A review of the Account Notes shows that TCG had not recalled

---

[1] Notably, NCS would not have its investigators and contractors contact third parties regarding the debt to avoid any possible violations of FDCPA § 1692c(b).

or requested modifications of the AOL-Miller Account and a review of the batch file would confirm the validity and accuracy of the Account. Exhibit "A" at ¶ 21. Then, as Plaintiff's dispute letter claimed, "the Apartment Complex agreed that the lease they turned over to the Debt Collector was void and of no force and effect," and included legal documents from a lawsuit against TCG, as well as a request to contact TCG / AOL, NCS sent its form original creditor verification of dispute letter (Client email 71) to TCG. *Id*; Exhibit "A-13" at 2; Exhibit "A-3" at NCS-083, entry 04/14/2023 03:06:55 AM. The verification request letter was customized to explain Plaintiff's dispute and emailed to the correct TCG contact (alas@connorgroup.com) on April 14 and again April 19, 2023. *See* Exhibit "A-3" at NCS-08. The verification request letter also attached Plaintiff's dispute letter dated March 23, 2023, including the attached copy of the Complaint and Judgment. The verification letter specifically requested the following:

> It is of critical importance that NCS pursue recovery on verifiably correct account balances from the parties who are legally responsible.   As data furnishers to the credit bureaus, we are required by law to conduct an investigation into consumer, or former resident, account disputes
>
> Please understand that it is very important that the information below be reviewed and replied to as soon as possible and **no later than 05/04/2023.** Without this verification, NCS will have to close this account or remove the disputed item.
>
> **1. Issue in question:**   THE FORMER RESIDENT IS DISPUTING THE DEBT. PLEASE REVIEW THE ATTACHED DISPUTE ALONG WITH YOUR RECORDS AND CONFIRM IF THE DEBTOR OWES THE BALANCE. ALSO, PLEASE VERIFY THE BALANCE AND CONFIRM IF THE CHARGES BEING ASSESSED ARE CORRECT OR IF THE BALANCE SHOULD BE REVISED.
>
> **2. See attachment(s) if applicable.**

Exhibit "A-14."

22.     On April 19, 2023, TCG responded to NCS's request for verification by reply email indicating that the AOL-Miller Account was valid and owing:

| | |
|---|---|
| **From:** | Alas Over Lowry <alas@connorgroup.com> |
| **To:** | legal@nationalcreditsystems.com |
| **Date:** | Wed, 19 Apr 2023 18:49:38 +0000 |

Hello,

This amount is owed per our records.

Thank you,

Caiti Kopp
Alas Over Lowry
Property Manager

Exhibit "A" at ¶ 22; Exhibit "A-15."

23.     As Plaintiff's letter indicated that an investigation should include contacting TCG-AOL and to make sure the AOL-Miller Account was still showing a balance owed, on April 20, 2023, NCS followed up on its verification request to TCG by sending another email to the designated email address to seek a copy of the tenant ledger to confirm the account balance, for which TCG responded and provided a copy of the Tenant Ledger. Exhibit "A" at ¶ 23; *see* Exhibit "A-3" at NCS-084; Exhibit "A-16." Based on TCG's verification of the AOL-Miller Account as accurate and valid, and providing a Tenant Ledger that still showed the balance owed by Plaintiff, NCS responded to the second set of ACDVs by verifying the AOL-Miller Account. Exhibit "A" at ¶ 23; *see* Exhibit "A-4" at NCS-132 (showing eOscar dispute response code "23" which is a code to verify the account). Unfortunately, while TCG resolved the AOL–Miller Account in the State Court Lawsuit, it failed to update its Tenant Ledger or otherwise inform the onsite property manager designated to respond to dispute investigations at AOL who verified the AOL-Miller Account as accurate. Exhibit "A" at ¶ 23.

24.     NCS did receive two additional ACDVs in May 2023 on the AOL-Miller Account. *Id*. at ¶ 24. However, such ACDVs failed to provide any dispute letter or any supporting documentation. *Id*. All NCS received was an ACDV with a dispute code. *Id*. Without any new

information to investigate, NCS relied on its previous investigations as provided in the Account Notes and batch file. *Id.*; *see* Exhibit "A-3" at NCS-084 at entries on 05/29/2024.

25.     Had TCG properly recalled the AOL-Miller Account or otherwise communicated that the Account was waived or determined to be invalid during the investigation process, NCS would have submitted a deletion request of the tradeline to the CRAs. Exhibit "A" at ¶ 25. When NCS was served with Plaintiff's Complaint in this lawsuit, that is precisely what happened on September 29, 2023, such that any negative credit reporting would have ended on that date. *Id.*

<u>Plaintiff's Attorney Never Alerted TCG or its Attorneys to the Collection Issue</u>

26.     Plaintiff's attorney Dan Vedra communicated with TCG's attorneys, Greenberg Traurig, LLP ("GT Law") regarding various aspects of the conclusion of State Court Litigation, including the following emails—all of which were during the same time frame of Plaintiff's dispute to the CRAs about NCS's continued collection of the AOL-Miller Account—and none of which mention the collection issue:

- <u>Feb. 20, 2023</u>: Emails whereby Dan Vedra sought an extension of time for Mr. Vedra to file a motion for fees. Exhibit "B-3."

- <u>Mar. 23, 2023</u>: Emails whereby Dan Vedra agreed to extend the time for TCG's response brief to the motion for fees so long as TCG confirmed to pay the $1,781 damage award in the Judgment directly to Ms. Miller.  Exhibit "B-4."

- <u>Apr. 18, 2023</u>: Emails whereby Dan Vedra sought an extension of time for Mr. Vedra to file a reply brief to the motion for fees. Exhibit "B-5."

- <u>Jun. 12, 2023</u>: Emails whereby Dan Vedra sought payment of the attorneys' fees and costs awarded to be made payable to his law firm rather than Ms. Miller. Exhibit "B-6."

- <u>Jun. 27, 2023</u>: Emails whereby Dan Vedra agreed to notarize and file the satisfaction of judgment. Exhibit "B-7."

27.     None of those emails from February 2023 to June 2023, nor in any documents produced by Plaintiff in the above-referenced litigation, did Ms. Miller's attorney, Mr. Vedra, indicate to GT Law that the debt extinguished by the Judgment was being collected by TCG or any collection agency on behalf of TCG. In fact, quite the opposite, as Ms. Miller, by Mr. Vedra, filed a Satisfaction of Judgment. *See* Exhibits "B-3" through "B-7." A true and correct copy of the Satisfaction of Judgment filed July 7, 2023, is attached hereto as Exhibit "B-8."

Respectfully submitted,

By: ___*s/John W. Bowdich*_____
JOHN W. BOWDICH
State Bar No. 00796233

BOWDICH & ASSOCIATES, PLLC
8150 N. Central Expy., Suite 500
Dallas, Texas 75206
(214) 307-9500 – Telephone
(214) 307-5137 – Telecopy
jbowdich@bowdichlaw.com

ATTORNEY FOR DEFENDANT
NATIONAL CREDIT SYSTEMS, INC.

<u>CERTIFICATE OF SERVICE</u>

On August 30, 2024, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, District of Colorado using the electronic case filing system of the court, thereby providing service to all parties.

Daniel J. Vedra, Esq.                    <u>Via ECF</u>: <u>dan@vedralaw.com</u>
Vedra Law LLC
1444 Blake Street
Denver, CO 80202

Duran Keller, Esq.                       <u>Via ECF</u>: <u>duran@keller.law</u>
8 N Third Street, Suite 403
Lafayette, IN 47901-1264
  *Attorneys for Plaintiff*

                                         By: ____*s/John W. Bowdich*____
                                             John W. Bowdich