# EXHIBIT "A"

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| ZEPHERINE MILLER, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | No. 1:23-cv-02620-MEH |
| | § | |
| NATIONAL CREDIT SYSTEMS, INC., | § | |
| | § | |
| *Defendant*. | § | |

---

## DECLARATION OF RON SAPP
## NCS VICE PRESIDENT OF OPERATIONS

---

1.     My name is Ron Sapp. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that I am fully competent to provide this Declaration and the foregoing statements are true and correct, and within my personal knowledge.

2.     I am Vice President of Operations of National Credit Systems, Inc., a Georgia Corporation (hereinafter, "NCS") and I have over thirty-five (35) years' experience in the industry, including thirty years in operations at NCS.  I am familiar with the facts and claims set forth in the litigation filed by Plaintiff Zepherine Miller ("Ms. Miller" or "Plaintiff") styled: Civil Action No. 23-cv-02620-NYW-MEH; *Zepherine Miller v. National Credit Systems, Inc., at al.*; In the United States District Court of Colorado (hereinafter, this "Litigation") that dealt with an alleged debt owed by Ms. Miller to The Connor Group, A Real Estate Investment Firm, LLC d/b/a The Connor Group managing the Alas Over Lowry Apartments ("AOL") related to a breached lease agreement, the "AOL-Miller Account." I am the corporate representative of NCS and I am authorized on behalf of NCS to make this Declaration.

3.      I am also personally familiar with NCS's collection policies, procedures and practices, and it is part of my duties and responsibilities at NCS to help develop and maintain policies and procedures that are reasonably adapted to avoid any errors that could violate consumer protection statutes, including (1) the process by which NCS obtains new accounts for collection, including policies and procedures that NCS has developed to ensure the debts accepted for collection are accurate, (2) the process and policies and procedures maintained and followed by NCS to perform reasonable investigations and respond to direct disputes made to NCS, and (3) the process and policies and procedures maintained and followed by NCS to perform investigations and respond to indirect disputes made to a consumer reporting agency ("CRA" such as Experian, Equifax, and Trans Union) that NCS receives through the Metro2 e-Oscar system used by the CRAs known as automated consumer dispute verifications ("ACDVs") which NCS typically performs using the assistance of an independent contractor, Provana, that specializes in the investigation of consumer disputes.  I am also familiar with NCS's policies and procedures maintained and followed to collect only accurate and valid debts, as well as ensure consumer's disputes are properly furnished to the CRAs.  Finally, I am familiar with NCS's system for maintaining records, and I am a custodian of NCS's records.

### NCS Policies to Obtain Verifiable and Accurate Lease Debts for Collection

4.      By way of background, while also performing other collection related services, NCS is a third-party debt collector that collects debts from responsible parties that allegedly breached lease agreements. NCS has specialized in lease debt collection services for over thirty (30) years.   Over that thirty-year period, NCS has developed and maintains policies and procedures to prevent collection efforts or data furnishing to consumer reporting agencies ("CRAs") on inaccurate or invalid debts, including the following:

- NCS requires the original creditor, or its property manager that hires NCS to collect its outstanding receivables (collectively referred to herein as an original creditor), to either provide to NCS or have available for NCS's review, a signed lease by the responsible parties, a lease application with the responsible parties' contact and personal information to help identify and verify the responsible parties, and provide a final account statement or other similar document, such as a tenant ledger, that provides a description of the charges due under the lease that comprises the alleged principal amount of the debt.

- NCS utilizes service agreements with its clients require the original creditor to represent that the debts provided to NCS for collection are accurate and/or include an indemnity provision, whereby, if the original creditor provides a debt to NCS for collection that is not accurate, the original creditor must indemnify NCS from any damages resulting from the inaccuracy.

- NCS, upon placement of a debt, sends an account acknowledgment communication requiring the original creditor to review the relevant account information, including the identity of the responsible parties and the amount of debt placed with NCS and inform NCS of any inaccuracies then or in the future before NCS will take any collection action. NCS's client services representatives regularly work with original creditors to adjust or recall accounts when debts are modified, paid, or waived through this process.

- For every account placed, NCS requires a contact for addressing collections issues, including disputes or general questions about each specific debt.  Each client provides a contact or contact(s) for disputes, either on a property, portfolio, or client basis.  Clients may provide different contacts for certain types of inquiries.

- NCS, upon receipt of a direct or indirect dispute that qualifies as a level two investigation (such as documents supporting a contractual dispute, documents contradicting information in the batch file for the account, documents in support of fraud or identity theft, or documents questioning the validity or accuracy of the subject debt), emails the original creditor a form letter to alert the original creditor of the alleged debtor's dispute, explain the basis of the dispute including a copy of the dispute and supporting documentation, and requires a response from the original creditor regarding the dispute. The form letter informs the original creditor that a response is required to prevent NCS from ceasing collection and submitting a deletion request to the CRAs.

5.     Such policies incentivize NCS's clients to avoid placing inaccurate or unverifiable debts.  Between the documents that support these leasing debts (leases and account statements prepared by property managers familiar with the lease terms), NCS's service agreement terms, NCS's account acknowledgement, and NCS's dispute investigation procedures, NCS can reasonably rely on the accuracy of the debts placed for collection and such policies and procedures are maintained to prevent any alleged violations of Federal Debt Collection Practices Act ("FDCPA"), including 15 U.S.C. §§ 1692e(2)(A), 1692e(8), 1692e(10), and 1692f.

6.     <u>Evidence in support of Bona Fide Error</u>.  Regarding the AOL-Miller Account, NCS had no intention of violating the FDCPA as shown by the fact that it followed the policies and procedures NCS maintains to prevent violations of FDCPA 15 U.S.C. §§ 1692e(2)(A), 1692e(8), 1692e(10), and 1692f as set out in Paragraphs 4 and 5 above. The account documents (Lease Application, Lease, and Final Account Statement) were all provided by TCG as detailed below. The Service Agreement with TCG contains the required indemnity provision, and the account acknowledgement form was sent to TCG without resulting in any issue regarding the

account or validity of the AOL-Miller Account.  A true and correct copy of the Service Agreement and Account Acknowledgement is attached as Exhibits "A-1" and "A-2."  TCG provided a contact email to receive communications, provide documents and information regarding its accounts, and assist in resolving disputes (alas@connorgroup.com) as shown in the communications attached as Exhibits "A-6" through "A-12" and "A14" through "A16." TCG's representative was active in providing documentation and information to ensure account accuracy. *Id.* In addition, on three different occasions involving three different disputes by Ms. Miller, NCS followed its dispute investigation procedures by forwarding its form letter to TCG along with copies of Ms. Miller's disputes and obtained responses from TCG all as detailed below.

### NCS' Policies Regarding Dispute Investigation

7.      It is NCS's policy to only provide accurate information to the CRAs. Further, it is NCS's policy to conduct a reasonable investigation when a dispute is received, regardless of whether it is a direct dispute to NCS or indirect dispute received through ACDVs from the CRAs. NCS trains its investigators, and in the case of contractors hired as specialists for investigations such as Provana, such investigators receive separate training by Provana, to perform reasonable investigations, including the use of NCS's written policies and procedures which are described below:

8.      <u>Indirect Disputes Received through ACDVs</u>. By way of background, for each dispute received by the CRAs from consumers, the CRA will review the consumer dispute received, determine the appropriate "dispute code" from a list of e-Oscar (the application used by all CRAs and data furnishers, such as NCS) dispute codes, then submit the ACDV to NCS for response. If the consumer attaches relevant documents or information to support their dispute to

the CRAs, then the CRAs, when submitting the ACDVs to the data furnisher will (typically) include a description or basis of the dispute and the supporting documentation from the consumer's dispute that would assist the data furnisher with its investigation. Indeed, as a third-party collector, NCS routinely communicates with the original creditor when a dispute raises issues about the amount or validity of the debt.  From my thirty-five years in third party consumer debt collection operations, this is in compliance with industry standards and best-practices.

9.      For a situation like the one presented in this Litigation where the alleged debtor claims that the amount owed is not correct, pursuant to its written policies and procedures to conduct a reasonable investigation of these indirect disputes received through ACDVs, NCS's administrative personnel and contractors that conduct the investigations, will review the following:

(a)      the Dispute Code provided by the CRA which is used to guide the investigation;

(b)      NCS's Account Notes for the subject debt which will include notes on the investigation of any previous disputes, communications between NCS and the debtor, and communications between NCS and the original creditor;

(c)      the documents in NCS's "batch file" for the subject debt such as the lease, final account or move-out statement, any lease application and supporting documents, any tenant ledger, and any communications between the debtor and original creditor;

(d)      any reasons for the dispute or relevant information as supplied by the ACDV;

DECLARATION OF RON SAPP                                             Page 6 of 15

(e)     any documents provided by the alleged debtor included with the ACDV, as well as previous documents supplied by the alleged debtor to NCS, all of which are kept in NCS's batch file for the subject debt; and

(f)     if warranted by the previous items, contact the original creditor, providing the original creditor with a form letter that describes the nature of the alleged debtor's dispute and requirements to perform an investigation of the dispute and return the results to the CRAs, including a summary of the debtor's dispute and a copy of any documents supplied with the ACDV in support of the dispute.  The form letter requires the original creditor to review the dispute and verify or otherwise update NCS regarding any issues with the validity or accuracy of the alleged debt.

Based on NCS's thirty years of experience investigating leasing debt disputes, this process has proven to be a reasonable investigation process.

10.    Issue of Legal Disputes. For the situation presented in this litigation, NCS does not, and is not required under the framework of the FCRA, to train its collectors, investigators, or contractors to attempt to resolve legal or contractual disputes that are not objectively and readily verifiable.  For instance, as was applicable in Plaintiff initial disputes prior to the State Court Litigation against TCG described below, Plaintiff's dispute involved questions of contract interpretation that would require a direct action between the TCG and Plaintiff.  Following resolution of the State Court Litigation, Plaintiff's dispute involved the applicability of a Judgment against TCG.  Again, as a state court judgment, which could be subject to later proceedings and did not specifically reference AOL, it is more reasonable to rely on TCG to determine the applicability of the Judgment than have NCS's personnel and contractors determine that legal question.

## NCS' Collection of the AOL-Miller Account

11.     All activity taken with respect to a particular collection placement are noted and included on NCS's Account Demographics and Notes (the "Account Notes").  All collectors, investigators, and contractors performing investigations are trained regarding NCS's collection software, WinDebt, including how to notate all activity taken with respect to a particular account and debt on the Account Notes.  A true and correct copy of NCS's Account Notes for the AOL-Miller Account is attached hereto as Exhibit "A-3."

12.     The placement of the AOL-Miller Account by TCG occurred on December 21, 2020.  *See* Exhibit "A-3." Pursuant to NCS's polices and procedures, that triggered NCS to email its Account Acknowledgment Report to TCG on December 22, 2020, to confirm the responsible party and amount due for the AOL-Miller Account before any collection activity.  *See* Exhibit "A-2." On December 28, 2020, NCS began collection efforts by sending Plaintiff its FDCPA § 1692g compliant letter (the 1.3 Letter) and attempting collection communications. *See* Exhibit "A-3." NCS began furnishing information regarding the AOL-Miller Account to the CRAs on March 2, 2021. *See* Exhibit "A-3."

## NCS' Investigation of Plaintiff's Disputes

13.     For any direct disputes, the information related to those disputes is fully contained in the Account Notes.  For indirect disputes received through eOscar as ACDVS, the information on all ACDV's can be downloaded from the eOscar application into a spreadsheet.  A true and correct copy of the spreadsheet containing all information on the ACDVs received on the AOL-Miller Account is attached as Exhibit "A-4" and the results of any investigations, including any communications with the Original Creditor for investigations are included in the Account Notes, Exhibit "A-3."

14.     <u>Plaintiff's first set of indirect disputes received from Experian, Equifax, and Trans Union (May–June 2021)</u>.  On May 23, 26 and June 10, 2021, NCS received ACDVs from each of the CRAs containing the same dispute letter from Plaintiff dated May 8, 2021.  *See* Exhibit "A-4" at NCS-137 and one of the dispute letter copies attached to the ACDVs, a true and correct copy of which is attached as Exhibit "A-5."  The dispute codes used were 112 (claims inaccurate information) or 1 (not his hers).  *See* Exhibit "A-4" at NCS-093.  NCS followed its reasonable investigation protocol set out above in <u>Paragraph 9</u>.  Because the dispute letter made an allegation that the Lease did not contain a security deposit at the time of signing including supporting documentation, that investigation included a verification request to TCG to verify the AOL-Miller Account.  On May 31, and again on June 1, 2021, NCS emailed its form letter (Client email 71) that is customized to provide a description of Plaintiff's dispute and a copy of the dispute to TCG to review and verify whether the AOL-Miller Account was accurate and valid.  A true and correct copy of such verification request to TCG is attached hereto as Exhibit "A-6."  TCG responded on June 3, 2021, to provide all the documents to support the validity of the AOL – Miller Account, including the Lease, Application and Acknowledgement, a true and correct copy of which is attached hereto as Exhibit "A-7."   NCS followed up on that communication requesting a copy of the Final Account Statement ("FAS") that supported the amount due, for which TCG provided a copy to NCS on June 9, 2021, a true and correct copy of which is attached hereto as Exhibit "A-8."  Such communications are also reflected on the Account Notes, Exhibit "A-3" on the 06/09/2021 entries at NCS-080.

15.     <u>Plaintiff's direct dispute to NCS</u>. On August 6, 2021, NCS processed a dispute letter from Plaintiff complaining about the same security deposit issue and attaching supporting documentation which triggered NCS to email NCS's form letter to TCG attaching a copy of a

dispute letter from Plaintiff along with the supporting documentation, a true and correct copy of which is attached hereto as Exhibit "A-9."  On August 11, 2021, TCG responded as follows, a true and correct copy of which (sans attachments) is attached hereto as Exhibit "A-10":

| | |
|---|---|
| **From:** | Alas Over Lowry <alas@connorgroup.com> |
| **To:** | Legal <legal@nationalcreditsystems.com> |
| **Date:** | Wed, 11 Aug 2021 00:31:03 +0000 |
| **Attachments:** | 20210609123259765.pdf (18.02 kB); 20210603101424818.pdf (304.93 kB); 20210603100101356.pdf (240.41 kB); 450U6NG3.DOC (80.64 kB); 4510687-03.pdf (375.12 kB) |

Hello,

Zepherine was well aware of what the security deposit could be. She was also well aware that when signing the lease which was explained as a legally binding document that she would be responsible for the lease. Attached are copies of the lease, application acknowledgement form, application, ledger, and utilities addendum.

Thank you,

**Ben Glover**
Alas Over Lowry
Operations Manager
82 N Uinta Way
Denver, CO 80230
720-452-9055

16.    On August 14, 2021, TCG responded to NCS's inquiry whether the unit leased by Ms. Miller was re-rented to determine whether the AOL – Miller Account should be reduced for mitigation, a true and correct copy of which is attached as Exhibit "A-11."

17.    On September 21 and 25, 2021, TCG responded to another email from NCS regarding Plaintiff's dispute regarding the mitigation issue, for which TCG reviewed the account and provided NCS with a revised Final Account Statement with a reduced balance.  True and correct copies of these communications are attached as Exhibit "A-12."

18.    <u>Effect of Notating Plaintiff's Account as "Disputed"</u>. As a result of Plaintiff's disputes, NCS marked the subject account as disputed by Plaintiff at least by August 6, 2021. *See* Exhibit "A-3" at entry on 08/06/2021.  This notation adds the eOscar code "XB" to all information furnished to the CRAs as required by FDCPA § 1692e(2)(A) and e(8).  Compliance

code XB indicates that the account information is disputed by consumer under FCRA on all of its future credit submissions—it is "sticky"—meaning it is not removed with subsequent furnishings or as a matter of course. When compliance code XB is furnished with an account on a credit report, that account is excluded from credit scoring.  Meaning, a consumer's credit score is not impacted positively or negatively by any account where compliance code XB is notated.

19.     NCS is familiar with the XB codes and this mitigation policy, pursuant to its efforts to comply with the requirements of the FCRA, including the review of materials furnished by the CRAs, general industry resources, information from and the engagement of credit experts familiar with the credit scoring models and processes to assist NCS in complying with the FCRA.

20.     <u>Plaintiff's second set of indirect disputes received from Experian and TransUnion (April 2023)</u>.  On April 6 and 7, 2023, NCS received ACDVs from Experian and TransUnion containing the same dispute letter from Plaintiff dated March 23, 2023, using dispute codes 112 (claims inaccurate information) and 118 (disputes current balance).   *See* Exhibit "A-4" at NCS-093, NCS-137.   A true and correct copy of the dispute letter and attachments, including a Complaint from a State Court Lawsuit and Judgment against TCG, is attached as Exhibit "A-13." The dispute letter indicated that "the Apartment Complex [AOL] agreed that the lease they turned over to the Debt Collector was void and of no force or effect."  Plaintiff's dispute letter also requested that the CRAs verify the dispute with TCG as follows:[1]

---

[1] Notably, NCS would not have its investigators and contractors contact third parties regarding the debt to avoid any possible violations of FDCPA § 1692c(b).

<u>DECLARATION OF RON SAPP</u>                                          Page 11 of 15

If you need to know anything about this lease, you can call or write the following people:

*Attorneys for Apartment Complex*
Greg Ostfeld
Greenberg Traurig
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
OstfeldG@gtlaw.com
312-476-5056

Lindsay Aherne
Greenberg Traurig
1144 15th Street, Suite 3300
Denver, CO 80202
ahernel@gtlaw.com
303-572-6500

*Apartment Complex Owner*
The Connor Group
10510 N Springboro Pike
Dayton, OH 45342
937-434-3095

*Apartment Complex Property Manager*
Alas Over Lowery
82 Unita Way
Denver, CO 80230
720-868-9157

21.     NCS's investigative contractor, Provana combined with NCS's internal personnel coordinating communications with TCG, performed a reasonable investigation of Plaintiff's second set of indirect disputes by following NCS's procedure set out above in <u>Paragraph 9</u> and shown by the Account Notes.  *See* Exhibit "A-3" at NCS-083, 084 at entries 04/14/2023 through 05/01/2023.  A review of the Account Notes shows that TCG had not recalled or requested modifications of the AOL-Miller Account and a review of the batch file would confirm the validity and accuracy of the Account.  Then, as Plaintiff's dispute letter claimed, "the Apartment Complex agreed that the lease they turned over to the Debt Collector was void and of no force and effect," and included legal documents from a lawsuit against TCG, as well as a request to contact TCG / AOL, NCS sent its form original creditor verification of dispute letter (Client email 71) to TCG.  The verification request letter was customized to explain Plaintiff's dispute and emailed to the correct TCG contact (alas@connorgroup.com) on April 14 and again April 19, 2023. *See* Exhibit "A-3" at NCS-08.  The verification request letter also attached Plaintiff's dispute letter dated March 23, 2023, including the attached copy of the Complaint and Judgment. A true and correct copy of the emails and attachments is attached as Exhibit "A-14" whereby the verification letter specifically requested the following:

<u>DECLARATION OF RON SAPP</u>                                               Page 12 of 15

It is of critical importance that NCS pursue recovery on verifiably correct account balances from the parties who are legally responsible.   As data furnishers to the credit bureaus, we are required by law to conduct an investigation into consumer, or former resident, account disputes

Please understand that it is very important that the information below be reviewed and replied to as soon as possible and **no later than 05/04/2023.** Without this verification, NCS will have to close this account or remove the disputed item.

**1. Issue in question**:   THE FORMER RESIDENT IS DISPUTING THE DEBT. PLEASE REVIEW THE ATTACHED DISPUTE ALONG WITH YOUR RECORDS AND CONFIRM IF THE DEBTOR OWES THE BALANCE. ALSO, PLEASE VERIFY THE BALANCE AND CONFIRM IF THE CHARGES BEING ASSESSED ARE CORRECT OR IF THE BALANCE SHOULD BE REVISED.

**2. See attachment(s) if applicable.**

22.     On April 19, 2023, TCG responded to NCS's request for verification by reply email indicating that the AOL-Miller Account was valid and owing:

> **From:**   Alas Over Lowry <alas@connorgroup.com>
> **To:**     legal@nationalcreditsystems.com
> **Date:**   Wed, 19 Apr 2023 18:49:38 +0000
>
> Hello,
>
> This amount is owed per our records.
>
> Thank you,
>
> Caiti Kopp
> Alas Over Lowry
> Property Manager

A true and correct copy of this verification of the debt is attached hereto as Exhibit "A-15."

23.     As Plaintiff's letter indicated that an investigation should include contacting TCG-AOL and to make sure the AOL-Miller Account was still showing a balance owed, on April 20, 2023, NCS followed up on its verification request to TCG by sending another email to the designated email address to seek a copy of the tenant ledger to confirm the account balance, for which TCG responded and provided a copy of the Tenant Ledger.  *See* Exhibit "A-3" at NCS-084.  A true and correct copy of this email exchange is attached as Exhibit "A-16." Based on TCG's verification of the AOL-Miller Account as accurate and valid, and providing a Tenant

Ledger that still showed the balance owed by Plaintiff, NCS responded to the second set of ACDVs by verifying the AOL-Miller Account. *See* Exhibit "A-4" at NCS-132 (showing eOscar dispute response code "23" which is a code to verify the account). Unfortunately, while TCG resolved the AOL–Miller Account in the State Court Lawsuit, it failed to update its Tenant Ledger or otherwise inform the onsite property manager designated to respond to dispute investigations at AOL who verified the AOL-Miller Account as accurate.

24.     NCS did receive two additional ACDVs in May 2023 on the AOL-Miller Account. However, such ACDVs failed to provide any dispute letter or any supporting documentation. All NCS received was an ACDV with a dispute code. Without any new information to investigate, NCS relied on its previous investigations as provided in the Account Notes and batch file. *See* Exhibit "A-3" at NCS-084 at entries on 05/29/2024.

25.     Had TCG properly recalled the AOL-Miller Account or otherwise communicated that the Account was waived or determined to be invalid during the investigation process, NCS would have submitted a deletion request of the tradeline to the CRAs. When NCS was served with Plaintiff's Complaint in this lawsuit, that is precisely what happened on September 29, 2023, such that any negative credit reporting would have ended on that date.

26.     Business Records. I am a custodian of records for NCS. Attached hereto are Exhibits "A-1" through "A-16" are business records of NCS for Plaintiff's Account with NCS. These records are kept by NCS in the regular course of business, and it was the regular course of business of NCS. for an employee or representative of NCS, with knowledge of the act, event, condition, opinion or diagnosis, recorded to make the record or to transmit information thereof to be included or to transmit information thereof to be included in such record; and the record was

made at or near the time or reasonably soon thereafter.  The records attached are the original or exact duplicates of the original.

Executed within the United States, in Marietta, Cobb County, Georgia on August 30, 2024.

NATIONAL CREDIT SYSTEMS, INC.


By: ___*s/ Ron Sapp*_____
          RON SAPP, VICE PRESIDENT OF OPERATIONS

# EXHIBIT "A-1"

*The Connor Group*



## Service Agreement

This agreement made and entered into this 19 day of November, 2007 by and between THE CONNOR GROUP ("Client"), and National Credit Systems, Inc ("NCS") sets forth the conditions under which NCS is to perform contracted services

Whereas, Client desires the services of an independent contractor to recover various uncollected accounts receivable which it now has or will have in the future and NCS wishes to provide such services

In consideration of the mutual covenants and agreements herein expressed, the parties agree as follows:

### 1. Authorization to Collect

Client authorizes NCS to use all legal means necessary to induce payment of debts assigned by Client; including written correspondence, telephone contact, personal contact, and listing unpaid accounts with credit reporting bureaus

### 2. Fair Debt Collection Practices Act Compliance

NCS warrants and agrees that it will not, under any circumstances or in any event, knowingly violate the Fair Debt Collection Practices Act of 1977, 15 U.S.C 1692, et seq., and the regulations thereunder, as well as other applicable statutes

### 3. Legal Action

NCS shall not institute litigation on behalf of Client without obtaining written consent from Client and notifying Client of all corresponding court costs associated with such action

### 4. Account Status and Reporting

NCS shall maintain records in such a manner that it can provide to Client, within a reasonable time, the present status of and the collection efforts expended on any accounts receivable held by NCS  NCS will provide such reports on an as requested basis or on an agreed upon predetermined schedule

### 5. Collection Remittance

NCS shall remit collected funds by check to Client on a net basis  This remittance shall be made no later than the end of the month following payment and shall be accompanied by a trust statement (itemization) accounting for the month's payments NCS and Client covenant and agree that Client may receive payments on accounts receivable held by NCS, whether over the counter or by mail, and shall not be required to refuse such payments  Client shall notify NCS within one (1) week of all such monies received to ensure proper and timely accounting for said payments  NCS is entitled to receive its standard collection fee set forth herein whether payments are received by Client, or other agents of Client, or by NCS

## 6. Account Settlement

Accounts may be compromised and settled by NCS only after the prior consent of Client, or other agent(s). From time to time, Client may wish to grant NCS the written authority to settle accounts at a predetermined percentage of the original balance to induce a more timely resolution of placed accounts. Unless otherwise notified, client hereby grants NCS the authority to settle any collection account placed for _60_ % of the original balance submitted for collection

## 7. Indemnification

NCS agrees to maintain in full force and effect during the term of the agreement an Errors and Omissions policy of insurance, insuring NCS and its clients from and against loss which may result from the collection activities of NCS on behalf of Client. NCS agrees to indemnify and hold harmless Client from and against claims or demands arising out of the failure of NCS to comply with laws and regulations set forth by the Fair Debt Collection Practices Act, or if found to be grossly negligent in its practices, as it relates to the collection of accounts placed by Client. Client agrees to indemnify and hold harmless NCS from and against claims or demands arising out of the negligence of Client, including but not limited to the inaccuracy of information relayed to NCS or the validity of debts placed for collection

## 8. Account Cancellation

Accounts placed for collection with NCS may be canceled by Client only in instances of legitimate error resulting in Client's nullification of said debt. Due to NCS's contingency fee structure, Client may not cancel accounts due to the re-establishment of prior payment schedules, any payment made to Client, or its agent(s), or other undisclosed arrangements entered into without the consent of NCS. NCS is entitled to its standard fee set forth herein for all payments received on accounts placed by Client whether made directly to NCS, or to Client, or its agent(s) NCS reserves the right to charge a reasonable per account service fee for accounts canceled after entry into NCS's computer system.

## 9. Fee for Service

NCS is compensated on a contingency fee basis. Please note the following schedule:

- First Placement Accounts      Client
                                NCS

- Litigation Accounts           Client
                                NCS

Applicable sales tax on services provided may be withheld from client remittance proceeds as dictated by state or local law

## 10. Term

NCS shall remain the exclusive collection agency for Client until either party wishes to terminate by giving the other party thirty (30) days written notice of its intent

TCG000097_0002

## 11. Change of Management

The terms and conditions set forth herein shall survive the transfer of management or acting agent, as well as the change of ownership, for existing collection accounts placed with NCS. Future management, acting agents or owners shall be under no obligation to continue placing new collection accounts with NCS.

In witness whereof, the parties have executed this Agreement as of the day first above written

By:

Printed Name: PATRICK S DORSEY

Title: PARTNER

"Client"

By:

Title: Account Executive

"NCS"

TCG000097_0003

# EXHIBIT "A-2"

# Placement Acknowledgment From National Credit Systems (54089)

| | |
|---|---|
| **From:** | acknowledgments@nationalcreditsystems.com |
| **To:** | Alas Over Lowry <alas@connorgroup.com> |
| **Date:** | Tue, 22 Dec 2020 10:26:51 +0000 |
| **Attachments:** | NewBiz Acknowledgment Client 54089 12-22-2020.PDF (6.02 kB) |

Dear Valued Client,

Please find the attached Account Acknowledgement Report.

This report contains a list of the collection accounts recently placed with our agency. It is of critical importance that NCS pursues recovery on verifiably correct account balances from the parties who are legally responsible. It is important that you review this report to confirm the accuracy of the information in our system and retain for future reference. If any of the information contained in this report does not look to be accurate, please contact our office as soon as possible so we may update our records.

We appreciate your business and look forward to serving your future collection needs.

Sincerely,

Your collection team at National Credit Systems, Inc.

404-629-9595 or 800-367-1050

TCG000072_0001

# National Credit Systems, Inc.
## New Business Acknowledgment Report

**Date:** 12/22/2020
**Time:** 05:26:51 AM
**Page:** 1

**ALAS OVER LOWERY APTS /**

82 N Uinta Way ofc
Denver, CO 80230

**Client No:**  54089
**Rate:**  ████

Please review the information below and confirm the accuracy of the amounts being submitted for collection.
It is of critical importance that NCS pursues recovery on verifiably correct account balances only from the parties
who are legally responsible. NCS must be informed immediately if a former resident is represented by an attorney,
has filed bankruptcy, or if any adjustments to the account are necessary.
** Indicates the account cannot be reported to credit bureaus, as it is missing the consumer's social security number AND date of birth.

| Name | Your Acct # | Amount Placed | Remarks | Our ID # |
|------|------------|---------------|---------|----------|
| REDACTED | 207 | $17,988.00 | | 4510686 |
| MILLER,ZEPHERINE | 102 | $25,788.00 | | 4510687 |
| **Totals:** | 2 | $43,776.00 | | |

TCG000073_0001

# EXHIBIT "A-3"

**Account Demographics & TALs**

<span style="color:red">CONFIDENTIAL</span>

Date: 09/19/2023
Time: 10:08:14
Page: 1 of 1

---

Client Account #: **102**

Account ID: **4510687**

SSN: ███████

Client : ALAS OVER LOWERY APTS / CONNOR

**MILLER ZEPHERINE**
**14078 NE 4TH ST**
**CHOCTAW OK 73020-**

| | | | |
|---|---|---|---|
| Amount Placed: $9670.50 | Last Payment : | Date Placed: 12/21/2020 | Current |
| Amount Collected: $0.00 | Current Status: AATT | Last Worked: 02/17/2022 | Phone: (405) 590-6390 |
| Current Balance: $9670.50 | Strategy: PH1 | Last Letter: 02/03/2023 | |

---

12/21/2020 05:20:21 PM (CMT) web placement
12/21/2020 05:29:31 PM (CMT) ZEPHERINE MILLER LexisNexis Banko Bankruptcy/Deceased Requests requested.
12/28/2020 04:49:45 PM (MWC1) 1.3 Letter Sent to ZEPHERINE MILLER at 8489 E LOWRY BLVD  DENVER CO 80230
12/29/2020 07:57:28 PM (166) ZEPHERINE MILLER Tel Res. (405) 590-6390 Current Residence  Left Message with VOICE MAIL RECORDER.
12/30/2020 02:01:42 PM (165) ZEPHERINE MILLER  Account info changed:
01/14/2021 07:51:45 PM (166) ZEPHERINE MILLER Tel Res. (405) 590-6390 Current Residence  Left Message with VOICE MAIL RECORDER.
01/20/2021 03:39:55 PM (166) ZEPHERINE MILLER Tel Res. (405) 590-6390 Current Residence  Left Message with VOICE MAIL RECORDER.
01/29/2021 04:03:13 PM (RVS) ZEPHERINE MILLER NCOASource NCOA Source Requests requested.
02/02/2021 04:55:26 PM (MWC1) 2.0 Letter Sent to ZEPHERINE MILLER at 8489 E LOWRY BLVD  DENVER CO 80230
02/22/2021 08:56:58 AM (RVS) ZEPHERINE MILLER NCOASource NCOA Source Requests requested.
02/25/2021 05:40:34 AM (*EOD*) ZEPHERINE MILLER Hot Follow Up Not Worked in 30 DAYS
03/02/2021 10:43:02 PM (*EOD*) Account 4510687 reported to credit bureaus.
03/11/2021 05:08:24 PM (MWC1) 3.1 Letter Sent to ZEPHERINE MILLER at 8489 E LOWRY BLVD  DENVER CO 80230
03/25/2021 05:49:04 AM (RM12) ZEPHERINE MILLER   Add address: 305 S FRIENDLY RD OKLAHOMA CITY OK 73130 added as Current Residence.
Address Removed: 8489 E LOWRY BLVD Denver CO 80230
05/04/2021 01:08:19 PM (112) ZEPHERINE MILLER Tel Res. (405) 590-6390 Current Residence  Left Message with VOICE MAIL RECORDER.
05/12/2021 10:18:20 AM (112) ZEPHERINE MILLER Tel Res. (405) 590-6390 Current Residence  Left Message with VOICE MAIL RECORDER.
05/19/2021 12:25:09 PM (112) ZEPHERINE MILLER Tel Res. (405) 590-6390 Current Residence  Left Message with VOICE MAIL RECORDER.
05/27/2021 03:00:52 PM (PRO2) ZEPHERINE MILLER Client email 71 was sent to alas@connorgroup.com,mnewman@theconnorgrp.com,.  Status changed
from  to .
05/27/2021 03:11:33 AM (PRO2) ZEPHERINE MILLER Free Hand Note: Consumer claimed inaccurate information. Dbtr stated that it was not disclosed to
him/her within the lease or upon
spking wid the leasing agent Vicki the amt of security deposit and the extra cost to take the ownership. Also,
ownership was never exchange. Debtr never lived on the premised of Alas Over Lowery. the aptment has been rented out which
Alas Over Lowery were double collecting for the same unit.dbtr provided the copies of lease and supporting docs.
Please verify the same. Also, please provide the copies of signed lease agreement and rental application.
05/31/2021 08:25:55 PM (*EOD*) Reminder to client email FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102|
:Second Request sent.
06/03/2021 02:36:02 PM (LRF) ZEPHERINE MILLER  Client email reminders cancelled.
06/04/2021 08:25:01 AM (LRF) ZEPHERINE MILLER Free Hand Note: SEE ANNA
06/09/2021 10:20:48 AM (ASF) ZEPHERINE MILLER  Client email reminders cancelled.
06/09/2021 10:21:26 AM (ASF) ZEPHERINE MILLER Received Email from Client; CLIENT Per Client: Obtained Information; From: Alas Over Lowry
[mailto:alas@connorgroup.com]
Sent: Thursday, June 03, 2021 12:16 PM
To: Legal
Subject: RE: FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102|
Hello,
Attached is a copy of the lease, application, application acknowledgement form, and utilities addendums.
Thank you,
Ben Glover
Alas Over Lowry
Operations Manager

06/09/2021 10:29:04 AM (ASF) ZEPHERINE MILLER Free Hand Note: Lease, Application, App acknowledgement form, and utilities addendum received from
client fwd to appends. Replied to client aasking for FAS.
06/09/2021 03:19:44 PM (ASF) ZEPHERINE MILLER Received Email from Client; CLIENT Per Client: Obtained Information; From: Alas Over Lowry
<alas@connorgroup.com>

---

**NCS-080**

**CONFIDENTIAL**

Account Demographics Details

---

Client Account #: **102**

Account ID: **4510687**

SSN: ▉▉▉▉▉▉▉

Client : ALAS OVER LOWERY APTS / CONNOR

**MILLER ZEPHERINE**
**14078 NE 4TH ST**
**CHOCTAW OK 73020-**

| | | |
|---|---|---|
| Amount Placed: $9670.50 | Last Payment : | Date Placed: 12/21/2020 | Current Phone: (405) 590-6390 |
| Amount Collected: $0.00 | Current Status: AATT | Last Worked: 02/17/2022 | |
| Current Balance: $9670.50 | Strategy: PH1 | Last Letter: 02/03/2023 | |

---

Sent: Wednesday, June 09, 2021 2:32 PM
To: afort@nationalcreditsystems.com
Subject: RE: FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102|
Hi Anna,
Attached is the FAS.
Thank you,
Ben Glover

06/09/2021 03:19:57 PM (ASF) ZEPHERINE MILLER  Account info changed: Status Code changed from Ò to Ò.
06/09/2021 03:20:36 PM (ASF) ZEPHERINE MILLER Free Hand Note: FAS received from client fwd to appends. Emailed FD for Letter 11 with FAS & Lease.
06/09/2021 03:21:19 PM (112) ZEPHERINE MILLER Tel Res. (405) 590-6390 Current Residence  Left Message with VOICE MAIL RECORDER.
06/11/2021 07:07:08 AM (PRO1) ZEPHERINE MILLER  Add address: 4428 ANDES WAY APT 415 DENVER CO 80249 added as Current Residence. Address Removed: 305 S FRIENDLY RD Oklahoma City OK 73130
06/18/2021 10:04:20 AM (112) ZEPHERINE MILLER Tel Res. (405) 590-6390 Current Residence  Left Message with VOICE MAIL RECORDER.
06/20/2021 04:41:11 PM (*EOD*) Account 4510687 reported to credit bureaus.
06/21/2021 04:13:25 PM (SCO) ZEPHERINE MILLER On Demand Letter: Debt Investigated CO was Sent to 4428 ANDES WAY APT 415 DENVER CO 80249.
06/25/2021 10:11:43 AM (112) ZEPHERINE MILLER Tel Res. (405) 590-6390 Current Residence  Left Message with VOICE MAIL RECORDER.
07/03/2021 10:07:07 AM (PRO2) Received escalation to Level 2 investigation: reviewed information submitted by consumer claiming inaccurate information with information supplied by client. I reviewed name, address, ssn/dob, account information, checked for accuracy and matching information. Documentation supporting the consumer's claim was provided. I'm reporting as disputed and the account will remain as active collections, unless the consumer provides other supporting information allowing us to further investigate the claim. RPC 23 – Accurate as of date reported. (Investigated by: Himanshu Kumar1)
07/05/2021 05:26:26 AM (PRO2) Received escalation to Level 2 investigation: reviewed information submitted by consumer claiming this is not his/hers with information supplied by client. I reviewed the name, address, ssn/dob, account information, checked for accuracy and matching information. Documentation supporting the consumer's claim was provided. I'm reporting the account as disputed and an active collection account based on the matching information provided by our client. RPC 23 – Accurate as of date reported. (Investigated by: Himanshu Kumar1)
07/06/2021 11:59:57 AM (112) ZEPHERINE MILLER Tel Res. (405) 590-6390 Current Residence  Left Message with VOICE MAIL RECORDER.
07/13/2021 01:54:08 PM (112) ZEPHERINE MILLER Tel Res. (405) 590-6390 Current Residence  Left Message with VOICE MAIL RECORDER.
07/21/2021 05:18:22 PM (112) ZEPHERINE MILLER Tel Res. (405) 590-6390 Current Residence  Left Message with VOICE MAIL RECORDER.
07/29/2021 03:38:10 PM (112) ZEPHERINE MILLER Tel Res. (405) 590-6390 Current Residence  Left Message with VOICE MAIL RECORDER.
08/05/2021 04:23:47 PM (112) ZEPHERINE MILLER Tel Res. (405) 590-6390 Current Residence  Left Message with VOICE MAIL RECORDER.
08/06/2021 01:54:14 PM (ARH) ZEPHERINE MILLER Marked account 4510687 for CBR dispute. Account investigation commenced
08/06/2021 01:54:18 PM (ARH) ZEPHERINE MILLER Client email 71 was sent to mnewman@theconnorgrp.com,.  Status changed from  to .
08/06/2021 02:05:43 PM (ARH) ZEPHERINE MILLER Free Hand Note: r.l Certified Dispute - verify balance owed, review accl rent
Ms. Miller is continuing to dispute the debt. Zepherine claims she never received possesion of the property because she wasn't made aware of the security deposit. Please review the attached dispute along with your records and confirm if the balance listed is correct or should be revised. If the apartment was re-rented during this period, please send a revised statement for correct amount currently owed.
08/06/2021 09:30:05 PM (LRF) ZEPHERINE MILLER  Client email reminders cancelled.
08/11/2021 09:46:48 AM (LRF) ZEPHERINE MILLER Free Hand Note:
From: Alas Over Lowry [mailto:alas@connorgroup.com]
Sent: Tuesday, August 10, 2021 8:31 PM
To: Legal
Subject: RE: FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102|
Hello,
Zepherine was well aware of what the security deposit could be. She was also well aware that when signing the lease which was explained as a legally binding document that she would be responsible for the lease. Attached are copies of the lease, application acknowledgement form, application, ledger, and

**NCS-081**

**CONFIDENTIAL**

**Account Demographics & TIALs**

Date: 09/19/2023
Time: 10:08:14
Page: 3 of 1

---

Client Account #: **102**

Account ID: **4510687**

SSN: ███████

Client : ALAS OVER LOWERY APTS / CONNOR

**MILLER ZEPHERINE**
**14078 NE 4TH ST**
**CHOCTAW OK 73020-**

| | | | |
|---|---|---|---|
| Amount Placed: $9670.50 | Last Payment : | Date Placed: 12/21/2020 | Current |
| Amount Collected:   $0.00 | Current Status: AATT | Last Worked: 02/17/2022 | Phone:  (405) 590-6390 |
| Current Balance: $9670.50 | Strategy: PH1 | Last Letter: 02/03/2023 | |

---

utilities addendum.
Thank you,
Ben Glover

08/11/2021 09:47:18 AM (LRF) ZEPHERINE MILLER Free Hand Note: emailing client to verify the unit has not been re-rented
08/16/2021 02:58:55 PM (LRF) ZEPHERINE MILLER Free Hand Note: From: Alas Over Lowry [mailto:alas@connorgroup.com]
Sent: Friday, August 13, 2021 9:52 PM
To: rwilbert@nationalcreditsystems.com
Subject: RE: FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102|
Hello,
The unit has been re-rented.
Thank you,
Ben Glover

08/16/2021 03:01:03 PM (LRF) ZEPHERINE MILLER Free Hand Note: emailng fd to send 11,fas and lease
08/16/2021 03:01:16 PM (LRF) ZEPHERINE MILLER  Account info changed: Status Code changed from Ò to Ò.
08/16/2021 03:22:24 PM (112) ZEPHERINE MILLER Other Called in Obtained info.
08/18/2021 04:03:10 PM (SCO) ZEPHERINE MILLER  Account info changed: Changed Hot Letter from Ò to Ò
08/18/2021 06:29:17 PM (MWC1) 11 Letter Sent to ZEPHERINE MILLER at 4428 ANDES WAY APT 415 DENVER CO 80249
08/27/2021 10:04:08 AM (112) ZEPHERINE MILLER Tel Res. (405) 590-6390 Current Residence  Left Message with VOICE MAIL RECORDER.
09/10/2021 10:59:21 AM (112) ZEPHERINE MILLER Tel Res. (405) 590-6390 Current Residence  Left Message with VOICE MAIL RECORDER.
09/21/2021 11:05:19 AM (112) ZEPHERINE MILLER Tel Res. (405) 590-6390 Current Residence  Left Message with VOICE MAIL RECORDER.
09/21/2021 11:21:57 AM (112) ZEPHERINE MILLER Other Called in Obtained info. spoke to slr - will reverify the balance
09/21/2021 11:22:15 AM (SLR) ZEPHERINE MILLER Client email 71 was sent to alas@connorgroup.com,.  Status changed from  to .
09/21/2021 11:22:34 AM (SLR) ZEPHERINE MILLER Free Hand Note: ACCELERATED RENT-It appears the former resident is being charged for accelerated rent. If the apartment was re-rented during this period, please send a revised statement for the current amount owed.
09/25/2021 09:33:01 AM (*EOD*) Reminder to client email FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102| :Second Request sent.
09/28/2021 04:57:54 PM (LRF) ZEPHERINE MILLER  Client email reminders cancelled.
09/29/2021 09:58:18 AM (LRF) ZEPHERINE MILLER Free Hand Note: see lynn
10/19/2021 04:46:41 PM (RAE) ZEPHERINE MILLER Emailed Client; From: rellington@nationalcreditsystems.com <rellington@nationalcreditsystems.com>
Sent: Tuesday, October 19, 2021 4:45 PM
To: 'lwilliams@nationalcreditsystems.com' <lwilliams@nationalcreditsystems.com>
Subject: Zepherine Miller / 4510687
Hi Lynn,
The above former resident is in dispute.I wanted to know if you heard from the property before I call them.
Thank you,

10/20/2021 09:53:01 AM (YLW) ZEPHERINE MILLER  Account info changed: Changed Amount Placed.
10/20/2021 09:54:58 AM (YLW) Adjustment Posted in the amount of: 16,117.50.
Applied to Account: 4510687
10/20/2021 09:55:42 AM (YLW) ZEPHERINE MILLER Received Email from Client; VICKI GETZ Per Client: Special Instructions Received; From: Alas Over Lowry <alas@connorgroup.com>
Sent: Tuesday, September 28, 2021 3:03 PM
To: legal@nationalcreditsystems.com
Subject: RE: FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102| :Second Request
Good Afternoon,

**NCS-082**

**CONFIDENTIAL**

Account Demographics & Notes

| | |
|---|---|
| Client Account #: **102** | **MILLER ZEPHERINE** |
| Account ID: **4510687** | **14078 NE 4TH ST** |
| SSN: ▓▓▓▓▓▓ | **CHOCTAW OK 73020-** |

Client : ALAS OVER LOWERY APTS / CONNOR

| | | | |
|---|---|---|---|
| Amount Placed: $9670.50 | Last Payment : | Date Placed: 12/21/2020 | Current Phone: (405) 590-6390 |
| Amount Collected: $0.00 | Current Status: AATT | Last Worked: 02/17/2022 | |
| Current Balance: $9670.50 | Strategy: PH1 | Last Letter: 02/03/2023 | |

Attached is the updated Final Account Statement with the adjusted amount owed.
Thank you,
Vicki Getz

10/20/2021 09:56:14 AM (YLW) ZEPHERINE MILLER Free Hand Note: sent Revised FAS and 12
10/20/2021 09:56:30 AM (YLW) ZEPHERINE MILLER On Demand Letter: Debt Adjusted CO was Sent to 4428 ANDES WAY APT 415 DENVER CO 80249.
10/20/2021 09:56:49 AM (YLW) ZEPHERINE MILLER  Account info changed: Status Code changed from Ò to Ò.
10/20/2021 10:01:55 AM (RAE) ZEPHERINE MILLER Emailed Client; Good morning Regina,
Yes and this has been completed.

Thank you,


Lynn Williams | Clerical Manager

10/20/2021 11:02:20 AM (112) ZEPHERINE MILLER Tel Res. (405) 590-6390 Current Residence  Left Message with VOICE MAIL RECORDER.
10/29/2021 05:51:01 PM (112) ZEPHERINE MILLER Tel Res. (405) 590-6390 Current Residence  Left Message with VOICE MAIL RECORDER.
11/19/2021 11:33:55 AM (112) ZEPHERINE MILLER Tel Res. (405) 590-6390 Current Residence  Left Message with VOICE MAIL RECORDER.
12/03/2021 04:04:08 PM (112) ZEPHERINE MILLER Tel Res. (405) 590-6390 Current Residence  Left Message with VOICE MAIL RECORDER.
12/13/2021 05:10:55 PM (112) ZEPHERINE MILLER Tel Res. (405) 590-6390 Current Residence  Left Message with VOICE MAIL RECORDER.
12/21/2021 11:07:22 AM (112) ZEPHERINE MILLER Tel Res. (405) 590-6390 Current Residence  Left Message with VOICE MAIL RECORDER.
12/31/2021 04:28:06 PM (112) ZEPHERINE MILLER Tel Res. (405) 590-6390 Current Residence  Left Message with VOICE MAIL RECORDER.
01/12/2022 03:49:58 PM (112) ZEPHERINE MILLER Tel Res. (405) 590-6390 Current Residence  Left Message with VOICE MAIL RECORDER.
01/31/2022 02:09:03 PM (JBL) ZEPHERINE MILLER TLO TLO Skip Outgoing requested.
02/01/2022 12:11:37 PM (MWC1) 6 Letter Sent to ZEPHERINE MILLER at 4428 ANDES WAY APT 415 DENVER CO 80249
02/01/2022 05:08:47 PM (112) ZEPHERINE MILLER Tel Res. (405) 590-6390 Current Residence  Left Message with VOICE MAIL RECORDER.
02/10/2022 12:06:10 PM (112) ZEPHERINE MILLER Tel Res. (405) 590-6390 Current Residence  Left Message with VOICE MAIL RECORDER.
02/17/2022 02:47:23 PM (112) ZEPHERINE MILLER Tel Res. (405) 590-6390 Current Residence  Left Message with VOICE MAIL RECORDER.
03/25/2022 05:44:47 AM (*EOD*) ZEPHERINE MILLER Hot Follow Up Not Worked in 30 DAYS
03/26/2022 05:12:14 AM (*EOD*) ZEPHERINE MILLER Phase 2 Right Party Contacted Move to House
02/02/2023 04:57:22 PM (JBL) ZEPHERINE MILLER TLO TLO Skip Outgoing requested.
02/03/2023 07:23:44 AM (RVS) TLO sent new address.
02/03/2023 08:49:58 AM (STW) 6 Letter Sent to ZEPHERINE MILLER at 14078 NE 4TH ST  CHOCTAW OK 73020
04/14/2023 03:06:55 AM (PRO4) ZEPHERINE MILLER Client email 71 was sent to alas@connorgroup.com,. Status changed from  to .
04/14/2023 03:07:31 AM (PRO4) ZEPHERINE MILLER Free Hand Note: E-oscar dispute-
The former resident is disputing the debt. Please review the attached dispute along with your records and confirm if the debtor owes the balance. Also, please verify the balance and confirm if the charges being assessed are correct or if the balance should be revised.
04/18/2023 08:16:00 PM (*EOD*) Reminder to client email FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102| :Second Request sent.
04/19/2023 02:32:15 PM (LRF) ZEPHERINE MILLER  Client email reminders cancelled.
04/20/2023 01:39:21 PM (RM2) ZEPHERINE MILLER Free Hand Note: From: Alas Over Lowry <alas@connorgroup.com>
Sent: Wednesday, April 19, 2023 2:29 PM
To: legal@nationalcreditsystems.com
Subject: RE: FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102| :Second Request
Hello,
This is correct this former resident does owes this amount according to our records.
Thank you,

**NCS-083**

**CONFIDENTIAL**

**Account Demographics & Nars**

| | |
|---|---|
| Client Account #: **102** | **MILLER ZEPHERINE** |
| Account ID: **4510687** | **14078 NE 4TH ST** |
| SSN: ▓▓▓▓▓▓ | **CHOCTAW OK 73020-** |

Client : ALAS OVER LOWERY APTS / CONNOR

| | | |
|---|---|---|
| Amount Placed: $9670.50 | Last Payment : | Date Placed: 12/21/2020 | Current |
| Amount Collected:   $0.00 | Current Status: AATT | Last Worked: 02/17/2022 | Phone:   (405) 590-6390 |
| Current Balance: $9670.50 | Strategy: PH1 | Last Letter: 02/03/2023 | |

---

Caiti Kopp

04/20/2023 01:43:50 PM (RM2) ZEPHERINE MILLER Free Hand Note: Received email from client, debt verified
04/20/2023 01:44:20 PM (RM2) ZEPHERINE MILLER  Account info changed: Status Code changed from Ò to Ò.
04/21/2023 05:42:03 AM (RM2) ZEPHERINE MILLER Free Hand Note: Emailed client to send ledger
04/21/2023 05:42:31 AM (RM2) ZEPHERINE MILLER Free Hand Note: Received email fromclient, docs frwded to appends ;
Hello,
Here is the ledger from our records.
Thank you,

04/26/2023 09:29:19 AM (PRO1) Received escalation to Level 2 investigation: reviewed information submitted by consumer claiming inaccurate information with information supplied by client. I reviewed name, address, ssn/dob, account information, checked for accuracy and matching information. Documentation supporting the consumer's claim was provided. I'm reporting as disputed and the account will remain as active collections, unless the consumer provides other supporting information allowing us to further investigate the claim. RPC 23 – Accurate as of date reported.
(Investigated by: Himanshu Kumar1)
05/01/2023 06:33:40 AM (PRO1) Received escalation to Level 2 investigation: reviewed information submitted by consumer disputing balance or amount past due with information supplied by client. I reviewed name, address, ssn/dob, account information, checked for accuracy and matching information. Documentation supporting the consumer's claim was provided. I'm reporting as disputed and the account will remain as active collections, unless the consumer provides supporting information allowing us to further investigate the claim. RPC 23 – Accurate as of date reported.

(Investigated by: Himanshu Kumar1)
05/29/2023 03:34:05 AM (PRO1) I received assignment of consumer dispute and claim of not his/hers. I have reviewed the consumer's claim and the information provided to us. During my investigation, I compared the name, ssn/dob, and address with our information on file. No documentation supporting the consumer's claim was provided. I'm reporting the account as disputed and an active collection account based on the matching information provided by our client. RPC 23 - Updated account information unrelated to dispute.(Investigated by: Manmohan Thakur)
05/29/2023 03:34:12 AM (PRO1) I received assignment of consumer dispute and claim of incorrect balance. I have reviewed the claim and the information provided by the consumer. In my investigation, I reviewed the itemization of charges provided by our client, payment information, balance in our system, documentation on file, and Windebt data. I verified name, ssn/dob, and address with our information on file. No documentation supporting the consumer's claim was provided. I'm reporting as disputed and the account will remain as active collections, unless the consumer provides supporting information allowing us to further investigate the claim. RPC 23 - Updated account information unrelated to dispute.
(Investigated by: Manmohan Thakur)
09/19/2023 10:06:16 AM (KLM) ZEPHERINE MILLER  Account info changed:
09/19/2023 10:06:28 AM (KLM) ZEPHERINE MILLER  Account info changed:
09/19/2023 10:06:40 AM (KLM) ZEPHERINE MILLER Free Hand Note: ***ALERT LAWSUIT RECEIVED***

---

# NCS-084

**Property of National Credit Systems, Inc. - Confidential**

# EXHIBIT "A-4"

| ACDVREQ_CRA_ACDV_CONTROL_NUM | ACDVREQ_ACCT_NUM | ACDVREQ_SUBSCRIBER_CODE | ACDVRESP_RESPONSE_DATE_TIME |
|---|---|---|---|
| 1.00E+17 | 4510687 | 401YC19990 | 6/11/2021 7:08 |
| 3.92E+12 | 4510687 | 2980803 | 6/11/2021 7:55 |
| 3.67E+14 | 4510687 | 1GVJ001 | 7/2/2021 5:54 |
| 2.13957E+12 | 4510687 | 2980803 | 4/24/2023 9:23 |
| 3.66972E+14 | 4510687 | 1GVJ001 | 4/28/2023 9:30 |
| 9.99931E+16 | 4510687 | 401YC19990 | 5/26/2023 20:39 |
| 3.66972E+14 | 4510687 | 1GVJ001 | 5/27/2023 15:55 |

**NCS-085**

| ACDVREQ_LAST_NAME | ACDVREQ_FIRST_NAME | ACDVREQ_MIDDLE_NAME | ACDVRESP_LAST_NAME | ACDVRESP_FIRST_NAME |
|---|---|---|---|---|
| MILLER | ZEPHERINE | | MILLER | ZEPHERINE |
| MILLER | ZEPHERINE | | MILLER | ZEPHERINE |
| MILLER | ZEPHERINE | MARIE | MILLER | ZEPHERINE |
| MILLER | ZEPHERINE | | | |
| MILLER | ZEPHERINE | MARIE | | |
| MILLER | ZEPHERINE | | | |
| MILLER | ZEPHERINE | MARIE | | |

**NCS-086**

| ACDVRESP_MIDDLE_NAME | ACDVREQ_STREET | ACDVREQ_CITY | ACDVREQ_STATE | ACDVREQ_ZIP | ACDVRESP_STREET |
|---|---|---|---|---|---|
| | 4428 ANDES WAY APT 415 | DENVER | CO | 80249 | 305 S FRIENDLY RD |
| | 4428 ANDES WAY | DENVER | CO | 80249 | |
| | 4428 ANDES WAY | DENVER | CO | 802496583 | |
| | 14078 NE 4TH STREET | CHOCTAW | OK | 73020 | |
| | 14078 NE 4TH ST | CHOCTAW | OK | 73020-4600 | |
| | 14078 NE 4TH ST | CHOCTAW | OK | 73020 | |
| | 14078 NE 4TH ST | CHOCTAW | OK | 73020-4600 | |

**NCS-087**

| ACDVRESP_CITY | ACDVRESP_STATE | ACDVRESP_ZIP | ACDVREQ_PREVIOUS_LAST_NAME | ACDVREQ_PREVIOUS_FIRST_NAME |
|---|---|---|---|---|
| Oklahoma City | OK | 73130 | | |
| | | | MILLER | ZEPHERINE |
| | | | MILLER | ZEPHERINE |
| | | | MILLER | ZEPHERINE |

**NCS-088**

| ACDVREQ_PREVIOUS_MIDDLE_NAME | ACDVRESP_PREVIOUS_LAST_NAME | ACDVRESP_PREVIOUS_FIRST_NAME |
| --- | --- | --- |
| M | | |
| M | | |
| M | | |

ACDVRESP_PREVIOUS_MIDDLE_NAME       ACDVREQ_PREVIOUS_STREET       ACDVREQ_PREVIOUS_CITY       ACDVREQ_PREVIOUS_STATE
                                    305 S FRIENDLY RD             OKLAHOMA CITY               OK

**NCS-090**

| ACDVREQ_PREVIOUS_ZIP | ACDVREQ_SSN | ACDVRESP_SSN | ACDVREQ_TEL_NUM | ACDVRESP_TEL_NUM |
|---|---|---|---|---|
| 73130 | ███████████████████████████████████ | | | |
| | ███████████████████████████████████ | | | |
| | ██████████████████████████ | | | |
| | ████ | | | |
| | █████████████████ | | | |
| | ████ | | | |
| | █████████████████ | | | |

**NCS-091**

| ACDVREQ_SECOND_PREVIOUS_STREET | ACDVREQ_SECOND_PREVIOUS_CITY | ACDVREQ_SECOND_PREVIOUS_STATE |
|---|---|---|
| 8489 E LOWRY BLVD | DENVER | CO |
| 1955 ULSTER ST APT 415 | DENVER | CO |

**NCS-092**

| ACDVREQ_SECOND_PREVIOUS_ZIP | ACDVREQ_DISPUTE_CODE_1 | ACDVREQ_DISPUTE_CODE_2 |
|---|---|---|
| 80230 | 112 | |
| | 112 | |
| 802202093 | 1 | 111 |
| | 112 | |
| | 118 | 110 |
| | 1 | |
| | 118 | 110 |

**NCS-093**

| ACDVREQ_FCRA_RELV_INFO | ACDVREQ_ACCT_STATUS_CODE | ACDVREQ_PAYMENT_RATING_CODE |
|---|---|---|
| IMAGE ATTACHED | 93 | |
| ||||||||||||||||||||||||| | 93 | |
| Unable to authenticate documentation dated 11 28 2020 | 93 | |
| | 93 | |
| Unable to authenticate documentation undated | 93 | |
| CONSUMER STATES ACCOUNT NOT MINE | 93 | |
| Consumer says information and balance is inaccurate | 93 | |

**NCS-094**

| ACDVREQ_MANNER_OF_PAYMENT_CODE | ACDVREQ_CONDITION_CUM_STATUS | ACDVREQ_DATE_OPENED_DAY |
|---|---|---|
| CD | | 22 |
| | / COLL ACCT | 22 |
| | | 22 |
| | | 22 |
| | | 22 |
| | | 22 |
| | | 22 |

| ACDVREQ_DATE_OPENED_MONTH | ACDVREQ_DATE_OPENED_YEAR | ACDVREQ_CURRENT_BALANCE | ACDVREQ_AMOUNT_PAST_DUE |
|---|---|---|---|
| 1 | 2021 | 25788 | |
| 1 | 2021 | 25788 | 25788 |
| 1 | 2021 | 25788 | 25788 |
| 1 | 2021 | 9670 | |
| 1 | 2021 | 9670 | |
| 1 | 2021 | 9670 | |
| 1 | 2021 | 9670 | |

**NCS-096**

| ACDVREQ_HIGH_CREDIT_ORIG_AMT | ACDVREQ_CREDIT_LIMIT | ACDVREQ_ORIG_CHARGE_OFF_AMT | ACDVRESP_ACCT_STATUS_CODE |
|---:|---|---|---|
| 25788 | | | |
| 25788 | | | |
| 25788 | | | |
| 9670 | | | |
| 9670 | | | |
| 9670 | | | |
| 9670 | | | |

**NCS-097**

| ACDVRESP_PAYMENT_RATING_CODE | ACDVRESP_DATE_OPENED_DAY | ACDVRESP_DATE_OPENED_MONTH |
|---|---|---|
| | 21 | 12 |
| | 21 | 12 |
| | 21 | 12 |

**NCS-098**

| ACDVRESP_DATE_OPENED_YEAR | ACDVRESP_CURRENT_BALANCE | ACDVRESP_AMOUNT_PAST_DUE |
|---|---|---|
| 2020 | 25788 | 25788 |
| 2020 | | |
| 2020 | | |
| | | 9670 |
| | | 9670 |
| | | 9670 |

**NCS-099**

| ACDVRESP_HIGH_CREDIT_ORIG_AMT | ACDVRESP_CREDIT_LIMIT | ACDVRESP_ORIG_CHARGE_OFF_AMT | ACDVREQ_ACCT_TYPE_CODE |
|---|---|---|---|
| | | | 48 |
| | | | 48 |
| | | | 48 |
| | | | 48 |
| | | | 48 |
| | | | 48 |
| | | | 48 |

**NCS-100**

| ACDVREQ_PORTFOLIO_TYPE_CODE | ACDVREQ_TERM_DURATION_CODE | ACDVREQ_TERM_FREQ_CODE | ACDVREQ_ACTIVITY_DATE_DAY |
|---|---|---|---|
| | | | 12 |
| | | 1 | 20 |
| O | | | 20 |
| | | 1 | |

**NCS-101**

| ACDVREQ_ACTIVITY_DATE_MONTH | ACDVREQ_ACTIVITY_DATE_YEAR | ACDVREQ_DATE_CLOSED | ACDVREQ_DATE_OF_LAST_PAYMENT |
|---|---|---|---|
| 5 | 2021 | | |
| 5 | 2021 | | |
| 5 | 2021 | | |
| | | | 10/20/2021 0:00 |
| | | | 10/20/2021 0:00 |
| | | | 10/20/2021 0:00 |
| | | | 10/20/2021 0:00 |

**NCS-102**

| ACDVREQ_SCHD_MONTHLY_PAYMENT | ACDVREQ_ECOA_CODE | ACDVREQ_FCRA_1ST_DATE_DELINQ | ACDVRESP_ACCT_TYPE_CODE |
|---|---|---|---|
| | 1 | 11/27/2020 0:00 | |
| | 1 | | 48 |
| | 1 | 11/27/2020 0:00 | |
| | 1 | | |
| | 1 | 11/27/2020 | |
| | 1 | 11/27/2020 | |
| | 1 | 11/27/2020 | |

**NCS-103**

ACDVRESP_PORTFOLIO_TYPE_CODE        ACDVRESP_TERM_DURATION_CODE        ACDVRESP_TERM_FREQ_CODE

O

O

**NCS-104**

| ACDVRESP_ACTIVITY_DATE_DAY | ACDVRESP_ACTIVITY_DATE_MONTH | ACDVRESP_ACTIVITY_DATE_YEAR | ACDVRESP_DATE_CLOSED |
|---|---|---|---|
| 11 | 6 | 2021 | |
| 11 | 6 | 2021 | |
| 2 | 7 | 2021 | |

**NCS-105**

ACDVRESP_DATE_OF_LAST_PAYMENT        ACDVRESP_SCHED_MONTHLY_PMT_AMT        ACDVRESP_ECOA_CODE

| ACDVRESP_FCRA_1ST_DATE_DELINQ | ACDVREQ_COMPL_CONDITION_CODE | ACDVREQ_SPECIAL_COMMENT_CODE |
|---|---|---|
| 11/27/2020 7:55 | | |
| | XB | |
| | XB | |
| | XB | |
| | XB | |

**NCS-107**

| ACDVREQ_CONS_INFO_IND_CODE | ACDVREQ_ORIG_CREDITOR_NAME | ACDVREQ_CREDITOR_CLASS |
|---|---|---|
| | ALAS OVER LOWERY APTS | 9 |
| | ALAS OVER LOWERY APTS | 9 |
| | ALAS OVER LOWERY APTS | 9 |
| | ALAS OVER LOWERY APTS | 9 |
| | ALAS OVER LOWERY APTS | 9 |
| | ALAS OVER LOWERY APTS | 9 |
| | ALAS OVER LOWERY APTS | 9 |

**NCS-108**

ACDVREQ_SPECIAL_PAY_IND_CODE        ACDVREQ_DEFER_PAY_START_DATE        ACDVREQ_PAYMENT_DUE_DATE

**NCS-109**

ACDVREQ_PAYMENT_AMOUNT        ACDVRESP_COMPL_CONDITION_CODE        ACDVRESP_SPECIAL_COMMENT_CODE

**NCS-110**

ACDVRESP_CONS_INFO_IND_CODE        ACDVRESP_ORIG_CREDITOR_NAME        ACDVRESP_CREDITOR_CLASS

ACDVRESP_SPECIAL_PAY_IND_CODE          ACDVRESP_DEFER_PMT_START_DATE          ACDVRESP_PAYMENT_DUE_DATE

**NCS-112**

ACDVRESP_PAYMENT_AMOUNT        ACDVREQ_AGENCY_ID      ACDVREQ_SEC_MKT_AGCY_ACCT_NUM        ACDVREQ_MORTGAGE_ID_NUM

**NCS-113**

ACDVRESP_AGENCY_ID     ACDVRESP_SEC_MKT_AGCY_ACCT_NUM     ACDVRESP_MORTGAGE_ID_NUM

**NCS-114**

ACDVREQ_ACTUAL_PAYMENT_AMOUNT        ACDVREQ_PORTFOLIO_IND        ACDVREQ_PURCHASED_PORTFOLIO        ACDVREQ_REMARKS_CODE

**NCS-115**

ACDVRESP_FST_ASSO_CONS_LSTNAME          ACDVRESP_FST_ASSO_CONS_FSTNAME          ACDVRESP_FST_ASSO_CONS_MIDNAME

**NCS-116**

ACDVRESP_SEC_ASSO_CONS_LSTNAME          ACDVRESP_SEC_ASSO_CONS_FSTNAME          ACDVRESP_SEC_ASSO_CONS_MIDNAME

**NCS-117**

ACDVRESP_FST_ASSO_CONS_STREET        ACDVRESP_FST_ASSO_CONS_CITY        ACDVRESP_FST_ASSO_CONS_STATE

**NCS-118**

ACDVRESP_FST_ASSO_CONS_ZIP        ACDVRESP_SEC_ASSO_CONS_STREET        ACDVRESP_SEC_ASSO_CONS_CITY

**NCS-119**

ACDVRESP_SEC_ASSO_CONS_STATE          ACDVRESP_SEC_ASSO_CONS_ZIP          ACDVRESP_FST_ASSO_CONS_SSN

**NCS-120**

ACDVRESP_SEC_ASSO_CONS_SSN          ACDVRESP_FST_ASSO_CONS_DOB_DAY          ACDVRESP_FST_ASSO_CONS_DOB_MTH

ACDVRESP_FST_ASSO_CONS_DOB_YR          ACDVRESP_SEC_ASSO_CONS_DOB_DAY          ACDVRESP_SEC_ASSO_CONS_DOB_MTH

**NCS-122**

ACDVRESP_SEC_ASSO_CONS_DOB_YR     ACDVRESP_FST_ASSO_CONS_TEL_NUM     ACDVRESP_SEC_ASSO_CONS_TEL_NUM

**NCS-123**

ACDVRESP_FST_ASSO_CONS_ECOA_CD          ACDVRESP_FST_ASSO_CONS_INF_IND          ACDVRESP_SEC_ASSO_CONS_ECOA_CD

**NCS-124**

ACDVRESP_SEC_ASSO_CONS_INF_IND        ACDVREQ_SEVEN_YEAR_PAY_HIST

-------------------------------------------------------------------------------

GG-----------------------------------------------------------------------------

-------------------------------------------------------------------------------

**NCS-125**

| ACDVRESP_SEVEN_YEAR_PAY_HIST | ACDVRESP_VERIFY_LAST_NAME |
|---|---|
| ------------------------------------------------------------------------------- | 2 |
| ------------------------------------------------------------------------------- | 2 |
| ------------------------------------------------------------------------------- | 2 |

**NCS-126**

| ACDVRESP_VERIFY_FIRST_NAME | ACDVRESP_VERIFY_MIDDLE_NAME | ACDVRESP_VERIFY_PREV_LAST_NAME |
|---|---|---|
| 2 | 3 | 3 |
| 2 | | |
| 2 | 3 | 3 |

**NCS-127**

| ACDVRESP_VERIFY_PREV_FST_NAME | ACDVRESP_VERIFY_PREV_MID_NAME | ACDVRESP_VERIFY_ADDRESS |
|---|---|---|
| 3 | 3 | 1 |
| | | 2 |
| 3 | 3 | 2 |

**NCS-128**

| ACDVRESP_VERIFY_DATE_OF_BIRTH | ACDVRESP_VERIFY_TELEPHONE_NUM | ACDVRESP_VERIFY_SSN | ACDVREQ_GENERATION_CODE |
|---|---|---|---|
| 2 | 1 | 2 |
| 2 | 1 | 2 |
| 2 | 2 | 2 |

**NCS-129**

| ACDVRESP_GENERATION_CODE | ACDVRESP_VERIFY_GEN_CODE | ACDVREQ_DATE_OF_BIRTH_DAY | ACDVREQ_DATE_OF_BIRTH_MONTH |
|---|---|---|---|
| | | 3 | 24 | 10 |
| | | | 24 | 10 |
| | | 3 | 24 | 10 |
| | | | 24 | 10 |
| | | | 24 | 10 |
| | | | 24 | 10 |
| | | | 24 | 10 |

**NCS-130**

| ACDVREQ_DATE_OF_BIRTH_YEAR | ACDVRESP_DATE_OF_BIRTH_DAY | ACDVRESP_DATE_OF_BIRTH_MONTH |
|---|---|---|
| 1979 | | |
| 1979 | | |
| 1979 | | |
| 1979 | | |
| 1979 | | |
| 1979 | | |
| 1979 | | |

**NCS-131**

| ACDVRESP_DATE_OF_BIRTH_YEAR | ACDVRESP_ACDVRESPONSE_CODE | ACDVREQ_RESPONSE_DUE_DATE |
|---|---|---|
| | 23 | 6/12/2021 0:00 |
| | 23 | 6/18/2021 0:00 |
| | 23 | 7/5/2021 0:00 |
| | 23 | 4/26/2023 0:00 |
| | 23 | 4/30/2023 0:00 |
| | 23 | 6/16/2023 0:00 |
| | 23 | 6/19/2023 0:00 |

**NCS-132**

ACDVRESP_DF_CONTACT_TEL_NUM          ACDVRESP_ACTUAL_PAYMENT_AMOUNT          ACDVRESP_PORTFOLIO_IND

**NCS-133**

ACDVRESP_PURCHASED_PORTFOLIO        ACDVRESP_PREVIOUS_STREET        ACDVRESP_PREVIOUS_CITY        ACDVRESP_PREVIOUS_STATE

**NCS-134**

| ACDVRESP_PREVIOUS_ZIP | ACDVRESP_VERIFY_PREV_ADDRESS | ACDVREQ_PREVIOUS_GEN_CODE | ACDVRESP_PREVIOUS_GEN_CODE |
|---|---|---|---|
| | | 2 | |
| | | 3 | |
| | | 3 | |

**NCS-135**

| ACDVRESP_FST_ASSO_CONS_GEN_CD | ACDVRESP_SEC_ASSO_CONS_GEN_CD | ACDVRESP_AUTHORIZED_NAME |
|---|---|---|
| | | Himanshu Kumar1 |
| | | Himanshu Kumar1 |
| | | Himanshu Kumar1 |
| | | Himanshu Kumar1 |
| | | Himanshu Kumar1 |
| | | Manmohan Thakur |
| | | Manmohan Thakur |

**NCS-136**

| ACDVREQ_DATE_CREATED | ACDVREQ_INTEREST_TYPE_IND | ACDVRESP_INTEREST_TYPE_IND | ACDVREQ_IMAGE_COUNT |
|---|---|---|---|
| 5/23/2021 19:31 | | | 1 |
| 5/26/2021 6:17 | | | 1 |
| 6/10/2021 0:00 | | | 1 |
| 4/7/2023 0:00 | | | |
| 4/6/2023 0:00 | | | |
| 5/23/2023 0:00 | | | |
| 5/24/2023 0:00 | | | |

**NCS-137**

| ACDVREQ_IMAGE_RECEIVED_COUNT | ACDV_IMAGE_IMAGE_ACCESSED | ACDV_IMAGE_IMAGE_ID | QUEUE_QUEUE_NAME |
|---|---|---|---|
| 1 | Y | 146749909 | default1012245 |
| 1 | Y | 146878599 | default1012245 |
| 1 | Y | 147569086 | default1012245 |

**NCS-138**

| ACDVREQ_DATE_REQUESTED | ORIG_CODES_ORIG_DESCRIPTION | ROW_NUM |
|---|---|---|
| 5/23/2021 22:05 | Equifax | 7378 |
| 5/26/2021 19:44 | Experian | 15317 |
| 6/11/2021 4:31 | TransUnion | 38 |
| | Experian | 79 |
| | TransUnion | 11 |
| | Equifax | 119 |
| | TransUnion | 120 |

**NCS-139**

# EXHIBIT "A-5"

DR 06/08/2021 (00TA41) 68.117268.01022039

Zepherine Miller

4428 Andes Way

Denver, CO 80249


May 8, 2021

Transunion

Dispute Department

P.O. Box 2000

Chester, PA 19016


Dear Sir or Madam


I, Zepherine Miller am writing to dispute the following information on my credit report. This item National Credit System-Alas Over Lowery is wrong due to inaccurate information was presented to me which did not provide me the opportunity to make an effective decision. It was not disclosed to me within the lease or upon speaking with the leasing agent Vicki the amount of the security deposit and the extra cost to take ownership of the apartment. Ownership was never exchange as no keys or possession of the apartment were exchanged. I never lived on the premises of Alas Over Lowery. The apartment has been rented out which Alas Over Lowery are double collecting for the same unit. This can be proven with a video of the tenant within the apartment. I am requesting that the item be removed from my credit report

Enclosed are copies of the lease and emails supporting my dispute. Please investigate this matter and remove the disputed item as soon as possible and inform me in writing of the outcome. Please send me a full copy of my credit file.

Thank you for your time and consideration


Sincerely,


Zepherine Miller

Enclosures: lease, welcome letter, and communication emails.


*Received Via E-Oscar: 7/5/2021*


**NCS-026**

DR 06/08/2021 (00TA41) 69.117268.01022039

*Received Via E-Oscar: 7/5/2021*

**NCS-027**

DR 06/08/2021 (00TA41) 69.117268.01022039

18.   VEHICLES AND PARKING: Vehicles shall be parked in designated parking spaces, carports, or garages only. Inoperable vehicles shall not be parked or stored on the premises. For purposes of this paragraph, a vehicle with one or more flat tires, expired license plate, visible exterior damage or graffiti or any inappropriate signage shall be considered inoperable. Management shall have the right to remove any vehicle left on the premises in violation of this paragraph at the expense of the owner of such vehicle. No vehicle repair work or any type, including oil changes, shall be performed on the premises. No vehicle with more than two axles shall be allowed to be parked on the premises at any time. All boats, trailers, and campers must be approved in writing by Management prior to their being parked on the premises. The number of vehicles permitted per apartment is limited to a maximum of two (2).

19.   INDEMNIFICATION FOR USE OF RECREATIONAL FACILITIES: (Applicable only if Apartment Community is equipped with corresponding facilities.) (A) In consideration of making fitness and swimming facilities available to Resident without additional charge, the Resident, his/her spouse, family members, dependants, guests, visitors and anyone else in the Apartment or on the premises of the Apartment Community with Resident's permission, shall save harmless the owner of the Apartment Community, Management and their respective partners, members, officers, agents, and employees, from any and all liability imposed by law arising out of any injury, illness, or death of any person or the damaging, theft or destruction of any property arising out of the Resident's use of the fitness and swimming facilities located on the Premises. Such facilities include but are not limited to the racquetball court, sauna, whirlpool, hot tub, swimming pool, tennis court, volleyball court, weight room, and exercise machines. (B) Resident acknowledges the potential hazards of tanning including, but not limited to: skin cancer, burns, photosensitivity, cataracts, premature skin aging, blood vessel damage and reduced immunity. Further, Resident expressly assumes the risk of such potential hazards (whether known or unknown). Resident agrees to (i) use the tanning bed only during regular office hours; (ii) to use the timer on the bed; (iii) use the bed in increments no greater than twenty (20) minutes at a time and for not more than twenty cumulative minutes in a single 24-hour period; (iv) not to permit any guests to use the bed; (v) only permit dependants 18 years or older residing with the Resident to use the bed; and (vi) to comply with such other rules and regulations as Management may from time to time require regarding usage of the tanning bed. The Resident and the Resident's spouse agree to hold the owners of the Apartment Community, Management and their respective partners, members, officers, agents, employees and assigns harmless from any liability arising out of an injury or illness arising out of Resident's, Resident's spouse, or dependant's use of the tanning bed located on the Premises. (C) Resident acknowledges and agrees that he/she is responsible for the behavior of his/her spouse, dependants, and guests when they use any recreational facility provided by Management. Resident shall require his/her spouse, dependants, guests and visitors to follow any and all rules contained in this Lease Agreement, posted in or around the facility, or otherwise provided to him/her by Management, concerning the use of recreational facilities, and shall hold Management and its respective partners, members, officers, agents, employees and assigns harmless for any liability or injury resulting from the intentional and negligent use of Apartment Community's recreational facilities by his/her spouse, family members, dependants, guests, or visitors.

20.   WATER SOFTENERS: Resident agrees not to install, or cause to be installed, any type of water softening device shall constitute Immediate grounds for termination of this Lease Agreement. The illegal installation of any type of water softening device shall constitute Immediate grounds for termination of this Lease Agreement.

21.   HALLWAYS AND OTHER COMMON AREAS: No bicycles, motorcycles, or toys shall be stored or parked in any hallway or entryway of the Apartment Community and Resident shall not place or store any item (except doormats) in any hallway, entryway, or common area of the Apartment Community. No motorcycles are allowed inside any apartment.

22.   INSURANCE: (A) Resident is required, at his/her sole cost and expense, to procure and maintain, throughout the term of this Lease Agreement and any renewal period, Renter's Insurance including fire coverage and covering claims for bodily injury and/or personal injury, including death and property damage occurring in or upon the Apartment, from the Apartment, in standard form and with an insurance carrier rated "A-" or better by A.M. Best or equivalent with said insurance carrier licensed to do business in the state where the Apartment is located. (B) Coverage with a minimum of $100,000 Combined Single Limit in respect to any one accident or occurrence is required. Each policy provided for in this section shall contain an agreement by the insurer that the policy cannot be canceled without at least thirty (30) days prior written notice to Management. Insurer and/or its agent may charge a late fee for any payments not received on a timely basis. Said late fee shall be considered the same as unpaid rent and grounds for not accepting future rental payments. (C) A Certificate of insurance evidencing Comprehensive Personal Liability Insurance shall be required and kept on file in the Apartment Community Manager's office at the time the Lease Agreement is executed. Waterbeds are permitted with proof of insurance and a copy of the Declaration page submitted to the Rental Office.

23.   DAMAGE TO PROPERTY: Resident shall personally refrain, and shall forbid his/her spouse, family members, dependants, guests, visitors, and anyone else in the Apartment or on the premises of the Apartment Community with Resident's permission, from intentionally or negligently altering, destroying, defacing, damaging or removing any part of the Apartment or Apartment Community including, but not limited to, structure, walls, flooring, glass, plumbing, wiring, fixtures, and appliances. Resident shall reimburse Management within five (5) days of demand for the cost of repairs for damage beyond ordinary wear and tear, caused intentionally or negligently by Resident, his/her family, dependants, guests, or visitors.

24.   HOLDING OVER: (A) If Resident or an approved sub lessee remains in or continues to be in possession of the Apartment or any part thereof after the termination of this Agreement, Management shall, at its option, have the right to charge Resident or sub lessee, as liquidated damages for the time that he/she remains or remains in possession, a sum equal to twice the amount of rent, or to treat such holder over as a renewal by Resident or sub lessee of the same duration as covered hereby, upon the same terms and conditions, except that Management may charge the highest renewal rate being charged for a like apartment at the time of the hold over. In the event Management elects to treat such holding over as a renewal of this Agreement, each and all terms of this Agreements, excepting only the rent charge as provided above, shall be and remain in full force and effect for the renewal term. (B) In the event no renewal is desired or if it is refused by Management, Management shall proceed to let the Apartment to another and charge Resident for any damages resulting from his/her failure to deliver possession on the date of termination, in addition to any other rights accruing to Management under law and the terms of this Agreement.

25.   NONWAIVER: Failure of Management to insist upon strict compliance with the terms of this Agreement shall not constitute a waiver of Management's right to act on any violation.

26.   REMEDIES CUMULATIVE: All remedies under this Agreement or in law or equity shall be cumulative.

27.   ATTORNEY'S FEES: In the event of (i) the employment of an attorney by Management because of a violation by Resident of any terms or conditions of this Agreement, or (ii) should Management employ an attorney and prevail in the defense of any legal action brought by Resident, Resident shall pay such attorney's fees and other costs or expenses incurred by Management in connection therewith, which shall be considered an additional fee and shall be secured hereunder.

28.   REPAIRS: Resident acknowledges and agrees that he/she accepts the Apartment "as is" and that the Apartment is in a tenantable condition. Resident agrees to keep and, at the end of the term, return the Apartment and fixtures therein in a clean and sanitary condition and in good repair. Management will make repairs to the Apartment, as required by law, with reasonable promptness after receipt of written notice from Resident. Resident agrees to immediately notify Management of any condition (a) that requires repair or maintenance, or (b) that diminishes or interferes with the habitability or Resident's quiet enjoyment of the Apartment. Time is of the essence with respect to Resident's obligation to provide notice to Management under this Section 28. Failure to provide notice to Management as required under this Section 28 is grounds for eviction.

29.   NOTICES: All notices shall be in writing and given personally, mailed by registered or certified mail, or in the case of notice given by Management to Resident, tacked to Resident's Apartment.

30.   ABANDONMENT: Resident shall not abandon the Apartment. "Abandonment" is defined as the desertion of the Apartment by Resident for more than ten (10) days without payment of the rent due under the terms of this Agreement. If Resident vacates or abandons the Apartment in violation of this Agreement, any property Resident leaves on the premises shall be deemed to have been abandoned and may either be retained by Management as Management's property or sold at public or private sale as Management sees fit. The proceeds of any such sale or the fair market value of property of Resident retained by Management under this section shall be applied by Management against (1) Management's expenses for renewal, storage or sale of Resident's personal property; (2) the arrears of rent and fees or future rent and fees payable under this Agreement; (3) any other damages to which Management may be entitled hereunder. The remaining balance, if any, shall be given to Resident upon written demand with forwarding address, without interest.

31.   SUBORDINATION: Resident's rights under this Agreement shall at all times be junior and subject to any deed to secure debt which is now or is later placed on the premises of which the Apartment is a part; and if requested, Resident shall execute promptly any certificate that Management may request to specifically implement the subordination provision of this section.

32.   DEFAULT: Any breach or violation of any provision of this Agreement, or any untrue information in Resident's application to rent, shall give Management the right to terminate this Agreement upon thirty (30) days' notice for non-rent defaults and three (3) days' notice for rent default. In the event of termination, Management shall have the right to sue for possession, damages, and all past and future rent due under this Agreement. Management shall have the further right to re-let the Apartment, and Resident shall be liable to Management for the difference, if any, between all rent due hereunder and the total rent obtained by Management upon such re-letting.

33.   SEVERABILITY: If any provision of this Agreement is invalid under applicable law, such provision shall be ineffective to the extent of the invalidity only, without invalidating the remainder of this Agreement.

34.   RULES AND REGULATIONS: Resident, his/her family, guests, and visitors shall comply with all governmental laws and regulations, and all rules and regulations issued by Management which may be changed during the term of this Agreement. The Rules and Regulations attached hereto are deemed a part of this Lease Agreement.

35.   ENTIRE AGREEMENT: This Agreement constitutes the entire Agreement between the parties, and no modification of this Agreement is valid unless in writing signed by Resident and an authorized agent of Management as identified in Section 37 of this Agreement.

36.   LIMITATION ON CLAIMS AGAINST MANAGEMENT: Notwithstanding any statute of limitations available at law to claims by Resident against Management arising from this Lease Agreement, Resident agrees not to commence any action or lawsuit against Management relating to this Lease Agreement or Resident's occupancy of the Apartment more than six (6) months after the termination of this Lease Agreement.

| 37.   This Lease Agreement is valid and binding only when signed by an authorized representative of Management. Only a Property Manager or a member of the Senior Management Team is an authorized agent of Management for the purposes of binding Management to this Lease Agreement  X _____ (Resident's Initials) |

Dated NOVEMBER 25, 20 20   By: _Ryan Munn_ _____   (Authorized Agent of Management)

Resident (print clearly) X _Zepherine Miller_ _____   Resident (signature) X _Zepherine Miller_ _____

Other Person(s) Residing in Apartment:

*Received Via E-Oscar: 7/5/2021*

# NCS-028

DR 06/08/2021 (OOTA41) 70.117268.01022039



# ALAS over LOWRY

## CONGRATULATIONS AND WELCOME TO YOUR NEW HOME!

The team at Alas Over Lowry strives to provide excellent customer service during your stay at our community. We wanted to give you a quick list of items that you will need to know for your move in.

- ❖ Register your vehicle with ParkM at **https://www.parkm.com/**
  - o **All guests staying after 7PM need to be registered**
- ❖ Transfer/start your electricity through Xcel
  - o Call 866-379-3072 or **https://www.xcelenergy.com/start_stop_transfer**
  - o Please note that your Xcel account number is required to receive keys.
- ❖ Set up your internet and/or cable through Xfinity/Comcast
- ❖ Call or download the app (Parcel Pending) to set up your account to start receiving packages
- ❖ Set up your online portal to pay rent and utilities through downloading Resident Billing Services App **www.residentbillpay.com**. If you have any questions, please call Resident Billing at **877-436-2798** or email **customerservice@residentbillpay.com**.
  - o **You will have access to the app AFTER you move in.**
- ❖ You are required to have renter's insurance coverage on your personal belongings with a **$100,000 minimum liability coverage**. You can email a copy of your declarations page to alassales@connorgroup.com
- ❖ **Address: 8489 E Lowry Blvd, Denver, CO  80230**
- ❖ **Building 13-102**
- ❖ **Mailbox #: 71**

### Amount Due at Move-In on November 27th:

| | |
|---|---|
| Security Deposit | $1000.00 |
| November Prorated Rent (27th – 30th) | $286.53 |
| One Time Fob Fee | $99.00 |
| **Total due on November 27th** | **$1385.53** |
| | |
| **\*\*December Rent will be due on the 1st** | $2149.00 |

**Please be sure that your move-in payment is in certified funds:**
**1.95% credit/debit card fee, money order or cashier's check**

### Important Phone Numbers:

| | |
|---|---|
| ❖ Leasing office | 720-450-3524 |
| ❖ Emergency Maintenance Phone | 720-988-3083 |
| ❖ Denver Non-Emergency Police | 720-913-2000 |

*Received Via E-Oscar: 7/5/2021*

**NCS-029**

DR 06/08/2021 (00TA41) 71.117268.01022039

## Application - Alas over Lowry

From:  Alas Over Lowry Sales (alassales@connorgroup.com)

To:     ladyinnursing@yahoo.com

Date:  Saturday, November 28, 2020, 05:26 PM MST

Hi Zepherine,

Attached is the application for the property.  If the occupant can fill this out, send it back for us to process and then call and pay the $28 background fee.  If we can make this happen tomorrow, that would be great.  Then we will be ready on Monday for them to move in.

Thank you,

**Vicki Getz**

Alas Over Lowry

82 N Uinta Way

Denver, CO 80230

720-450-3525

 Application_for_Rental.pdf
961.6kB

*Received Via E-Oscar: 7/5/2021*

**NCS-030**

DR 06/08/2021 (00TA41) 72.117268.01022039

## RE: IMPORTANT

From:  Alas Over Lowry (alas@connorgroup.com)

To:      ladyinnursing@yahoo.com

Date:  Monday, December 7, 2020, 12:20 PM MST

Hi Zepherine,

First, the lease is signed, there are no "missing" signatures. Second, section 7 on the lease is referring to a delay in possession in Alas Over Lowry's ability to deliver the apartment. Possession was ready to be given to you on the move in date, we still have your new home ready and keys are in your file as well as your move in packet, we would love to see you today for your move in that was delayed on your part. Your inability to pay is not us delaying your possession so the lease still stands. If you do not move in and pay we will have to send you to collections.

Thank you,

Ben Glover

Alas Over Lowry

Operations Manager

**From:** Zepherine Miller <ladyinnursing@yahoo.com>
**Sent:** Saturday, December 5, 2020 10:30 PM
**To:** Alas Over Lowry Sales <alassales@connorgroup.com>
**Subject:** IMPORTANT

I want to thank you for taking the time to show me around the apartment complex. However, due to not being able to take possession of the apartment as the security deposit was not placed in the lease as well an approval  for the apartment was not established before signing the lease, my initials was not signed within the lease and lastly have no keys to the apartment. Due to this matter has led to not being able to financially pay a deposit and first month rent. I am sending this written notice to cancel the agreement. Per number seven within the lease- if there is a delay in delivery of possession of the apartment, rent shall be abide on a daily basis. If possession is not granted within 10 days after the beginning dates of the lease term. Resident may cancel agreement by written notice and gave full refund if any monies paid management shall not be liable for the damages caused by the delay in possession.

Based on the delay of taken possession of the apartment as it relates to the move in date of November 27, 2020  this is a written notice to cancel the agreement within the 10 days outline in the lease agreement.

December 5, 2020.

*Received Via E-Oscar: 7/5/2021*

**NCS-031**

DR 06/08/2021 (00TA41) 73.117268.01022039

Best regards,

Zepherine Miller

*Received Via E-Oscar: 7/5/2021*

**NCS-032**

DR 06/08/2021 (00TA41) 74.117268.01022039

# LEASE AGREEMENT

**CONDITIONS PRECEDENT TO LEASE EFFECTIVENESS: PLEASE NOTE THAT THIS LEASE SHALL NOT BECOME EFFECTIVE UNTIL AND UNLESS YOUR APPLICATION IS APPROVED BY THE LANDLORD. IF YOUR APPLICATION IS NOT APPROVED BY THE LANDLORD, THIS LEASE WILL NOT GO INTO EFFECT AND SHALL BE DEEMED NULL AND VOID.**

ZEPHERINE MILLER ("Resident") agrees to lease from The Connor Group ("Management"). Apt. No. 102 of the ALAS OVER LOWRY Apartment Community located at 8489 E LOWRY BLVD DENVER, CO 80230 ("Apartment"), upon the following terms and conditions:

1.   **RENT:** Resident agrees to pay as rent for said Apartment the sum of TWENTY FIVE THOUSAND SEVEN HUNDRED EIGHTY EIGHT dollars ($25788) payable in 12 monthly installments of TWO THOUSAND ONE HUNDRED FORTY NINE dollars ($2149 ) each, payable on or before the first day of each month (THE DUE DATE), without a grace period. Resident shall pay rent without demand at the Apartment Community manager's office or by placing it in the Community's 24-hour rent drop. Rent unpaid after the due date is delinquent. If rent is not paid before the 2nd of the month (THE LATE CHARGE DATE), Resident agrees to pay an initial late charge of $150.00 plus an additional late charge of $125.00 on the 7th of the month if all monies have not been paid in full. In addition, if Resident pays by check and said check is not honored on presentation for any reason whatsoever, Resident agrees to pay Management an additional fee of $100.00 as a returned check penalty charge, in addition to a $100.00 late charge. This penalty provision shall not be considered a waiver or relinquishment of any of the other rights or remedies of Management. Failure to pay rent in a timely fashion is grounds for eviction. Management reserves the right to reject late rent.

|                    |            |
|--------------------|------------|
| Rent               | $ 2149     |
| Pet Rent           | $          |
| Garage/Carport Rent| $          |
| W/D Rent           | $          |
| Other              | $          |
| TOTAL MONTHLY      | $ 2149     |

2.   **PET ADDENDUM:** (1) Resident agrees that only the pet approved and accepted will occupy premises. No additional or different pet is authorized under this agreement. (2) Resident agrees that pet will be kept inside at all times, except when on a leash and accompanied by, and under the control of, the Resident. (3) Resident agrees to clean all pet droppings of their pet on the property each time the pet is walked. Persons not complying with this policy will be charged a clean-up fee. (4) Resident agrees that if a pet becomes annoying, bothersome, or in any way a nuisance to other residents or to the apartment operation, Resident will immediately, upon notice from Management, remove the pet from the premises or vacate the apartment. (5) Resident agrees to pay the Management the additional sum of $_____ for one pet and $_____ for two pets. This pet fee is non-refundable and is for the privilege of keeping a pet in the Apartment. (6) Resident agrees to pay $_____ per month as additional pet rent. (7) Resident agrees to pay for any additional extermination caused by the pet, such as flea infestation. (8) Only approved dogs are accepted. Cats must be de-clawed and neutered.

3.   **CARPORT OR GARAGE ADDENDUM:** Resident has leased carport/garage number _____ located at PARKING LOWRY and agrees to pay as rent monthly installments of $_____ beginning with the NOVEMBER 21 20 20 rental payments. Resident understands and agrees that the leasing of the carport/garage shall be for a period of 12 MONTHS, beginning NOVEMBER 21 20 20 . Resident agrees to each of the following conditions: (1) At no time maintain within the storage facility any article dangerous or detrimental to life or health of the occupants of the apartment community; nor may there be stored straw, excelsior, cotton, paper stock, rags, junk or other flammable material that may create a fire hazard. (2) No other locks, keys or other security devices may be added to storage facility. (3) No improvements or alterations shall be made without the prior written consent of Management and Resident agrees to protect the walls of said storage facility and not to place any nails, screws, or hooks upon the doors, floors, cabinets and walls. (4) Any stored goods are not insured by the Management, and Management does not undertake or arrange to obtain insurance on the goods stored. (5) Management has no liability whatsoever for loss or damage to Resident's property whether by fire, theft, vandalism, mysterious disappearance or otherwise while the goods are stored within the storage facility. (6) Any stored items shall be deemed abandoned if not removed within ten (10) days after termination of Resident's occupancy of the apartment described in said lease. Upon such abandonment Management may remove all personal property therein and sell it at public sale and the proceeds from the sale thereof may be applied to the expense for removal notice and advertisement of sale, and for said rent and expenses of such removal.

4.   **WASHER & DRYER ADDENDUM:** Resident agrees to rent a washer & dryer from ALAS OVER LOWRY for the term of said lease agreement for 12 MONTHS at the amount of INCLUDED ($ 0 ) per month. Resident understands that any damage that may result from the said appliance will be the responsibility of the Resident. Any mechanical repairs made to the washer and/or dryer within reason will be repaired by ALAS . The stated appliances are not to be removed from the said unit of 13-102 at any time during the course of at the completion of the lease agreement. If stated appliances are not left in the apartment in good working condition, the Resident agrees to pay all costs to repair or replace the equipment. This lease addendum will renew with Resident's unit lease renewal.

5.   **TERM:** The initial term of this Agreement shall begin at 12 noon NOVEMBER 21 2020 , and end at 12 noon NOVEMBER 21 2021 . This Agreement will be automatically renewed on a month-to-month basis unless written notification of termination is given by either party at least sixty (60) days before the end of the lease term or renewal period or unless another lease is signed by both parties. The month-to-month rate will be at the market rent rate plus $300 per month for the duration.

6.   **USE:** The Apartment shall be used for residential purposes only. Neither the Apartment nor the Apartment Community shall be used in violation of applicable laws or ordinances, or so as to interfere with other residents' quiet enjoyment of their apartment.

7.   **POSSESSION:** If there is a delay in delivery of possession of the Apartment, rent shall be abated on a daily basis. If possession is not granted within ten (10) days after the beginning date of the lease term, Resident may cancel this Agreement by written notice, and have full refund of any monies paid Management, less 2B.25 dollars for the credit check/processing fee. Management shall not be liable for damages caused by the delay in possession.

8.   **SECURITY DEPOSIT:** Resident agrees to deposit $_____ with Management before taking possession of the Apartment as a security deposit for Resident's fulfillment of the conditions of this Agreement. The deposit will be returned to Resident within thirty (30) days after Resident vacates the Apartment if: (a) the lease term has been terminated by both parties; and (b) all monies due Management from Resident have been paid; and (c) the Apartment is not damaged and is left in its original condition, normal wear and tear expected. Resident shall provide Management with a forwarding address to which this deposit refund may be sent. The deposit may be applied by Management to satisfy all or part of the Resident's obligations and such act shall not prohibit Management from claiming damages in excess of the deposit. Resident agrees not to apply the deposit to any rent payment, charges, or fees permitted by this Agreement.

9.   **ADMINISTRATIVE FEE:** Resident agrees to pay $ 399 to Management before taking possession of the Apartment as an administrative fee which is non-refundable. This fee pays Management for the administrative costs in connection with the Resident's use of the Apartment including, but not limited to, the cost of processing lease documents and all other documents related to the Resident's possession of the Apartment.

10.  **MOVE-OUT:** Resident must provide Management with written notice of intent to move out at least sixty (60) days before the date of move-out. Verbal notice of intent to move out is not sufficient under any circumstances. If Resident fails to give Management the 60-day written notice as provided above, or if Resident moves out without rent being paid in full for the entire lease term or renewal period, Resident will be liable for actual damages including, but not limited to, Management's expenses for re-renting, advertising, and any other incidental costs, plus continued liability for future rentals and other damages or charges to which Management is entitled. Resident also agrees to pay Management thirty-five dollars ($35) for re-keying if all keys are not returned.

11.  **SUBLET:** Resident shall not sublet the Apartment or assign this Agreement without the written consent of Management. Any subletting shall not relieve Resident of his/her obligations under this Agreement. Subletting without Management's permission is grounds for eviction.

12.  **UTILITIES:** Resident is responsible for all utilities including utilities described in the utility addendum. Management reserves the right to change utilities charged and fees with a thirty (30) day notice. Management can also change utility provider at any time. Management owns and retains control of all wiring including, but not limited to, telephone, cablevision, and computer cable installed in the Apartment Community. Residents shall obtain specific written approval from Management before using wiring.

13.  **DESTRUCTION OF THE APARTMENT:** If the Apartment is made uninhabitable by fire (10) days by fire or other casualty, Resident or Management may terminate this Agreement, provided that such destruction is not due in whole or part to any negligence of Resident, his/her dependents, guests or visitors. If the Apartment Community is taken or conveyed to a governmental authority in whole or part, Management may, at its option, terminate this Agreement. In the event of such a taking or conveyance in connection with a threatened taking, Resident releases to Management all rights to any compensation paid by a governmental authority. Resident also agrees to purchase renter's insurance, under the terms of Section 22 of this Agreement.

14.  **RIGHT TO ENTER:** Management may enter Apartment at any reasonable time to inspect, repair or maintain it, or to show the property to a prospective purchaser, lender or insurance agent. If Resident or Management has provided notice to terminate the Lease Agreement, Management may enter the Apartment at any reasonable time to show it to prospective tenants. Management may enter at any time to protect life or to prevent damage to the property. Resident shall not install, or permit to be installed, any device which interferes with Management's ability to enter the Apartment. If Resident changes any lock on the door to or in the Apartment, he/she shall provide a key to Management within 24 ____ ___ _____ _____ __ ___ ____ ____.

*Received Via E-Oscar: 7/5/2021*

**NCS-033**

Zephemie Miller

4428 Andes Way

Denver, CO 80249

7018 1130 0001 1893 63

Trans
Disp
P.O.
Chea

*Received Via E-Oscar: 7/5/2021*

**NCS-034**



DR 06/08/2021 (00FA41) 75.117268.01022039

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

7018 1130 0001 1493 E379

*Received Via E-Oscar: 7/5/2021*

**NCS-035**

# EXHIBIT "A-6"

## FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102|

**From:** legal@nationalcreditsystems.com
**To:** Alas Over Lowry <alas@connorgroup.com>, Melissa Newman <mnewman@connorgroup.com>
**Date:** Mon, 31 May 2021 07:44:56 +0000
**Attachments:** 2606TJJX.DOC (80.8 kB)

Hi,

Please see the attached information request regarding your former resident. We are required by law to reply back to the former resident within a narrow timeframe, so your prompt attention to this request would be helpful.

We appreciate your assistance.

Sincerely,

**Client Services Department**





**National Credit Systems, Inc.**

*P.O. Box 312125 Atlanta, GA 31131   (800) 459-1539   (404) 629-2728*

05/27/2021

Alas Over Lowery Apts
82 N Uinta Way ofc
Denver,CO 80230

Re: Former Resident Zepherine Miller
Client Account Number: 102 /
NCS Account Number: 4510687
Balance:   $25,788.00

## Fair Credit Reporting Act Information Confirmation

Dear Resident Manager,

It is of critical importance that NCS pursue recovery on verifiably correct account balances from the parties who are legally responsible.   As data furnishers to the credit bureaus, we are required by law to conduct an investigation into consumer, or former resident, account disputes

Please understand that it is very important that the information below be reviewed and replied to as soon as possible. Without this verification, NCS will have to close this account or remove the disputed item.

**1. Issue in question**:   CONSUMER CLAIMED INACCURATE INFORMATION. DBTR STATED THAT IT WAS NOT DISCLOSED TO HIM/HER WITHIN THE LEASE OR UPONSPKING WID THE LEASING AGENT VICKI THE AMT OF SECURITY DEPOSIT AND THE EXTRA COST TO TAKE THE OWNERSHIP. ALSO,OWNERSHIP WAS NEVER EXCHANGE. DEBTR NEVER LIVED ON THE PREMISED OF ALAS OVER LOWERY. THE APTMENT HAS BEEN RENTED OUT WHICHALAS OVER LOWERY WERE DOUBLE COLLECTING FOR THE SAME UNIT.DBTR PROVIDED THE COPIES OF LEASE AND SUPPORTING DOCS.PLEASE VERIFY THE SAME. ALSO, PLEASE PROVIDE THE COPIES OF SIGNED LEASE AGREEMENT AND RENTAL APPLICATION.

**2. See attachment(s) if applicable.**

**3. Please review your records and respond accordingly via email, phone, or fax. (See contact information below)**

In your reply to this request, it is important that you include a copy of this letter if responding via email or fax. This will allow for proper handling and a more timely resolution to this issue.

Thank you in advance for your assistance in this matter.

Sincerely,

Client Services Department
404-629-9595 or   800-367-1050 ext. 802
legal@nationalcreditsystems.com

# FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102| :Second Request

**From:**          legal@nationalcreditsystems.com
**To:**            Alas Over Lowry <alas@connorgroup.com>
**Cc:**            Melissa Newman <mnewman@connorgroup.com>
**Date:**          Tue, 01 Jun 2021 00:25:55 +0000
**Attachments:**   62A17SCS1.PDF (62.31 kB)

Dear Valued Client,

Please see the attached regarding this time-sensitive matter. We are required by law to reply back to the former resident within a narrow timeframe, so your prompt attention to this request would be helpful.

We appreciate your assistance.

Sincerely,

Your collection team at National Credit Systems, Inc.

404-629-9595 or 800-367-1050



**P.O. Box 312125 Atlanta, GA 31131   (800) 459-1539   (404) 629-2728**

05/27/2021

Alas Over Lowery Apts
82 N Uinta Way ofc
Denver,CO 80230

Re: Former Resident Zepherine Miller
Client Account Number: 102 /
NCS Account Number: 4510687
Balance:   $25,788.00

## Fair Credit Reporting Act Information Confirmation

Dear Resident Manager,

It is of critical importance that NCS pursue recovery on verifiably correct account balances from the parties who are legally responsible.   As data furnishers to the credit bureaus, we are required by law to conduct an investigation into consumer, or former resident, account disputes

Please understand that it is very important that the information below be reviewed and replied to as soon as possible. Without this verification, NCS will have to close this account or remove the disputed item.

**1. Issue in question**:   CONSUMER CLAIMED INACCURATE INFORMATION. DBTR STATED THAT IT WAS NOT DISCLOSED TO HIM/HER WITHIN THE LEASE OR UPONSPKING WID THE LEASING AGENT VICKI THE AMT OF SECURITY DEPOSIT AND THE EXTRA COST TO TAKE THE OWNERSHIP. ALSO,OWNERSHIP WAS NEVER EXCHANGE. DEBTR NEVER LIVED ON THE PREMISED OF ALAS OVER LOWERY. THE APTMENT HAS BEEN RENTED OUT WHICHALAS OVER LOWERY WERE DOUBLE COLLECTING FOR THE SAME UNIT.DBTR PROVIDED THE COPIES OF LEASE AND SUPPORTING DOCS.PLEASE VERIFY THE SAME. ALSO, PLEASE PROVIDE THE COPIES OF SIGNED LEASE AGREEMENT AND RENTAL APPLICATION.

**2. See attachment(s) if applicable.**

**3. Please review your records and respond accordingly via email, phone, or fax. (See contact information below)**

In your reply to this request, it is important that you include a copy of this letter if responding via email or fax.   This will allow for proper handling and a more timely resolution to this issue.

Thank you in advance for your assistance in this matter.


Sincerely,

Client Services Department
404-629-9595 or   800-367-1050 ext. 802
legal@nationalcreditsystems.com

# EXHIBIT "A-7"

# RE: FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102|

| | |
|---|---|
| **From:** | Alas Over Lowry <alas@connorgroup.com> |
| **To:** | Legal <legal@nationalcreditsystems.com> |
| **Date:** | Thu, 03 Jun 2021 16:15:41 +0000 |
| **Attachments:** | 2606TJJX.DOC (80.8 kB); 20210603101424818.pdf (304.93 kB); 20210603100101356.pdf (240.41 kB) |

Hello,

Attached is a copy of the lease, application, application acknowledgement form, and utilities addendums.

Thank you,

**Ben Glover**
Alas Over Lowry
Operations Manager
82 N Uinta Way
Denver, CO 80230
720-452-9055



---

**From:** legal@nationalcreditsystems.com <legal@nationalcreditsystems.com>
**Sent:** Monday, May 31, 2021 1:45 AM
**To:** Alas Over Lowry <alas@connorgroup.com>; Melissa Newman <MNewman@connorgroup.com>
**Subject:** FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102|

Hi,

Please see the attached information request regarding your former resident. We are required by law to reply back to the former resident within a narrow timeframe, so your prompt attention to this request would be helpful.

We appreciate your assistance.

Sincerely,

**Client Services Department**



TCG000081_0002

## THE CONNOR GROUP
A REAL ESTATE INVESTMENT FIRM

**APPLICATION FOR RENTAL**

| | | | | | |
|---|---|---|---|---|---|
| Applicant's Last Name: Miller | First: Zepherine | Initial: M | Birthdate: 10/24/1979 | Driver's License No. & State: REDACTED | Soc. Sec. No.: REDACTED |
| ☒Single ☐Married ☐Separated | Spouse's Name | | Birthdate | Driver's License No. & State | Soc. Sec. No. |

Expected Move-in Date: 11-27-2020
There will be **3** people occupying the apartment
Names & Ages of all residents to appear on lease: Ta'Shawn Miller 21yo Trevon Miller 15yo

Do you have pets? ☐Yes ☒No   How many?   Type and size: ___   Who referred you?

## PART I   CONTACT INFORMATION
Applicant's email address(es): ladvinnursing@yahoo.com   Cell Phone No.: 405-590-6390

## PART II   RESIDENCE HISTORY (LAST 2 YEARS)
Present Address: 1955 Ulster St Apt 415   City: Denver   State: OK   Zip: 80230   How long? 2yr   Area Code Phone: 303-321   ☐Own ☒Rent
Name & Address of Present Landlord or Mortgage Co.: Advenir at Stapelton   Monthly Pymt.

## PART III   EMPLOYMENT HISTORY (LAST 3 YEARS)
Applicant Employed By: East Ridge Community center   Supervisor's Name: Amy Cribbs   How long? 5 months
Address: 11777 Wesley   City: Aurora   State: Co   Zip: 80114   Phone: 720-747-2200   Position Held-Occupation: Techer   Salary: 3925-gross
Monthly Income source: ☒Salary ☐Commission ☐Tips ☐Govt. Asst. ☒Other SSI-183

## PART IV   CAR INFORMATION
Auto No. 1 - Type: Ford Flex 2019   License No.: BSH-H98   State: CO

## PART V
Have you ever been evicted from any tenancy? ☐Yes ☒No
Do you have a criminal record? ☐Yes ☒No
In case of emergency, call: La Shonnda Bailey   Relationship: Niece   Phone: 720-999-3826

Application Fee $ ___ + Admin Fee $ ___ + Deposit $ ___ = $ ___   Date 11-25-2020
Signature of Applicant: Zepherine Miller

TCG000082_0001

# APPLICATION ACKNOWLEDGMENT FORM

Name: _Zepherine Miller_          Phone#: _405-590-6390_

Name: _____          Phone#: _____

The undersigned (prospective customer) has hereby given a non-refundable payment in the amount of _Four hundred twenty seven_ Dollars ($ _427_ ), of which $ _399_ is an administrative fee and $ _28_ is an application fee(s) to reserve the dwelling located at the address listed below for possible owner consideration of acceptance for rental.

*If you, the prospective customer, are declined residency for any reason whatsoever, <u>only</u> the administrative fee is fully refundable.*          Initial _zm_          Initial _____

Deposit must be paid within 48 hours of applicant(s) approval.          Initial _zm_          Initial _____

I fully understand the above statements and agree to abide by them.

Date: _November 25_ , 20 _20_ .          _Zepherine Miller_
                                                                          Applicant

_Diane Holt_                                                              _____
Property Representative                                                   Applicant

Upon approval of your application, please refer to your signed lease agreement for unit #, address, lease dates, and rate.

*Rental rate subject to change should applicant fail to take possession on/before the move-in date*

MOVE-IN DATE: _Nov 27, 20_   _4 days_

| Monthly Charges | | Pro-rated Amounts | | Deposits Due: | |
|---|---|---|---|---|---|
| Rental Rate: | _2149_ | Rent: | _286.53_ | Deposit: | _TBD_ |
| Pet Rent: | _____ | Pet Rent: | _____ | _2_ Bdrm: | $ _300_ and up |
| Garage/Carport: | _____ | Garage/Carport: | _____ | # of Bedrooms | Minimum Deposit |
| W/D: | _included_ | W/D: | _included_ | <u>Non-Refundable Fees Due:</u> | |
| TOTAL DUE MONTHLY: | _2149_ | TOTAL RENT DUE AT MOVE IN: | _286.53_ | Pet Fee: | _____ |
| | | | | Other: | _99 security access_ |

## APPLICATION ACKNOWLEDGMENT FORM

> ### SIGN AND DATE BELOW TO ACKNOWLEDGE THAT RESIDENT BILLING SERVICES WAS EXPLAINED TO YOU

_Zepherine Miller_  _11-25-2020_          _____
Applicant          Date          Applicant          Date

### Utilities must be in your name in order to receive keys.

Revised 07/2019

TCG000082_0002



Dear Resident,

Resident Billing Services is a third party billing company that works with your apartment community to bill you for your utility services such as water, sewer, trash, cable/internet, and other applicable charges. We welcome the opportunity to service you and your apartment community. You will receive a consolidated monthly bill from Resident Billing Services for all your services and utilities.

Your account will be set up by your property manager according to the effective date of your Utilities Lease Addendum. Resident Billing Services bills residents on the 10th of each month for the previous month services, and the bills are due on the 1st of the following month.

If you do not receive your first bill, or would like additional information, please contact our customer service department at toll free 877-436-2798 or go to our website at www.residentbillpay.com. You can also email us at customerservice@residentbillpay.com.

RBS provides the following convenient services to all residents:

- View and pay your bills online with a debit/credit card or checking account after your set-up your login for your account.
- Pay over the phone at toll free 877-436-2798
- Sign-up for paperless billing and receive your bill via email; it's free!
- Remit your payment in the mail to the address listed on your monthly billing statement.

Welcome to your new home!

Warmest, Regards,
**Resident Billing Services**

**Resident(s) Signature:** _Cathenine Miller_

**Date:** _11-25-2020_

# UTILITIES AND SERVICES ADDENDUM

This addendum is attached to and made a part of the lease dated Nov 25, 2020 (the "Lease") by and between _____ **The Connor Group**____ ("Lessor"), and Zepherine Miller ("Resident") for apartment number 3-102 ("Unit") in **Alas Over Lowry** community (the "Property").

UTILITES: Lessor and Resident agree to the billing described below for each of the following utilities (check only if applicable): √ Water; √ Sewer; √ Common Electric; √ Common Gas; and √ Other Common Utilities (all of such checked utilities are collectively referred to as the "Utilities").

SERVICES: Lessor and Resident agree to the billing described below for each of the following services (check only if applicable): √ Trash ($44.88); √ Valet Trash ($24.88); √ HOA Fee ($4.00); and √ Internet ($99.00) (all of such checked services are collectively referred to as the "Services").

The responsibility for the utilities and services not checked above as well as those utilities and services not specifically identified above shall be governed by the terms of the lease. During the lease term, Lessor is authorized to bill Resident for, and Resident agrees to pay, a portion of the monthly bills for the Utilities and Services for the Property as follows:

1. Resident's monthly rent under the Lease does <u>not</u> include a charge for the Utilities and Services. Instead, for the Utilities and Services, Resident shall pay, at the option of Lessor in its sole discretion, the amount stated in a separate bill received by Resident each month from Lessor or a billing service provider designated by Lessor ("Utility and Services Bill") due as specified in the Utility and Services Bill.

2. Resident understands and agrees that water and sewer charges are not included in monthly rent fee. Resident understands that failure to pay water and sewer charges is an event of default under the lease agreement as defined by the Utility and Services Addendum, which could result in legal action to have the resident evicted from the premises. Any outstanding balance may be deducted from your security deposit at lease termination. If the resident and management agree to a sublease of the apartment, the subtenant is responsible for all utilities as defined by the Utilities and Services Addendum. If the subtenant is in default, the Resident will be responsible for all outstanding utility and services charges incurred during the sublease period.

3. If a Utility and Services Bill is sent, each Utility and Services Bill shall be based on either (a) the amount specified above, OR (b) an estimated or actual reading of the submeter for Resident's Unit, OR (c) the previous month's actual bills for the Utilities for the Property allocated to Resident pursuant to an allocation formula based, in whole or in part, upon at least one or more of the following components; the number of Units at the Property, the number of occupied Units at the Property, the square footage of the Unit, the number of occupants in the Unit, and the number of bathrooms in the Unit. Payment of the Utility and Services Bill shall be sent to the location identified on such Utility and Services Bill.

4. If a Utility and Services Bill is sent, in addition to the submetered or allocated charge for the Utilities, Resident agrees to pay a one-time set up fee, which fee shall be included on the first Utility and Services Bill received by Resident, a monthly invoice administrative fee, a termination fee at move-out, and Late and NSF fees, when appropriate, which fee shall be included on each Utility and Services Bill received by Resident. The fees are as follows:

   a. Activation Fee          $19.99
   b. Late Fee balances       $0-$25, No Charge, $25.01-$100, $8.99, over $100 Charge $14.99
   c. Returned Check Fee      $45.00
   d. Disconnect Fee          $24.99

5. Resident represents that all occupants that will be residing in the Unit are accurately identified in the Lease. Resident agrees to promptly notify Lessor of any change in such number of occupants.

6. To the extent permitted by law, any delinquent payment of a Utility and Services Bill shall be considered a default under the Lease to the same extent and with the same remedies to Lessor (including, without limitation, the right to bring a summary proceeding for eviction against Resident and the right to impose late fees and other related charges and fees) as if Resident had been delinquent in Resident's payment of rent.

7. If Resident moves into or out of the Unit on a date or other than the first of the month, Resident shall pay Utilities and Services for the full period of the time that Resident was living in, occupying, or responsible for payment of rent for the Unit. If Resident breaks or breaches the Lease, Resident will be responsible for all charges for the Utilities and Services through the time it takes for Lessor to retake possession of the Unit, regardless of whether Resident is still occupying the Unit. When the Resident vacates the Unit, all charges for the Utilities and Services must be paid by the move out date. To the extent permitted by law, any unpaid charges for the Utilities and Services at the time of the move out date will be deducted from the security deposit being held by Lessor under the lease.

8. Lessor is not liable for any losses or damages Resident incurs as the result of outages, interruptions, or fluctuations in utilities or services provided to the Unit unless such loss or damage was the direct result of the gross negligence of Lessor. Resident releases Lessor from any and all such claims and waives any claims for offset or reductions of rent or diminished rental value of the Unit due to such outages, interruptions, or fluctuations.

9. Resident agrees to allow Lessor or a billing service provider designated by Lessor access to read the submeter for Resident's Unit, if any.

10. Resident agrees that Resident may, upon thirty (30) days prior written notice from Lessor to Resident, begin receiving a bill for additional utilities and services, at which time such additional utilities and services shall for all purposes be included in the term "Utilities" or "Services", as applicable.

11. If any provision of this addendum or the Lease is invalid or unenforceable under applicable law, such provision shall be ineffective to the extent of such invalidity or unenforceability only without invalidating or otherwise affecting the remainder of this addendum or the Lease.

| Zepherine Miller | 11-25-2020 | (signature) |
|---|---|---|
| Resident | Date | Agent for owner of the Property |

| _____ | _____ | |
|---|---|---|
| Resident | Date | revised 09/04/2020 |

TCG000082_0004

# LEASE AGREEMENT

**CONDITIONS PRECEDENT TO LEASE EFFECTIVENESS:** PLEASE NOTE THAT THIS LEASE SHALL NOT BECOME EFFECTIVE UNTIL AND UNLESS YOUR APPLICATION IS APPROVED BY THE LANDLORD. IF YOUR APPLICATION IS NOT APPROVED BY THE LANDLORD, THIS LEASE WILL NOT GO INTO EFFECT AND SHALL BE DEEMED NULL AND VOID.

_ZEPHERINE MILLER_ ("Resident") agrees to lease from The Connor Group ("Management"). Apt. No. _102_ of the _ALAS OVER LOWRY_ Apartment Community located at _8489 E LOWRY BLVD DENVER, CO 80230_ ("Apartment"), upon the following terms and conditions:

1. **RENT:** Resident agrees to pay as rent for said Apartment the sum of _TWENTY FIVE THOUSAND SEVEN HUNDRED EIGHTY EIGHT_ dollars ($_25788_) payable in _12_ monthly installments of _TWO THOUSAND ONE HUNDRED FORTY NINE_ dollars ($_2149_) each, payable on or before the first day of each month (THE DUE DATE), without a grace period. Resident shall pay rent without demand at the Apartment Community manager's office or by placing it in the Community's 24-hour rent drop. Rent unpaid after the due date is delinquent. If rent is not paid before the 2nd of the month (THE LATE CHARGE DATE), resident agrees to pay an initial late charge of $150.00 plus an additional late charge of $125.00 on the 7th of the month if all monies have not been paid in full. In addition, if Resident pays by check and said check is not honored on presentation for any reason whatsoever, Resident agrees to pay Management an additional fee of $100.00 as a returned check penalty charge, in addition to a $100.00 late charge. This penalty provision shall not be considered a waiver or relinquishment of any of the other rights or remedies of Management. Failure to pay rent in a timely fashion is grounds for eviction. Management reserves the right to reject late rent.

| | |
|---|---|
| Rent | $ _2149_ |
| Pet Rent | $ _____ |
| Garage/Carport Rent | $ _____ |
| W/D Rent | $ _____ |
| Other | $ _____ |
| TOTAL MONTHLY | $ _2149_ |

2. **PET ADDENDUM:** (1) Resident agrees that only the pet approved and accepted will occupy premises. No additional or different pet is authorized under this agreement. (2) Resident agrees that pet will be kept inside at all times, except when on a leash and accompanied by, and under the control of, the Resident. (3) Resident agrees to clean all pet droppings of their pet on the property each time the pet is walked. Persons not complying with this policy will be charged a clean-up fee. (4) Resident agrees that if a pet becomes annoying, bothersome, or in any way a nuisance to other residents or to the apartment operation, Resident will immediately, upon notice from Management, remove the pet from the premises or vacate the apartment. (5) Resident agrees to pay the Management the additional sum of $_____ for one pet and $_____ for two pets. This pet fee is non-refundable and is for the privilege of keeping a pet in the Apartment. (6) Resident agrees to pay $_____ per month as additional rent for one pet and $_____ per month for two pets. (7) Resident agrees to pay for any additional extermination caused by the pet, such as flea infestation. (8) Only approved dogs are accepted. Cats must be de-clawed and neutered.

3. **CARPORT OR GARAGE ADDENDUM:** Resident has leased carport/garage number _——_ located on _PARKING LOWRY_ and agrees to pay as rent monthly installments of $_____ beginning with the _NOVEMBER 21_, 20_20_ rental payment. Resident understands and agrees that the leasing of the carport/garage shall be for a period of _12 MONTHS_, beginning _NOVEMBER 21_, 20_20_. Resident agrees to each of the following conditions: (1) At no time maintain within the storage facility any article dangerous or detrimental to life or health of the occupants of the apartment community; nor may there be stored straw, excelsior, cotton, paper stock, rags, junk or other flammable material that may create a fire hazard. (2) No other locks, keys or other security devices may be added to storage facility. (3) No improvements or alterations shall be made without the prior written consent of Management and Resident agrees to protect the walls of said storage facility and not to place any nails, screws, or hooks upon the doors, floors, cabinets and walls. (4) Any stored goods are not insured by the Management, and Management does not undertake or arrange to obtain insurance on the goods stored. (5) Management has no liability whatsoever for loss or damage to Resident's property whether by fire, theft, vandalism, mysterious disappearance or otherwise while the goods are stored within the storage facility. (6) Any stored items shall be deemed abandoned if not removed within ten (10) days after termination of Resident's occupancy of the apartment described in said lease. Upon such abandonment Management may remove all personal property therein and sell it at public sale and the proceeds from the sale thereof may be applied to the expense for removal notice and advertisement of sale, and for lost rental revenue.

4. **WASHER & DRYER ADDENDUM:** Resident agrees to rent a washer & dryer from _ALAS OVER LOWRY_ for the term of said lease agreement for _12 MONTHS_ at the amount of _INCLUDED_ ($ _0_) per month. Resident understands that any damage that may result from the said appliance will be the responsibility of the Resident. Any mechanical repairs made to the washer and/or dryer within reason will be repaired by _ALAS_. The stated appliances are not to be removed from the said unit of _13-102_ at any time during the course of at the completion of the lease agreement. If stated appliances are not left in the apartment in good working condition, the Resident agrees to pay all costs to repair or replace the equipment. This lease addendum will renew with Resident's unit lease renewal.

5. **TERM:** The initial term of this Agreement shall begin at 12 noon _NOVEMBER 21_, 20_20_, and end at 12 noon _NOVEMBER 21, 2021_. This Agreement will be automatically renewed on a month-to-month basis unless written notification of termination is given by either party at least sixty (60) days before the end of the lease term or renewal period or unless another lease is signed by both parties. The month-to-month rate will be at the market rent rate plus $300 per month for the duration.

6. **USE:** The Apartment shall be used for residential purposes only. Neither the Apartment nor the Apartment Community shall be used in violation of applicable laws or ordinances, or so as to interfere with other residents' quiet enjoyment of their apartment.

7. **POSSESSION:** If there is a delay in delivery of possession of the Apartment, rent shall be abated on a daily basis. If possession is not granted within ten (10) days after the beginning date of the lease term, Resident may cancel this Agreement by written notice, and have full refund of any monies paid Management, less _28.25_ dollars for the credit check/processing fee. Management shall not be liable for damages caused by the delay in possession.

8. **SECURITY DEPOSIT:** Resident agrees to deposit $_1,000_ with Management before taking possession of the Apartment as a security deposit for Resident's fulfillment of the conditions of this Agreement. The deposit will be returned to Resident within thirty (30) days after Resident vacates the Apartment if: (a) the lease term has been terminated by both parties; and (b) all monies due Management from Resident have been paid; and (c) the Apartment is not damaged and is left in its original condition, normal wear and tear excepted. Resident shall provide Management with a forwarding address to which this deposit refund may be sent. The deposit may be applied by Management to satisfy all or part of the Resident's obligations and such act shall not prohibit Management from claiming damages in excess of the deposit. Resident, or fees permitted by this Agreement to any rent payment, charges, or fees permitted by this Agreement.

9. **ADMINISTRATIVE FEE:** Resident agrees to pay $_399_ to Management before taking possession of the Apartment as an administrative fee which is non-refundable. This fee pays Management for the administrative costs in connection with the Resident's use of the Apartment including, but not limited to, the cost of processing lease documents and all other documents related to the Resident's possession of the Apartment.

10. **MOVE-OUT:** Resident must provide Management with written notice of intent to move out at least sixty (60) days before the date of move-out. **Verbal notice of intent to move out is not sufficient under any circumstances.** If Resident fails to give Management the 60-day written notice as provided above, or if Resident moves out without rent being paid in full for the entire lease term or renewal period, Resident will be liable for actual damages including, but not limited to, Management's expenses for re-renting, advertising, and any other incidental costs, plus continued liability for future rentals and other damages or charges to which Management is entitled. Resident also agrees to pay Management thirty-five dollars ($35) for re-keying if all keys are not returned.

11. **SUBLET:** Resident shall not sublet the Apartment or assign this Agreement without the written consent of Management. Any subletting shall not relieve Resident of his/her obligations under this Agreement. Subletting without Management's permission is grounds for eviction.

12. **UTILITIES:** Resident is responsible for all utilities including utilities described in the utility addendum. Management reserves the right to change utilities charged and fees with a thirty (30) day notice. Management can also change utility provider at any time. Management owns and retains control of all wiring including, but not limited to, telephone, cablevision, and computer cable installed in the Apartment Community. Residents shall obtain specific written approval from Management before using wiring.

13. **DESTRUCTION OF THE APARTMENT:** If the Apartment is made uninhabitable for ten (10) days by fire or other casualty, Resident or Management may terminate this Agreement, provided that such destruction is not due in whole or part to any negligence of Resident, his/her dependants, guests or visitors. If the Apartment Community is taken or conveyed to a governmental authority in whole or part, Management may, at its option, terminate this Agreement. In the event of such a taking or conveyance in connection with a threatened taking, Resident releases to Management all rights to any compensation paid by a governmental authority. Resident also agrees to purchase renter's insurance, under the terms of Section 22 of this Agreement.

14. **RIGHT TO ENTER:** Management may enter Apartment at any reasonable time to inspect, repair or maintain it, or to show the property to a prospective purchaser, lender or insurance agent. If Resident or Management has provided notice to terminate the Lease Agreement, Management may enter the Apartment at any reasonable time to show it to prospective tenants. Management may enter at any time to protect life or to prevent damage to the property. Resident shall not install, or permit to be installed, any device which interferes with Management's ability to enter the Apartment. If Resident changes any lock on the door to or in the Apartment, he/she shall provide a key to Management within 24 hours of installation of the new lock.

15. **DRAPES AND SHADES:** All drapes and shades installed by Resident must be lined in white to present a uniform exterior appearance.

16. **ANTENNAS:** Radio antennas or any other type antennas shall not be placed or erected on any part of the building and/or premises.

17. **SATELLITE DISHES:** Satellite dishes may only be installed under the following criteria: (a) So that they are not affixed to any part of the building up to and including roof, gutters, siding, balconies, fences or other exterior surface areas; and (b) All dishes must be freestanding and remain inside the domain you rent. This can include the patio area or balcony area, so long as it does not violate Item "a" listed above; and (c) Prior to erecting the dish, Resident must receive written approval from Management. Should any component of this Section 17 be violated, Management shall be entitled to void this lease and recover all damages and expenses up to and including legal fees associated with said violation.

TCG CO 150 1119

**18. VEHICLES AND PARKING:** Vehicles shall be parked in designated parking spaces, carports, or garages only. Inoperable vehicles shall not be parked or stored on the premises. For purposes of this paragraph, a vehicle with one or more flat tires, expired license plate, visible exterior damage or graffiti or any inappropriate signage shall be considered inoperable. Management shall have the right to remove any vehicle left on the premises in violation of this paragraph at the expense of the owner of such vehicle. No vehicle repair work or any type, including oil changes, shall be performed on the premises. No vehicle with more than two axles shall be allowed to be parked on the premises at any time. All boats, trailers, and campers must be approved in writing by Management prior to their being parked on the premises. The number of vehicles permitted per apartment is limited to a maximum of two (2).

**19. INDEMNIFICATION FOR USE OF RECREATIONAL FACILITIES:** (Applicable only if Apartment Community is equipped with corresponding facilities.) (A) In consideration of making fitness and swimming facilities available to Resident without additional charge, the Resident, his/her spouse, family members, dependants, guests, visitors and anyone else in the Apartment or on the premises of the Apartment Community with Resident's permission, shall save harmless the owner of the Apartment Community, Management and their respective partners, members, officers, agents, and employees, from any and all liability imposed by law arising out of any injury, illness, or death of any person or the damaging, theft or destruction of any property arising out of the Resident's use of the fitness and swimming facilities located on the Premises. Such facilities include but are not limited to the racquetball court, sauna, whirlpool, hot tub, swimming pool, tennis court, volleyball court, weight room, and exercise machines. (B) Resident acknowledges the potential hazards of tanning including, but not limited to: skin cancer, burns, photosensitivity, cataracts, premature skin aging, blood vessel damage and reduced immunity. Further, Resident expressly assumes the risk of such potential hazards (whether known or unknown). Resident agrees to (i) use the tanning bed only during regular office hours; (ii) to use the timer on the bed; (iii) use the bed in increments no greater than twenty (20) minutes at a time and for not more than twenty cumulative minutes in a single 24-hour period; (iv) not to permit any guests to use the bed; (v) only permit dependants 18 years or older residing with the Resident to use the bed; and (vi) to comply with such other rules and regulations as Management may from time to time require regarding usage of the tanning bed. The Resident and the Resident's spouse agree to hold the owners of the Apartment Community, Management and their respective partners, members, officers, agents, employees and assigns harmless from any liability arising out of an injury or illness arising out of Resident's, Resident's spouse, or dependant's use of the tanning bed located on the Premises. (C) Resident acknowledges and agrees that he/she is responsible for the behavior of his/her spouse, dependants, and guests when they use any recreational facility provided by Management. Resident shall require his/her spouse, dependants, guests and visitors to follow any and all rules contained in this Lease Agreement, posted in or around the facility, or otherwise provided to him/her by Management, concerning the use of recreational facilities, and shall hold Management and its respective partners, members, officers, agents, employees and assigns harmless for any liability or injury resulting from the intentional and negligent use of Apartment Community's recreational facilities by his/her spouse, family members, dependants, guests, or visitors.

**20. WATER SOFTENERS:** Resident agrees not to install, or cause to be installed, any type of water softening device unless prior written approval is obtained from management. The illegal installation of any type of water softening device shall constitute immediate grounds for termination of this Lease Agreement.

**21. HALLWAYS AND OTHER COMMON AREAS:** No bicycles, motorcycles, or toys shall be stored or parked in any hallway or entryway of the Apartment Community and Resident shall not place or store any item (except doormats) in any hallway, entryway, or common area of the Apartment Community. No motorcycles are allowed inside any apartment.

**22. INSURANCE:** (A) Resident is required, at his/her sole cost and expense, to procure and maintain, throughout the term of this Lease Agreement and any renewal period, Renter's Insurance including fire coverage and covering claims for bodily injury and/or personal injury, including death and property damage occurring in or upon or resulting from the Apartment, in standard form and with an insurance carrier rated "A-" or better by A.M. Best or equivalent with said insurance carrier licensed to do business in the state where the Apartment is located. **(B) Coverage with a minimum of $100,000 Combined Single Limit in respect to any one accident or occurrence is required. Each policy provided for in this section shall contain an agreement by the insurer that the policy cannot be canceled without at least thirty (30) days prior written notice to Management. Insurer and/or its agent may charge a late fee for any payments not received on a timely basis. Said late fee shall be considered the same as unpaid rent and grounds for not accepting future rental payments.** (C) A Certificate of insurance evidencing Comprehensive Personal Liability Insurance shall be required and kept on file in the Apartment Community Manager's office at the time the Lease Agreement is executed. Waterbeds are permitted with proof of insurance and a copy of the Declaration page submitted to the Rental Office.

**23. DAMAGE TO PROPERTY:** Resident shall personally refrain, and shall forbid his/her spouse, family members, dependants, guests, visitors, and anyone else in the Apartment or on the premises of the Apartment Community with Resident's permission, from intentionally or negligently altering, destroying, defacing, damaging or removing any part of the Apartment or Apartment Community including, but not limited to, structure, walls, flooring, glass, plumbing, wiring, fixtures, and appliances. Resident shall reimburse Management within five (5) days of demand for the cost of repairs for damage beyond ordinary wear and tear, caused intentionally or negligently by Resident, his/her family, dependants, guests, or visitors.

**24. HOLDING OVER:** (A) If Resident or an approved sub lessee remains in or continues to be in possession of the Apartment or any part thereof after the termination of this Agreement, Management shall, at its option, have the right to charge Resident or sub lessee, as liquidated damages for the time that he/she remains or remains in possession, a sum equal to twice the amount of rent, or to treat such holder over as a renewal by Resident or sub lessee of the same duration as covered hereby, upon the same terms and conditions, except that Management may charge the highest renewal rate being charged for a like apartment at the time of the hold over. In the event Management elects to treat such holding over as a renewal of this Agreement, each and all terms of this Agreement, excepting only the rent charge as provided above, shall be and remain in full force and effect for the renewal term. (B) In the event no renewal is desired or if it is refused by Management, Management shall proceed to let the Apartment to another and charge Resident for any damages resulting from his/her failure to deliver possession on the date of termination, in addition to any other rights accruing to Management under law and the terms of this Agreement.

**25. NONWAIVER:** Failure of Management to insist upon strict compliance with the terms of this Agreement shall not constitute a waiver of Management's right to act on any violation.

**26. REMEDIES CUMULATIVE:** All remedies under this Agreement or in law or equity shall be cumulative.

**27. ATTORNEY'S FEES:** In the event of (i) the employment of an attorney by Management because of a violation by Resident of any terms or conditions of this Agreement, or (ii) should Management employ an attorney and prevail in the defense of any legal action brought by Resident, Resident shall pay such attorney's fees and other costs or expenses incurred by Management in connection therewith, which shall be considered an additional fee and shall be secured hereunder.

**28. REPAIRS:** Resident acknowledges and agrees that he/she accepts the Apartment "as is" and that the Apartment is in a tenantable condition. Resident agrees to keep and, at the end of the term, return the Apartment and fixtures therein in a clean and sanitary condition and in good repair. Management will make repairs to the Apartment, as required by law, with reasonable promptness after receipt of written notice from Resident. Resident agrees to immediately notify Management of any condition (a) that requires repair or maintenance, or (b) that diminishes or interferes with the habitability or Resident's quiet enjoyment of the Apartment. Time is of the essence with respect to Resident's obligation to provide notice to Management under this Section 28. Failure to provide notice to Management as required under this Section 28 is grounds for eviction.

**29. NOTICES:** All notices shall be in writing and given personally, mailed by registered or certified mail, or in the case of notice given by Management to Resident, tacked to Resident's Apartment.

**30. ABANDONMENT:** Resident shall not abandon the Apartment. "Abandonment" is defined as the desertion of the Apartment by Resident for more than ten (10) days without payment of the rent due under the terms of this Agreement. If Resident vacates or abandons the Apartment in violation of this Agreement, any property Resident leaves on the premises shall be deemed to have been abandoned by Resident and may be retained by Management's property or sold at public or private sale as Management sees fit. The proceeds of any such sale or the fair market value of property of Resident retained by Management: (1) the arrears of rent and fees or future rent and fees payable under this Agreement; (3) any Management's expenses for removal, storage or sale of Resident's personal property; (2) the arrears of rent and fees or future rent and fees payable under this Agreement; (3) any other damages to which Management may be entitled hereunder. The remaining balance, if any, shall be given to Resident upon written demand with forwarding address, without interest.

**31. SUBORDINATION:** Resident's rights under this Agreement shall at all times be junior and subject to any deed to secure debt which is now or is later placed on the premises of which the Apartment is a part; and if requested, Resident shall execute promptly any certificate that Management may request to specifically implement the subordination provision of this section.

**32. DEFAULT:** Any breach or violation of any provision of this Agreement, or any untrue information in Resident's application to rent, shall give Management the right to terminate this Agreement upon thirty (30) days' notice for non-rent defaults and three (3) days' notice for rent default. In the event of termination, Management shall have the further right to re-let the Apartment, and Resident shall be liable to sue for possession, damages, and all past and future rent due under this Agreement. Management shall have the further right to re-let the Apartment, and Resident shall be liable to Management for the difference, if any, between all rent due hereunder and the total rent obtained by Management upon such re-letting.

**33. SEVERABILITY:** If any provision of this Agreement is invalid under applicable law, such provision shall be ineffective to the extent of the invalidity only, without invalidating the remainder of this Agreement.

**34. RULES AND REGULATIONS:** Resident, his/her family, guests, and visitors shall comply with all governmental laws and regulations, and all rules and regulations issued by Management which may be changed during the term of this Agreement. The Rules and Regulations attached hereto are deemed a part of this Lease Agreement.

**35. ENTIRE AGREEMENT:** This Agreement constitutes the entire Agreement between the parties, and no modification of this Agreement is valid unless in writing signed by Resident and an authorized agent of Management as identified in Section 37 of this Agreement.

**36. LIMITATION ON CLAIMS AGAINST MANAGEMENT:** Notwithstanding any statute of limitations available at law to claims by Resident against Management arising from this Lease Agreement, Resident agrees not to commence any action or lawsuit against Management relating to this Lease Agreement or Resident's occupancy of the Apartment more than six (6) months after the termination of this Lease Agreement.

**37. This Lease Agreement is valid and binding only when signed by an authorized representative of Management. Only a Property Manager or a member of the Senior Management Team is an authorized agent of Management for the purposes of binding Management to this Lease Agreement.** ___X___ (Resident's Initials)

Dated NOVEMBER 25, 20 20   By: _Ryan Moore_ (Authorized Agent of Management)

Resident (print clearly) _Zepherine Miller_   Resident (signature) _Zepherine Miller_

Other Person(s) Residing in Apartment:

_____   _____

_____   _____

Dated _November 25_, 20 20   By: _____ (Authorized Agent of Management)

TCG000083_0002



*National Credit Systems, Inc.*

*P.O. Box 312125 Atlanta, GA 31131   (800) 459-1539   (404) 629-2728*

05/27/2021

Alas Over Lowery Apts
82 N Uinta Way ofc
Denver,CO 80230

Re: Former Resident Zepherine Miller
Client Account Number: 102 /
NCS Account Number: 4510687
Balance:   $25,788.00

## Fair Credit Reporting Act Information Confirmation

Dear Resident Manager,

It is of critical importance that NCS pursue recovery on verifiably correct account balances from the parties who are legally responsible.   As data furnishers to the credit bureaus, we are required by law to conduct an investigation into consumer, or former resident, account disputes

Please understand that it is very important that the information below be reviewed and replied to as soon as possible. Without this verification, NCS will have to close this account or remove the disputed item.

**1. Issue in question**:   CONSUMER CLAIMED INACCURATE INFORMATION. DBTR STATED THAT IT WAS NOT DISCLOSED TO HIM/HER WITHIN THE LEASE OR UPONSPKING WID THE LEASING AGENT VICKI THE AMT OF SECURITY DEPOSIT AND THE EXTRA COST TO TAKE THE OWNERSHIP. ALSO,OWNERSHIP WAS NEVER EXCHANGE. DEBTR NEVER LIVED ON THE PREMISED OF ALAS OVER LOWERY. THE APTMENT HAS BEEN RENTED OUT WHICHALAS OVER LOWERY WERE DOUBLE COLLECTING FOR THE SAME UNIT.DBTR PROVIDED THE COPIES OF LEASE AND SUPPORTING DOCS.PLEASE VERIFY THE SAME. ALSO, PLEASE PROVIDE THE COPIES OF SIGNED LEASE AGREEMENT AND RENTAL APPLICATION.

**2. See attachment(s) if applicable.**

**3. Please review your records and respond accordingly via email, phone, or fax. (See contact information below)**

In your reply to this request, it is important that you include a copy of this letter if responding via email or fax. This will allow for proper handling and a more timely resolution to this issue.

Thank you in advance for your assistance in this matter.

Sincerely,

Client Services Department
404-629-9595 or   800-367-1050 ext. 802
legal@nationalcreditsystems.com

# EXHIBIT "A-8"

# RE: FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102|

| | |
|---|---|
| **From:** | Alas Over Lowry <alas@connorgroup.com> |
| **To:** | afort@nationalcreditsystems.com |
| **Date:** | Wed, 09 Jun 2021 18:32:02 +0000 |
| **Attachments:** | 20210609123259765.pdf (18.02 kB) |

Hi Anna,

Attached is the FAS.

Thank you,

Ben Glover

---

**From:** afort@nationalcreditsystems.com <afort@nationalcreditsystems.com>
**Sent:** Wednesday, June 9, 2021 8:29 AM
**To:** Alas Over Lowry <alas@connorgroup.com>
**Subject:** RE: FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102|
**Importance:** High

Good Morning Ben,

Can you also please send me a final account statement or Soda showing the $25,788.00 balance owed for Zepherine Miller? I apologize it was not requested in the previous request. But we need one for validation to respond to her dispute.

Thank you very much for your help and response.


**Anna Fort| Client Services Representative**



3750 Naturally Fresh Blvd | Atlanta, GA 30349
800-367-1050 x363 Office
www.nationalcreditsystems.com


*THE INFORMATION CONTAINED IN THIS E-MAIL MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE DESIGNATED RECIPIENTS . IF THE READER OF THIS MESSAGE IS NOT AN INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY REVIEW, USE, DISSEMINATION, FORWARDING OR COPYING OF THIS MESSAGE IS STRICTLY PROHIBITED.  PLEASE NOTIFY US IMMEDIATELY BY REPLY E-MAIL OR TELEPHONE, AND*

*DELETE THE ORIGINAL MESSAGE AND ALL ATTACHMENTS FROM YOUR SYSTEM.  THANK YOU.*

---

**From:** Alas Over Lowry [mailto:alas@connorgroup.com]
**Sent:** Thursday, June 03, 2021 12:16 PM
**To:** Legal
**Subject:** RE: FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102|

Hello,

Attached is a copy of the lease, application, application acknowledgement form, and utilities addendums.

Thank you,

**Ben Glover**
Alas Over Lowry
Operations Manager
82 N Uinta Way
Denver, CO 80230
720-452-9055



---

**From:** legal@nationalcreditsystems.com <legal@nationalcreditsystems.com>
**Sent:** Monday, May 31, 2021 1:45 AM
**To:** Alas Over Lowry <alas@connorgroup.com>; Melissa Newman <MNewman@connorgroup.com>
**Subject:** FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102|

Hi,

Please see the attached information request regarding your former resident. We are required by law to reply back to the former resident within a narrow timeframe, so your prompt attention to this request would be helpful.

We appreciate your assistance.

Sincerely,

**Client Services Department**



TCG000067_0003

Alas Over Lowry
82 Uinta Way
Denver, CO  80230-7327

Miller, Zepherine
82 Uinta Way
Denver, CO  80230-7327

## Final account statement

| Ledger Account at move-out | | FAS Prepared | |
|---|---|---|---|
| Balance at move-out | 0.00 | Date | 06/09/2021 |
| | | User | Glover, Ben |
| **Deposit Activities** | | | |
| Total Deposits on hand | 0.00 | **Pay to** | |
| | | Miller, Zepherine | |
| **Additional charges/credits/payments after move-out** | | | |
| Lease - New Move Out Charges - Miller | 25,788.00 | | |
| Total additional charges / credits / payments | 25,788.00 | **Lease information  - Unit  13-102** | |
| | | Move-in | |
| **Final Account balance** | | Notice given | |
| Balance at move-out | 0.00 | Lease expires | 11/21/2021 |
| Total Deposits | 0.00 | Move-out | |
| Total additional charges / credits / payments | 25,788.00 | Move-out reason | |
| Total account balance due | 25,788.00 | | |
| | | **Lease information  - Unit  13-102** | |
| | | Cancel/Deny date | 12/15/2020 |
| | | Lease expires | 11/21/2021 |
| | | Cancel/Deny reason | Cancelled |

> **Please contact us within 30 days of receiving this notice to make satisfactory payment arrangements. If arrangements are not made within 30 days your account will be fowarded to collections.**

Manager

TCG000068_0001

# EXHIBIT "A-9"

## FW: FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102|

| | |
|---|---|
| **From:** | Melissa Newman <mnewman@connorgroup.com> |
| **To:** | Alas Over Lowry <alas@connorgroup.com> |
| **Cc:** | Legal <legal@nationalcreditsystems.com> |
| **Date:** | Fri, 06 Aug 2021 18:15:15 +0000 |
| **Attachments:** | 450U6NG3.DOC (80.64 kB); 4510687-03.pdf (375.12 kB) |

Good Afternoon,

Please see below and attached. Please respond back to: legal@nationalcreditsystems.com.

Thank you,

**Melissa Newman**
**Vendor Management/Cap Ex**
**The Connor Group**
10510 Springboro Pike | Miamisburg, OH 45342
T 937-434-3095 | D 937-350-3393
**mnewman@connorgroup.com** | **www.connorgroup.com**



---

**From:** legal@nationalcreditsystems.com <legal@nationalcreditsystems.com>
**Sent:** Friday, August 6, 2021 2:06 PM
**To:** Melissa Newman <MNewman@connorgroup.com>
**Subject:** FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102|

Dear Client,

Please see the attached information request regarding your former resident. We are required by law to reply back to the former resident within a narrow timeframe, so your prompt attention to this request would be helpful.

We appreciate your assistance.

Sincerely,

**Client Services Department**





*P.O. Box 312125 Atlanta, GA 31131   (800) 459-1539   (404) 629-2728*

08/06/2021

Alas Over Lowery Apts
82 N Uinta Way ofc
Denver,CO 80230

Re: Former Resident Zepherine Miller
Client Account Number: 102 /
NCS Account Number: 4510687
Balance:   $25,788.00

## Fair Credit Reporting Act Information Confirmation

Dear Resident Manager,

It is of critical importance that NCS pursue recovery on verifiably correct account balances from the parties who are legally responsible.   As data furnishers to the credit bureaus, we are required by law to conduct an investigation into consumer, or former resident, account disputes

Please understand that it is very important that the information below be reviewed and replied to as soon as possible. Without this verification, NCS will have to close this account or remove the disputed item.

**1. Issue in question**:   MS. MILLER IS CONTINUING TO DISPUTE THE DEBT. ZEPHERINE CLAIMS SHE NEVER RECEIVED POSSESION OF THE PROPERTY BECAUSE SHE WASN'T MADE AWARE OF THE SECURITY DEPOSIT. PLEASE REVIEW THE ATTACHED DISPUTE ALONG WITH YOUR RECORDS AND CONFIRM IF THE BALANCE LISTED IS CORRECT OR SHOULD BE REVISED. IF THE APARTMENT WAS RE-RENTED DURING THIS PERIOD, PLEASE SEND A REVISED STATEMENT FOR CORRECT AMOUNT CURRENTLY OWED.

**2. See attachment(s) if applicable.**

**3. Please review your records and respond accordingly via email, phone, or fax. (See contact information below)**

In your reply to this request, it is important that you include a copy of this letter if responding via email or fax. This will allow for proper handling and a more timely resolution to this issue.

Thank you in advance for your assistance in this matter.


Sincerely,

Client Services Department
404-629-9595 or   800-367-1050 ext. 802
legal@nationalcreditsystems.com

4510687-03

Zepherine Miller

4428 Andes Way

Denver, CO 80249



RECEIVED

JUL 2 8 2021

BY: ........................

NATIONAL CREDIT SYSTEM INC

PO Box 312125

Atlanta, GA 31131-2125


I, Zepherine Miller am writing regarding this said debt related to Alas Over Lowery, due to inaccurate information that was presented to me, which did not provide me the opportunity to make an effective decision as I was under distress due to finding a place to live so my son and I would not be homeless, due to the previous living arrangements was not suitable for my son who uses a wheelchair and have severe to moderate disabilities. It was not disclosed to me within the lease or upon speaking with the leasing agent Vicki the amount of the security deposit and the extra cost to take ownership of the apartment. The lease that was provided to you by Alas Over Lowery the security deposit was placed on the lease after it was signed unannounced to me. I was not informed of the amount of the security deposit until hours after the lease was signed through text message from Vicki. At which time I informed her that I could not afford to pay that amount and if I would have known about the security deposit the lease would not have been signed. Vicki stated," I have worked hours to get your approved!" I never returned to the apartment complex or have the lease with the amount written in which was sent to you by Alas Over Lowery. Ownership was never exchange as no keys or possession of the apartment were exchanged. I never lived on the premises of Alas Over Lowery. I visited the apartment on May 10th, 2021, to speak with Ryan upon visiting I noticed the apartment has been rented out, (which I have video recording of the women and child in the apartment) and was informed that Ryan no longer works for Alas Over Lowery. Speaking with Vicki and Ben, I was told that the current residents got the apartment for a much cheaper rate (which can be heard in the video). The apartment has been rented out which Alas Over Lowery are trying to double collect on the unit. I am asking you to investigate the matter and remove this said debt from my credit file and I am provided with a written response of said decision.

Enclosed are copy of the original lease.


Sincerely,

Zepherine Miller

Zepherine Miller

_ZEPHERINE MILLER_
("Management"), Apt. No. _102_ of the _ALAS OVER LOWRY_ ("Resident") agrees to lease from The Conner Group
_8489 E LOWRY BLVD DENVER, CO 80230_ Apartment Community located at
_____ ("Apartment"), upon the following terms and conditions:

1. **RENT:** Resident agrees to pay as rent for said Apartment the sum of _TWENTY FIVE THOUSAND SEVEN HUNDRED EIGHTY EIGHT_ dollars ($_25788_) payable in
_12_ monthly installments of _TWO THOUSAND ONE HUNDRED FORTY NINE_ dollars ($_2149_) each, payable on or before the first
day of each month (THE DUE DATE), without a grace period. Rent shall pay rent without demand at the Apartment Community manager's office or by placing it in the
Community's 24-hour rent drop. Rent unpaid after the due date is delinquent. If rent is not paid before the 2nd of the month (THE LATE CHARGE DATE), resident agrees to pay
an initial late charge of $150.00 plus an additional late charge of $125.00 on the 7th of the month if all monies have not been paid in full. In addition, if Resident pays by check and
said check is not honored on presentation for any reason whatsoever, Resident agrees to pay Management an additional fee of $100.00 as a returned check penalty charge, in
addition to a $100.00 late charge. This penalty provision shall not be considered a waiver or relinquishment of any of the other rights or remedies of Management. Failure to pay
rent in a timely fashion is grounds for eviction. Management reserves the right to reject late rent.

| | |
|---|---|
| Rent | $ 2149 |
| Pet Rent | $ |
| Garage/Carport Rent | $ |
| W/D Rent | $ |
| Other | $ |
| **TOTAL MONTHLY** | $ 2149 |

2. **PET ADDENDUM:** (1) Resident agrees that only the pet approved and accepted will occupy premises. No additional or different pet is authorized under this agreement. (2)
Resident agrees that the pet will be kept inside at all times, except when on a leash and accompanied by, and under the control of, the Resident. (3) Resident agrees to clean all pet
droppings of their pet on the property each time the pet is walked. Persons not complying with this policy will be charged a clean-up fee. (4) Resident agrees that if a pet becomes
annoying, bothersome, or in any way a nuisance to other residents or to the apartment operation, Resident will immediately, upon notice from Management, remove the pet from
the premises or vacate the apartment. (5) Resident agrees to pay the Management the additional sum of $_____ for one pet and $_____ for two pets. This pet fee
is non-refundable and is for the privilege of keeping a pet in the Apartment. (6) Resident agrees to pay $_____ per month as additional pet rent. (7) Resident
agrees to pay for any additional extermination cost if the pet, such as flea infestation. (8) Only approved dogs are accepted. Cats must be de-clawed and neutered.
3. **CARPORT OR GARAGE ADDENDUM:** Resident has leased carport/garage number _____ located on _PARKING LOWRY_ and agrees to pay as rent
monthly installments of $_____ beginning with the _NOVEMBER 21_, 20 _20_ rental payment. Resident understands and agrees that the leasing of the
carport/garage shall be for a period of _12 MONTHS_, beginning _NOVEMBER 21_, 20 _20_. Resident agrees to each of the following conditions: (1) At no time maintain
within the storage facility any article dangerous or detrimental to life or health of the occupants of the apartment community; nor may there be stored straw, excelsior, cotton, paper
stock, rags, junk or other flammable material that may create a fire hazard. (2) No other locks, keys or other security devices may be added to storage facility. (3) No improvements
or alterations shall be made without the prior written consent of Management and Resident agrees to protect the walls of said storage facility and not to place any nails, screws, or
hooks upon the doors, floors, cabinets and walls. (4) Any stored goods are not insured by the Management, and Management does not undertake or arrange to obtain insurance on
the goods stored. (5) Management has no liability whatsoever for loss or damage to Resident's property whether by fire, theft, vandalism, mysterious disappearance or otherwise
while the goods are stored within the storage facility. (6) Any stored items shall be deemed abandoned if not removed within ten (10) days after termination of Resident's
occupancy of the apartment described in said lease. Upon such abandonment Management may remove all personal property therein and sell it at public sale and the proceeds from
the sale thereof may be applied to the expense for removal notice and advertisement of sale, and for last rental revenue.
4. **WASHER & DRYER ADDENDUM:** Resident agrees to rent a washer & dryer from _ALAS OVER LOWRY_ for the term of said lease agreement for
_12 MONTHS_ at the amount of _INCLUDED_ ($ _0_ ) per month. Resident understands that any damage that may result from the
said appliance will be the responsibility of the Resident. Any mechanical repairs made to the washer and/or dryer within reason will be repaired by _ALAS_. The stated
appliances are not to be removed from the said unit of _13-102_ at any time during the course of at the completion of the lease agreement. If stated appliances are not left in the
apartment in good working condition, the Resident agrees to pay all costs to repair or replace the equipment. This lease addendum will renew with Resident's unit lease renewal.
5. **TERM:** The initial term of this Agreement shall begin at 12 noon _NOVEMBER 21_, _2020_, and end at 12 noon _NOVEMBER 21_, _2021_. This
lease term or renewal period or unless another lease is signed by both parties. The month-to-month rate will be at the market rent rate plus $300 per month for the duration.
6. **USE:** The Apartment shall be used for residential purposes only. Neither the Apartment nor the Apartment Community shall be used in violation of applicable laws or
ordinances, or so as to interfere with other residents' quiet enjoyment of their Apartment.
7. **POSSESSION:** If there is a delay in delivery of possession of the Apartment, rent shall be abated on a daily basis. If possession is not granted within ten (10) days after the
beginning date of the lease term, Resident may cancel this Agreement by written notice, and have full refund of any monies paid Management, less _28.25_ dollars for
the credit check/processing fee. Management shall not be liable for damages caused by the delay in possession.
8. **SECURITY DEPOSIT:** Resident agrees to deposit $_____ with Management before taking possession of the Apartment as a security deposit for Resident's
fulfillment of the conditions of this Agreement. The deposit will be returned to Resident within thirty (30) days after Resident vacates the Apartment if: (a) the lease term has been
terminated by both parties; and (b) all monies from Management from Resident have been paid; and (c) the Apartment is not damaged and is left in its original condition, normal
wear and tear expected. Resident shall provide Management with a forwarding address to which this deposit refund may be sent. The deposit may be applied by Management to
satisfy all or part of the Resident's obligations and such act shall not prohibit Management from claiming damages in excess of the deposit. Resident agrees not to apply the deposit
to any rent payment, charges, or fees permitted by this Agreement.
9. **ADMINISTRATIVE FEE:** Resident agrees to pay $_399_ to Management before taking possession of the Apartment as an administrative fee which is non-
refundable. This fee pays Management for the administrative costs in connection with the Resident's lease of the Apartment including, but not limited to, the cost of processing lease
documents and all other documents related to the Resident's possession of the Apartment.
10. **MOVE-OUT:** Resident must provide Management with written notice of intent to move out at least sixty (60) days before the date of move-out. Verbal notice of intent to
move out is not sufficient under any circumstances. If Resident fails to give Management the 60-day written notice as provided above, or if Resident moves out without rent
being paid in full for the entire lease term or renewal period, Resident will be liable for actual damages including, but not limited to, Management's expenses for re-renting,
advertising, and any other incidental costs, plus continued liability for future rentals and other damages or charges to which Management is entitled. Resident also agrees to pay
Management thirty-five dollars ($35) for re-keying if all keys are not returned.
11. **SUBLET:** Resident shall not sublet the Apartment or assign this Agreement without the written consent of Management. Any subletting shall not relieve Resident of his/her
obligations under this Agreement. Subletting without Management's permission is grounds for eviction.
12. **UTILITIES:** Resident is responsible for all utilities including utilities described in the utility addendum. Management reserves the right to change utilities charged and fees
with a thirty (30) day notice. Management can also change utility provider at any time. Management owns and retains control of all wiring including, but not limited to, telephone,
cablevision, and computer cable installed in the Apartment Community. Residents shall obtain specific written approval from Management before using wiring.
13. **DESTRUCTION OF THE APARTMENT:** If the Apartment is made uninhabitable by ten (10) days by fire or other casualty, Resident or Management may terminate this
Agreement, provided that such destruction is not due in whole or part to any negligence of Resident, his/her dependants, guests or visitors. If the Apartment Community is taken or
conveyed to a governmental authority in whole or part, Management may, at its option, terminate this Agreement. In the event of such a taking or conveyance in connection with a
threatened taking, Resident releases to Management all rights to any compensation paid by a governmental authority. Resident also agrees to purchase renter's insurance, under the
terms of Section 22 of this Agreement.
14. **RIGHT TO ENTER:** Management may enter Apartment at any reasonable time to inspect, repair or maintain it, or to show the property to a prospective purchaser, lender
or insurance agent. If Resident or Management has provided notice to terminate the Lease Agreement, Management may enter the Apartment at any reasonable time to show it to
prospective tenants. Management may enter at any time to protect life or to prevent damage to the property. Resident shall not install, or permit to be installed, any device which
interferes with Management's ability to enter the Apartment. If Resident changes any lock on the door to or in the Apartment, he/she shall provide a key to Management within 24
hours of installation of the new lock.
15. **DRAPES AND SHADES:** All drapes and shades installed by Resident must be lined in white to present a uniform exterior appearance.
16. **ANTENNAS:** Radio antennas or any other type antenna shall not be placed or erected on any part of the building or premises.
17. **SATELLITE DISHES:** Satellite dishes may only be installed under the following criteria: (a) So that they are not affixed to any part of the building up to and including
roof, gutters, siding, balconies, fences or other exterior surface areas; and (b) All dishes must be freestanding and remain inside the domain you rent. This can include the patio area
or balcony area, so long as it does not violate Item "a" listed above; and (c) Prior to erecting the dish, Resident must receive written approval from Management. Should any
component of this Section 17 be violated, Management shall be entitled to void this lease and recover all damages and expenses up to and including legal fees associated with said
violation.

TCG CO 150 1119

is limited to a maximum of two (2).

**19. INDEMNIFICATION FOR USE OF RECREATIONAL FACILITIES:** In consideration of making fitness and swimming facilities available to Resident without additional charge, the Resident, his/her spouse, family members, dependants, guests, visitors and anyone else in the Apartment or on the premises of the Apartment Community with Resident's permission, shall save harmless the owner of the Apartment Community, Management and their respective partners, members, officers, agents, and employees, from any and all liability imposed by law arising out of any injury, illness, or death of any person or the damaging, theft or destruction of any property arising out of the Resident's use of the fitness and swimming facilities located on the Premises. Such facilities include but are not limited to the racquetball court, sauna, whirlpool, hot tub, swimming pool, tennis court, volleyball court, weight room, and exercise machines. (B) Resident acknowledges the potential hazards of tanning including, but not limited to: skin cancer, burns, photosensitivity, cataracts, premature skin aging, blood vessel damage and reduced immunity. Further, Resident expressly assumes the risk of such potential hazards (whether known or unknown). Resident agrees to (i) use the tanning bed only during regular office hours; (ii) to use the timer on the bed; (iii) use the bed in increments no greater than twenty (20) minutes at a time and for not more than twenty cumulative minutes in a single 24-hour period; (iv) not to permit any guests to use the bed; (v) only permit dependants 18 years or older residing with the Resident to use the bed; and (vi) to comply with such other rules and regulations as Management may from time to time require regarding usage of the tanning bed. The Resident and the Resident's spouse agree to hold the owners of the Apartment Community, Management and their respective partners, members, officers, agents, employees and assigns harmless from any liability arising out of an injury or illness arising out of Resident's, Resident's spouse, or dependant's use of the tanning bed located on the Premises. (C) Resident acknowledges and agrees that he/she is responsible for the behavior of his/her spouse, dependants, and guests when they use any recreational facility provided by Management. Resident shall require his/her spouse, dependants, guests and visitors to follow any and all rules contained in this Lease Agreement, posted in or around the facility, or otherwise provided to him/her by Management, concerning the use of recreational facilities, and shall hold Management and its respective partners, members, officers, agents, employees and assigns harmless for any liability or injury resulting from the intentional and negligent use of Apartment Community's recreational facilities by his/her spouse, family members, dependants, guests, or visitors.

**20. WATER SOFTENERS:** Resident agrees not to install, or cause to be installed, any type of water softening device shall constitute immediate grounds for termination of this Lease Agreement. The illegal installation of any type of water softening device unless prior written approval is obtained from management.

**21. HALLWAYS AND OTHER COMMON AREAS:** No bicycles, motorcycles, or toys shall be stored or parked in any hallway or entryway of the Apartment Community and Resident shall not place or store any item (except doormats) in any hallway, entryway, or common area of the Apartment Community. No motorcycles are allowed inside any apartment.

**22. INSURANCE:** (A) Resident is required, at his/her sole cost and expense, to procure and maintain, throughout the term of this Lease Agreement, Renter's Insurance including fire coverage and covering claims for bodily injury and/or personal injury, including death and property damage occurring in or upon or resulting from the Apartment, in standard form and with an insurance carrier rated "A-" or better by A.M. Best or equivalent with said insurance carrier licensed to do business in the state where the Apartment is located. (B) Coverage with a minimum of $100,000 Combined Single Limit is required in any case accident or occurrence is required. Each policy provided for in this section shall contain an agreement by the Insurer that the policy cannot be canceled without at least thirty (30) days prior written notice to Management. Insurer and/or its agent may charge a late fee for any payments not received on a timely basis. Said late fee shall be considered the same as unpaid rent and grounds for not accepting future rental payments. (C) A Certificate of insurance evidencing Comprehensive Personal Liability Insurance shall be required and kept on file in the Apartment Community Manager's office at the time the Lease Agreement is executed. Waterbeds are permitted with proof of insurance and a copy of the Declaration page submitted to the Rental Office.

**23. DAMAGE TO PROPERTY:** Resident shall personally refrain, and shall forbid his/her spouse, family members, dependants, guests, visitors, and anyone else in the Apartment or on the premises of the Apartment Community with Resident's permission, from intentionally or negligently injuring, defacing, destroying, damaging or removing any part of the Apartment or Apartment Community including, but not limited to, structure, walls, flooring, glass, plumbing, wiring, fixtures, and appliances. Resident agrees to notify Management within five (5) days of demand for the cost of repairs for damage beyond ordinary wear and tear, caused intentionally or negligently by Resident, his/her family, dependant, guests, or visitors.

**24. HOLDING OVER:** (A) If Resident or an approved sub lessee remains in or continues to be in possession of the Apartment or any part thereof after the termination of this Agreement, Management shall, at its option, have the right to charge Resident or sub lessee, as liquidated damages for the time that he/she remains or remains in possession, a sum equal to twice the amount of rent, or to treat such holder over as a renewal by Resident or sub lessee of the same duration as covered hereby, upon the same terms and conditions, except that Management may charge the highest renewal rate being charged for a like apartment at the time of the hold over. In the event Management may charge the highest renewal rate being charged for a like apartment at the time of the hold over. In the event over as a renewal of this Agreement, each and all terms of this Agreements, excepting only the rent charge as provided above, shall be and remain in full force and effect for the renewal term. (B) In the event no renewal is reached or if it is refused by Management, Management shall proceed to let the Apartment to another and charge Resident for any damages resulting from his/her failure to deliver possession on the date of termination, in addition to any other rights accruing to Management under law and the terms of this Agreement.

**25. NONWAIVER:** Failure of Management to insist upon strict compliance with the terms of this Agreement shall not constitute a waiver of Management's right to act on any violation.

**26. REMEDIES CUMULATIVE:** All remedies under this Agreement or in law or equity shall be cumulative.

**27. ATTORNEY'S FEES:** In the event of (i) the employment of an attorney by Management because of a violation by Resident of any terms or conditions of this Agreement, or (ii) should Management employ an attorney and prevail in the defense of any legal action brought by Resident, Resident shall pay such attorney's fees and other costs or expenses incurred by Management in connection therewith, which shall be considered an additional fee and shall be accrued hereunder.

**28. REPAIRS:** Resident acknowledges and agrees that he/she accepts the Apartment "as is" and that the Apartment is in a tenantable condition. Resident agrees to keep and, at the end of the term, return the Apartment and fixtures therein in a clean and sanitary condition and in good repair. Management will make repairs to the Apartment, as required by law, with reasonable promptness after receipt of written notice from Resident. Resident agrees to immediately notify Management of any condition (a) that requires repair or maintenance, or (b) that diminishes or interferes with the habitability or Resident's quiet enjoyment of the Apartment. Time is of the essence with respect to Resident's obligation to provide notice to Management under this Section 28. Failure to provide notice to Management as required under this Section 28 is grounds for eviction.

**29. NOTICES:** All notices shall be in writing and given personally, mailed by registered or certified mail, or in the case of notice given by Management to Resident, tacked to Resident's Apartment.

**30. ABANDONMENT:** Resident shall not abandon the Apartment. "Abandonment" is defined as the desertion of the Apartment by Resident for more than ten (10) days without payment of the rent due under the terms of this Agreement. If Resident vacates or abandons the Apartment in violation of this Agreement, any property Resident leaves on the premises shall be deemed to have been abandoned and may either be retained by Management at Management's property or sold at public or private sale as Management sees fit. The proceeds of any such sale or the fair market value of property of Resident retained by Management under this section shall be applied by Management against (1) Management's expenses for removal, storage or sale of Resident's personal property; (2) the arrears of rent and fees or future rent and fees payable under this Agreement; (3) any other damages to which Management may be entitled hereunder. The remaining balance, if any, shall be given to Resident upon written demand with forwarding address, without interest.

**31. SUBORDINATION:** Resident's rights under this Agreement shall at all times be junior and subject to any deed to secure debt which is now or is later placed on the premises of which the Apartment is a part; and if requested, Resident shall execute promptly any certificate that Management may request to specifically implement the subordination provision of this section.

**32. DEFAULT:** Any breach or violation of any provision of this Agreement, or any untrue information in Resident's application to rent, shall give Management the right to terminate this Agreement upon thirty (30) days' notice for non-rent defaults and three (3) days' notice for rent default. In the event of termination, Management shall have the right to sue for possession, damages, and all past and future rent due under this Agreement. Management shall have the further right to re-let the Apartment, and Resident shall be liable to Management for the difference, if any, between all rent due hereunder and the total rent obtained by Management upon such re-letting.

**33. SEVERABILITY:** If any provision of this Agreement is invalid under applicable law, such provision shall be ineffective to the extent of the invalidity only, without invalidating the remainder of this Agreement.

**34. RULES AND REGULATIONS:** Resident, his/her family, guests, and visitors shall comply with all governmental laws and regulations, and all rules and regulations issued by Management which may be changed during the term of this Agreement. The Rules and Regulations attached hereto are deemed a part of this Lease Agreement.

**35. ENTIRE AGREEMENT:** This Agreement constitutes the entire Agreement between the parties, and no modification of this Agreement is valid unless in writing signed by Resident and an authorized agent of Management as identified in Section 37 of this Agreement.

**36. LIMITATION ON CLAIMS AGAINST MANAGEMENT:** Notwithstanding any statute of limitations available at law to claims by Resident against Management arising from this Lease Agreement, Resident agrees not to commence any action or lawsuit against Management relating to the Lease Agreement or Resident's occupancy of the Apartment more than six (6) months after the termination of this Lease Agreement.

**37. This Lease Agreement is valid and binding only when signed by an authorized representative of Management. Only a Property Manager or a member of the Senior Management Team is an authorized agent of Management for the purposes of binding Management to this Lease Agreement. _X_ _____ (Resident's Initials)**

Dated _NOVEMBER 25_, 20 _20_   By: _Ryan Meow_
_____ (Authorized Agent of Management)

Resident (print clearly) X _Zepherine Miller_   Resident (signature) X _Zepherine Miller_

Other Person(s) Residing in Apartment:

_____

_____

Dated _____, 20___   By: _____

_____ (Authorized Agent of Management)

TCG CO 150 1119



National Credit
P.O. Box 31
Atlanta, GA

CERTIFIED MAIL

7020 2450 0000 5509 2317

LePherine Miller
7428 Andus way
Denver, CO 80249

RECEIVED
JUL 2 8 2021
BY:

TCG000044_0004

# EXHIBIT "A-10"

## RE: FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102|

| | |
|---|---|
| **From:** | Alas Over Lowry <alas@connorgroup.com> |
| **To:** | Legal <legal@nationalcreditsystems.com> |
| **Date:** | Wed, 11 Aug 2021 00:31:03 +0000 |
| **Attachments:** | 20210609123259765.pdf (18.02 kB); 20210603101424818.pdf (304.93 kB); 20210603100101356.pdf (240.41 kB); 450U6NG3.DOC (80.64 kB); 4510687-03.pdf (375.12 kB) |

Hello,

Zepherine was well aware of what the security deposit could be. She was also well aware that when signing the lease which was explained as a legally binding document that she would be responsible for the lease. Attached are copies of the lease, application acknowledgement form, application, ledger, and utilities addendum.

Thank you,

**Ben Glover**
Alas Over Lowry
Operations Manager
82 N Uinta Way
Denver, CO 80230
720-452-9055



---

**From:** Melissa Newman <MNewman@connorgroup.com>
**Sent:** Friday, August 6, 2021 12:15 PM
**To:** Alas Over Lowry <alas@connorgroup.com>
**Cc:** Legal <legal@nationalcreditsystems.com>
**Subject:** FW: FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102|
**Importance:** High

Good Afternoon,

Please see below and attached. Please respond back to:  legal@nationalcreditsystems.com.

Thank you,

Melissa Newman

**Vendor Management/Cap Ex**
**The Connor Group**
10510 Springboro Pike | Miamisburg, OH 45342
T 937-434-3095 | D 937-350-3393
mnewman@connorgroup.com | www.connorgroup.com

THE CONNOR GROUP
A REAL ESTATE INVESTMENT FIRM

**From:** legal@nationalcreditsystems.com <legal@nationalcreditsystems.com>
**Sent:** Friday, August 6, 2021 2:06 PM
**To:** Melissa Newman <MNewman@connorgroup.com>
**Subject:** FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102|

Dear Client,

Please see the attached information request regarding your former resident. We are required by law to reply back to the former resident within a narrow timeframe, so your prompt attention to this request would be helpful.

We appreciate your assistance.

Sincerely,

**Client Services Department**



# EXHIBIT "A-11"

## RE: FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102|

| | |
|---|---|
| **From:** | Alas Over Lowry <alas@connorgroup.com> |
| **To:** | rwilbert@nationalcreditsystems.com |
| **Date:** | Sat, 14 Aug 2021 01:52:04 +0000 |

Hello,

The unit has been re-rented.

Thank you,

Ben Glover

---

**From:** rwilbert@nationalcreditsystems.com <rwilbert@nationalcreditsystems.com>
**Sent:** Wednesday, August 11, 2021 7:47 AM
**To:** Alas Over Lowry <alas@connorgroup.com>
**Subject:** RE: FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102|

Good morning,

So the unit has not been re-rented?

Thank you!

Sincerely,

### Raven Wilbert | Client Services



3750 Naturally Fresh Blvd | Atlanta, GA 30349
800-367-1050 Ext. 307 Office
888-511-2169  Fax
www.nationalcreditsystems.com

This is an attempt to collect a debt by a debt collector. Any information obtained will be used for that purpose.

*THE INFORMATION CONTAINED IN THIS E-MAIL MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE DESIGNATED RECIPIENTS. IF THE READER OF THIS MESSAGE IS NOT AN INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY REVIEW, USE, DISSEMINATION, FORWARDING OR COPYING OF THIS MESSAGE IS STRICTLY PROHIBITED. PLEASE NOTIFY US IMMEDIATELY BY REPLY E-MAIL OR TELEPHONE, AND DELETE THE ORIGINAL MESSAGE AND ALL ATTACHMENTS FROM YOUR SYSTEM. THANK YOU*

TCG000060_0001

**From:** Alas Over Lowry [mailto:alas@connorgroup.com]
**Sent:** Tuesday, August 10, 2021 8:31 PM
**To:** Legal
**Subject:** RE: FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102|

Hello,

Zepherine was well aware of what the security deposit could be. She was also well aware that when signing the lease which was explained as a legally binding document that she would be responsible for the lease. Attached are copies of the lease, application acknowledgement form, application, ledger, and utilities addendum.

Thank you,

**Ben Glover**
Alas Over Lowry
Operations Manager
82 N Uinta Way
Denver, CO 80230
720-452-9055



**From:** Melissa Newman <MNewman@connorgroup.com>
**Sent:** Friday, August 6, 2021 12:15 PM
**To:** Alas Over Lowry <alas@connorgroup.com>
**Cc:** Legal <legal@nationalcreditsystems.com>
**Subject:** FW: FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102|
**Importance:** High

Good Afternoon,

Please see below and attached. Please respond back to: legal@nationalcreditsystems.com.

Thank you,

**Melissa Newman**
**Vendor Management/Cap Ex**
**The Connor Group**
10510 Springboro Pike | Miamisburg, OH 45342
T 937-434-3095 | D 937-350-3393
**mnewman@connorgroup.com** | **www.connorgroup.com**

TCG000060_0002



**From:** legal@nationalcreditsystems.com <legal@nationalcreditsystems.com>
**Sent:** Friday, August 6, 2021 2:06 PM
**To:** Melissa Newman <MNewman@connorgroup.com>
**Subject:** FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102|

Dear Client,

Please see the attached information request regarding your former resident. We are required by law to reply back to the former resident within a narrow timeframe, so your prompt attention to this request would be helpful.

We appreciate your assistance.

Sincerely,

**Client Services Department**



TCG000060_0003

# EXHIBIT "A-12"

## FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102|

**From:**          legal@nationalcreditsystems.com
**To:**            Alas Over Lowry <alas@connorgroup.com>
**Date:**          Tue, 21 Sep 2021 15:22:27 +0000
**Attachments:**   5F0ODJZL.DOC (80.41 kB)


Dear Client,

Please see the attached information request regarding your former resident. We are required by law to reply back to the former resident within a narrow timeframe, so your prompt attention to this request would be helpful.

We appreciate your assistance.

Sincerely,

Client Service Department





*P.O. Box 312125 Atlanta, GA 31131  (800) 459-1539  (404) 629-2728*

09/21/2021

Alas Over Lowery Apts
82 N Uinta Way ofc
Denver,CO 80230

Re: Former Resident Zepherine Miller
Client Account Number: 102 /
NCS Account Number: 4510687
Balance:   $25,788.00

# Fair Credit Reporting Act Information Confirmation

Dear Resident Manager,

It is of critical importance that NCS pursue recovery on verifiably correct account balances from the parties who are legally responsible.   As data furnishers to the credit bureaus, we are required by law to conduct an investigation into consumer, or former resident, account disputes

Please understand that it is very important that the information below be reviewed and replied to as soon as possible. Without this verification, NCS will have to close this account or remove the disputed item.

**1. Issue in question**:   IT APPEARS THE FORMER RESIDENT IS BEING CHARGED FOR ACCELERATED RENT. IF THE APARTMENT WAS RE-RENTED DURING THIS PERIOD, PLEASE SEND A REVISED STATEMENT FOR THE CURRENT AMOUNT OWED.

**2. See attachment(s) if applicable.**

**3. Please review your records and respond accordingly via email, phone, or fax. (See contact information below)**

In your reply to this request, it is important that you include a copy of this letter if responding via email or fax. This will allow for proper handling and a more timely resolution to this issue.

Thank you in advance for your assistance in this matter.


Sincerely,

Client Services Department
404-629-9595 or   800-367-1050 ext. 802
legal@nationalcreditsystems.com

# FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102| :Second Request

**From:**        legal@nationalcreditsystems.com
**To:**          Alas Over Lowry <alas@connorgroup.com>
**Date:**        Sat, 25 Sep 2021 13:33:01 +0000
**Attachments:** 65J0KGUUV.PDF (61.25 kB)

Dear Valued Client,

Please see the attached regarding this time-sensitive matter. We are required by law to reply back to the former resident within a narrow timeframe, so your prompt attention to this request would be helpful.

We appreciate your assistance.

Sincerely,

Your collection team at National Credit Systems, Inc.

404-629-9595 or 800-367-1050



*P.O. Box 312125 Atlanta, GA 31131   (800) 459-1539   (404) 629-2728*

09/21/2021

Alas Over Lowery Apts
82 N Uinta Way ofc
Denver,CO 80230

Re: Former Resident Zepherine Miller
Client Account Number: 102 /
NCS Account Number: 4510687
Balance:   $25,788.00

## <u>Fair Credit Reporting Act Information Confirmation</u>

Dear Resident Manager,

It is of critical importance that NCS pursue recovery on verifiably correct account balances from the parties who are legally responsible.   As data furnishers to the credit bureaus, we are required by law to conduct an investigation into consumer, or former resident, account disputes

Please understand that it is very important that the information below be reviewed and replied to as soon as possible. Without this verification, NCS will have to close this account or remove the disputed item.

**1. Issue in question**:   IT APPEARS THE FORMER RESIDENT IS BEING CHARGED FOR ACCELERATED RENT. IF THE APARTMENT WAS RE-RENTED DURING THIS PERIOD, PLEASE SEND A REVISED STATEMENT FOR THE CURRENT AMOUNT OWED.

**2. See attachment(s) if applicable.**

**3. Please review your records and respond accordingly via email, phone, or fax. (See contact information below)**

In your reply to this request, it is important that you include a copy of this letter if responding via email or fax. This will allow for proper handling and a more timely resolution to this issue.

Thank you in advance for your assistance in this matter.


Sincerely,

Client Services Department
404-629-9595 or    800-367-1050 ext. 802
legal@nationalcreditsystems.com

## RE: FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102| :Second Request

| | |
|---|---|
| **From:** | Alas Over Lowry <alas@connorgroup.com> |
| **To:** | legal@nationalcreditsystems.com |
| **Date:** | Tue, 28 Sep 2021 19:03:28 +0000 |
| **Attachments:** | Zepherine Miller - Updated FAS.pdf (70.25 kB) |

Good Afternoon,

Attached is the updated Final Account Statement with the adjusted amount owed.

Thank you,

**Vicki Getz**
Alas Over Lowry
Sales Manager
82 N Uinta Way
Denver, CO 80230
720-452-9055



---

**From:** legal@nationalcreditsystems.com <legal@nationalcreditsystems.com>
**Sent:** Saturday, September 25, 2021 7:33 AM
**To:** Alas Over Lowry <alas@connorgroup.com>
**Subject:** FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102| :Second Request

Dear Valued Client,

Please see the attached regarding this time-sensitive matter. We are required by law to reply back to the former resident within a narrow timeframe, so your prompt attention to this request would be helpful.

We appreciate your assistance.

Sincerely,

Your collection team at National Credit Systems, Inc.

404-629-9595 or 800-367-1050

TCG000087_0001

Alas Over Lowry
82 Uinta Way
Denver, CO  80230-7327

Miller, Zepherine
82 Uinta Way
Denver, CO  80230-7327

## Final account statement - Revised

| **Ledger Account at move-out** | | **FAS Prepared** | |
|---|---|---|---|
| Balance at move-out | **0.00** | Date | 09/28/2021 |
| | | User | little, ben |
| **Deposit Activities** | | | |
| Total Deposits on hand | **0.00** | **Pay to** | |
| | | Miller, Zepherine | |
| **Additional charges/credits/payments after move-out** | | | |
| Lease | **9,670.50** | | |
| Total additional charges / credits / payments | **9,670.50** | **Lease information  - Unit  13-102** | |
| | | Move-in | |
| **Final Account balance** | | Notice given | |
| Balance at move-out | 0.00 | Lease expires | 11/21/2021 |
| Total Deposits | 0.00 | Move-out | |
| Total additional charges / credits / payments | 9,670.50 | Move-out reason | |
| Total account balance due | 9,670.50 | | |
| | | **Lease information  - Unit  13-102** | |
| | | Cancel/Deny date | 12/15/2020 |
| | | Lease expires | 11/21/2021 |
| | | Cancel/Deny reason | Cancelled |

**Please contact us within 30 days of receiving this notice to make satisfactory payment arrangements. If arrangements are not made within 30 days your account will be fowarded to collections.**

_____
Manager

Onesite - Final account statement : Zepherine Miller                    Page 1 of 1

TCG000088_0001

# EXHIBIT "A-13"

DR 04/03/2023 (00MS10) 71.156125.04029308

March 23, 2023

Zepherine Miller
14078 NE 4th Street
Choctaw, OK 73020

TransUnion Consumer Solutions
P.O. Box 2000
Chester, PA 19016

> Re:  Tradeline Dispute
> *Zepherine Miller*
> *Social Security #:* ████████
> *DOB:10/24/1979:*
> *Driver's License No: 17-182-6651*
> *14078 NE 4th Choctaw, OK 73020:*
> *Name of Collection Agency: National Credit Systems, Inc.*
> *Original Creditor Name: Alas Over Lowery [sic] Apts*

To Whom It May Concern:

I am writing to dispute information contained in my credit file.  I am disputing information furnished by National Credit Systems, Inc, (the "Debt Collector") as collection agency for The Connor Group, A Real Estate Investment Firm, LLC d/b/a The Connor Group d/b/a Alas Over Lowery [sic] Apartments (the "Apartment Complex").  The information provided to you by the Debt Collector is incorrect and misleading. Once you do any investigation (or just look at what I provided), I trust you'll delete the tradeline.

I went to lease an apartment from the Apartment Complex. I filled out an application, paid an application fee, was approved, and signed a lease.  After I signed the lease, the Apartment Complex added a deposit to the lease that I never agreed to.  I told her that was not doable and that is when Vikki (now Office Manager) became rude and told me that I have to take the apartment, due to signing the lease without the security deposit being disclosed on it.  I refused to pay this deposit that was added after I had already signed the lease.

After the Apartment Complex was unwilling to honor the lease that I actually signed, they turned over the lease with the deposit to the Debt Collector.  I never agreed to the lease with the deposit. The Debt Collector then reported that I owed money on this lease to you.  I don't.  The only agreement I ever signed was for an apartment with no deposit.  I have never owed any money to the Apartment Complex or the Debt Collector because the Apartment Complex refused to lease the apartment to me based on the lease I agreed to.

After the Debt Collector would not remove this inaccurate information from my credit report and stop reporting it to you, I had to hire an attorney to fight the Apartment Complex in court. I tried to do it as a class action to help other people; I wasn't able to help others in court then, but I'm hoping my dispute here will inform your removal of other National Credit Systems reporting. While I couldn't help others because the judge said that my dispute letter was not enough to put

**NCS-050**

the Apartment Complex on notice that I was going to sue on behalf of others. Ultimately, the Apartment Complex agreed that the lease they turned over to the Debt Collector was void and of no force or effect. The Court entered a judgment declaring that the lease was void and of no force or effect. In other words, I don't owe any money to the Apartment Complex and I don't owe any money to the Debt Collector.

Even though the Apartment Complex has no right to collect any money from me, and the Debt Collector has no right to collect any money from me, this is still showing up on my credit report. It should not.

I am attaching a copy of the lease, a copy of my complaint against the Apartment Complex, and a copy of the Court's order declaring the lease void. You should also know that the Debt Collector is an unreliable source, as the company has been sued 181 times since January 1, 2020, for violations of consumer protection laws, as shown by PACER. They have 6,878 complaints made against them with the CFPB. 1,949 of these complaints are for attempting to collect debt that is not owed, and 690 of these complaints are about incorrect information on a credit report. They couldn't even get the name of the creditor correct on my report. They even misspelled the name of the Apartment Complex. They rely on the same bad source of information if they even look. The Debt Collector gets paid for collecting money so they have little incentive to do what is right: stop reporting this unfair and improper information.

If you need to know anything about this lease, you can call or write the following people:

*Attorneys for Apartment Complex*
Greg Ostfeld
Greenberg Traurig
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
OstfeldG@gtlaw.com
312-476-5056

Lindsay Aherne
Greenberg Traurig
1144 15th Street, Suite 3300
Denver, CO 80202
ahernel@gtlaw.com
303-572-6500

*Apartment Complex Owner*
The Connor Group
10510 N Springboro Pike
Dayton, OH 45342
937-434-3095

*Apartment Complex Property Manager*
Alas Over Lowery
82 Unita Way
Denver, CO 80230
720-868-9157

I didn't know how to deal with this reporting so I contacted my attorney, who helped me write this letter. But the dispute is coming directly from me. If you need any additional information, or if anything in this letter is unclear, please contact me at ladyinnursing@yahoo.com or 405-590-6390. Please send the results of the dispute, and a copy of my file, to me at the address listed above.

Sincerely,

Zepherine Miller

**NCS-051**

DR 04/03/2023 (00MS10) 73.156125.04029308

ZEPHERINE MILLER
("Management") Apt. No. 102 of the ALAS OVER LOWRY ("Resident") agrees to lease from The Canter Group
8489 E LOWRY BLVD DENVER, CO 80230 Apartment Community located at
("Apartment"), upon the following terms and conditions:

**1. RENT:** Resident agrees to pay as rent for said Apartment the sum of TWENTY FIVE THOUSAND SEVEN HUNDRED EIGHTY EIGHT dollars ($25788) payable in 12 monthly installments of TWO THOUSAND ONE HUNDRED FORTY NINE dollars ($2,149) each, payable on or before the first day of each month (THE DUE DATE), without a grace period. Resident shall pay rent without demand at the Management Community's 24-hour rent drop. Rent unpaid after the due date is delinquent...

| Rent | $ 2149 |
| Pet Rent | $ |
| Garage/Carport Rent | $ |
| W/D Rent | $ |
| Other | $ |
| **TOTAL MONTHLY** | $ 2149 |

**2. PET ADDENDUM:** ...

**3. CARPORT OR GARAGE ADDENDUM:** ... located at PARKING LOWRY ... beginning with the NOVEMBER 21, 20 20 ... for a period of 12 MONTHS, beginning NOVEMBER 21 20 20 ...

**4. WASHER & DRYER ADDENDUM:** Resident agrees to rent a washer & dryer from ALAS OVER LOWRY for the term of said lease agreement for 12 MONTHS at the amount of INCLUDED ($ 0 )... repaired by ALAS... 13-102...

**5. TERM:** The initial term of this Agreement shall begin at 12 noon NOVEMBER 21, 2020, and end at 12 noon NOVEMBER 21 2021...

**6. USE:** ...

**7. POSSESSION:** ... 28.25 dollars for...

**8. SECURITY DEPOSIT:** Resident agrees to deposit $ ...

**9. ADMINISTRATIVE FEE:** Resident agrees to pay $ 399 ...

**10. MOVE-OUT:** ...

**11. SUBLET:** ...

**12. UTILITIES:** ...

**13. DESTRUCTION OF THE APARTMENT:** ...

**14. RIGHT TO ENTER:** ...

**15. DRAPES AND SHADES:** ...

**16. ANTENNAE:** ...

**17. SATELLITE DISHES:** ...

TCG CO 150 1119

**NCS-052**

DR 04/03/2023 (OOMSIO) 73.156125.04029308

DR 04/03/2023 (00MS10) 74.156125.04029308

is limited to a maximum of two (2).

**19.   INDEMNIFICATION FOR USE OF RECREATIONAL FACILITIES:** (Applicable only if Apartment Community is equipped with corresponding facilities.) (A) In consideration of making fitness and swimming facilities available to Resident without additional charge, the Resident, his/her spouse, family members, dependents, guests, visitors and anyone else in the Apartment or on the premises of the Apartment Community with Resident's permission, shall cover harmless the owner of the Apartment Community, Management and their respective partners, members, officers, agents, and employees, from any and all liability imposed by law arising out of any injury, illness, or death of any person or the damage, theft or destruction of any property arising out of the Resident's use of the fitness and swimming facilities located on the Premises. Such facilities include but are not limited to the racquetball court, sauna, whirlpool, hot tub, swimming pool, tennis court, volleyball court, weight room, and exercise machines. (B) Resident acknowledges the potential hazards of tenants including, but not limited to this concur, burns, electrosensitivity, contracts, premature skin aging, blood vessel damage and reduced immunity. Further, Resident expressly assumes the risk of such potential hazards (whether known or unknown). Resident agrees to (i) use the tanning bed only during regular office hours; (ii) to use the timer on the bed; (iii) use the bed in increments no greater than twenty (20) minutes at a time and for not more than twenty cumulative minutes in a single 24-hour period; (iv) not to permit any guests to use the bed; (v) only permit dependents 18 years or older residing with the Resident to use the bed; and (vi) to comply with such other rules and regulations as Management may from time to time require regarding usage of the tanning bed. The Resident and the Resident's spouse agrees to hold the owners of the Apartment Community, Management and their respective partners, members, officers, agents, employees and assigns harmless from any liability arising out of an injury or illness arising out of Resident's, Resident's spouse, or dependant's use of the tanning bed located on the Premises. (C) Resident acknowledges and agrees that he/she is responsible for the behavior of his/her spouse, dependents, and guests when they use any recreational facility provided by Management. Resident shall require his/her spouse, dependents, guests and visitors to follow any and all rules contained in this Lease Agreement, permit in or around the facility, or otherwise provided to him/her by Management, concerning the use of recreational facilities, and shall hold Management and its respective partners, members, officers, agents, employees and assigns harmless for any liability or injury resulting from the intentional and negligent use of Apartment Community's recreational facilities by his/her spouse, family members, dependents, guests, or visitors.

**20.   WATER SOFTENERS:** Resident agrees not to install, or cause to be installed, any type of water softening device shall constitute grounds for termination of this Lease Agreement. The illegal installation of any type of water softening device shall constitute grounds for termination of this Lease Agreement.

**21.   HALLWAYS AND OTHER COMMON AREAS:** No bicycles, motorcycles, or toys shall be stored or parked in any hallway or entryway of the Apartment Community and Resident shall not place or store any item (except doormats) in any hallway, entryway, or common area of the Apartment Community. No motorcycles are allowed inside any apartment.

**22.   INSURANCE:** (A) Resident is required, at his/her sole cost and expense, to procure and maintain, throughout the term of this Lease Agreement and any renewal period, Renter's insurance including fire coverage and covering claims for bodily injury under personal injury, including death and property damage occurring in or upon or resulting from the Apartment, in attached them and with an insurance carrier rated "A-" or better by A.M. Best or equivalent with said insurance carrier licensed to do business in the state where the Apartment is located. (B) Coverage with a minimum of $200,000 Combined Single Limit in respect to any one accident or occurrence is required. Each policy provided for in this section shall contain an agreement by the Insurer that the policy cannot be canceled without at least thirty (30) days prior written notice to Management. Insurer and/or its agent may charge a late fee for any payments not received on a timely basis. Said late fee shall be considered at the same as unpaid rent and grounds for not accepting future rental payments. (C) A Certificate of Insurance evidencing Comprehensive Personal Liability Insurance shall be required and kept on file in the Apartment Community Manager's office at the time the Lease Agreement is executed. Waterbeds are permitted with proof of insurance and a copy of the Declaration page submitted to the Rental Office.

**23.   DAMAGE TO PROPERTY:** Resident shall personally refrain, and shall forbid his/her spouse, family members, dependents, guests, visitors, and anyone else in the Apartment or on the premises of the Apartment Community with Resident's permission, from intentionally or negligently placing, destroying, defacing, damaging or removing any part of the Apartment or Apartment Community including, but not limited to, structure, walls, flooring, plans, plumbing, wiring, fixtures, and appliances. Resident shall reimburse Management within five (5) days of demand for the cost of repairs for damage beyond ordinary wear and tear, caused intentionally or negligently by Resident, his/her family, dependents, guests, or visitors.

**24.   HOLDING OVER:** (A) If Resident or an approved sub-lessee remains in or continues to be in possession of the Apartment or any part thereof after the termination of this Agreement, Management shall, at its option, have the right to charge Resident or sub lessee, as liquidated damages for the time that he/she remains or remains in possession, a rent equal to twice the amount of rent, or to treat such holder over as a renewal by Resident or sub lessee of the same duration as covered hereby, upon the same terms and conditions, except that Management may charge the highest amount rent being charged for a like apartment at the time of the hold over. In the event Management elects to treat such holding over as a renewal of this Agreement, each and all terms of this Agreement, excepting only the rent charge as provided above, shall be and remain in full force and effect for the renewal term. (B) In the event no removal is desired or if it is refused by Management, Management shall proceed to let the Apartment to another and charge Resident for any damages resulting from his/her failure to deliver possession at the time of termination, in addition to any other rights accruing to Management under law and the terms of this Agreement.

**25.   NONWAIVER:** Failure of Management to insist upon strict compliance with the terms of this Agreement shall not constitute a waiver of Management's right to act on any violation.

**26.   REMEDIES CUMULATIVE:** All remedies under this Agreement or in law or equity shall be cumulative.

**27.   ATTORNEY'S FEES:** In the event of (i) the employment of an attorney by Management because of a violation by Resident of any terms or conditions of this Agreement, or (ii) should Management employ an attorney and prevail in the defense of any legal action brought by Resident, Resident shall pay such attorney's fees and other costs or expenses incurred by Management in connection therewith, which shall be considered an additional fee and shall be secured hereunder.

**28.   REPAIRS:** Resident acknowledges and agrees that he/she accepts the Apartment "as is" and that the Apartment is in a tenantable condition. Resident agrees to keep and the end of the lease, return the Apartment and fixtures therein in a clean and orderly condition and in good repair. Management will make repairs to the Apartment, as required by law, with reasonable promptness after receipt of written notice from Resident. Resident agrees to immediately notify Management of any condition (a) that requires repair or maintenance, or (b) that diminishes or interferes with the habitability or Resident's quiet enjoyment of the Apartment. Time is of the essence with respect to Resident's obligation to provide notice to Management under this Section 28. Failure to provide notice in Management an required under this Section 28 is grounds for eviction.

**29.   NOTICES:** All notices shall be in writing and given personally, mailed by registered or certified mail, or in the case of notice given by Management to Resident, mailed to Resident's Apartment.

**30.   ABANDONMENT:** Resident must not abandon the Apartment. "Abandonment" is defined as the desertion of the Apartment by Resident for more than ten (10) days without payment of the rent due under the terms of this Agreement. If Resident vacates or abandons the Apartment in violation of this Agreement, any property Resident leaves on the premises shall be deemed to have been abandoned and may either be retained by Management as Management's property or sold at public or private sale as Management sees fit. The proceeds of any such sale or the fair market value of property of Resident retained by Management under this section shall be applied by Management against (1) Management's expenses for removal, storage or sale of Resident's personal property; (2) the amount of rent and fees or future rent and fees payable under this Agreement; (3) any other damages to which Management may be entitled hereunder. The remaining balance, if any, shall be given to Resident upon written demand with forwarding address, without interest.

**31.   SUBORDINATION:** Resident's rights under this Agreement shall at all times be junior and subject to any deed to secure debt which is now or is later placed on the premises of which the Apartment is a part; and if requested, Resident shall execute promptly any certificate that Management may request to specifically implement the subordination provision of this Agreement.

**32.   DEFAULT:** Any breach or violation of any provision of this Agreement, or any untrue information in Resident's application to rent, shall give Management the right to terminate this Agreement upon thirty (30) days' notice for non-rent defaults and three (3) days' notice for rent default. In the event of termination, Management shall have the right to sue for possession, damages, and all past and future rent due under this Agreement. Management shall have the further right to re-let the Apartment, and Resident shall be liable to Management for the difference, if any, between all rent due hereunder and the total rent obtained by Management upon such re-letting.

**33.   SEVERABILITY:** If any provision of this Agreement is invalid under applicable law, such provision shall be ineffective to the extent of the invalidity only, without invalidating the remainder of this Agreement.

**34.   RULES AND REGULATIONS:** Resident, his/her family, guests, and visitors shall comply with all governmental laws and regulations, and all rules and regulations issued by Management which may be changed during the term of this Agreement. The Rules and Regulations attached hereto are deemed a part of this Lease Agreement.

**35.   ENTIRE AGREEMENT:** This Agreement constitutes the entire Agreement between the parties, and no modification of this Agreement is valid unless in writing signed by Resident and an authorized agent of Management as identified in Section 37 of this Agreement.

**36.   LIMITATION ON CLAIMS AGAINST MANAGEMENT:** Notwithstanding any statute of limitations available at law to claim by Resident against Management arising from this Lease Agreement, Resident agrees not to commence any action or lawsuit against Management relating to this Lease Agreement or Resident's occupancy of the Apartment more than six (6) months after the termination of this Lease Agreement.

| | |
|---|---|
| **37.  This Lease Agreement is valid and binding only when signed by an authorized representative of Management. Only a Property Manager or a member of the Senior Management Team is an authorized agent of Management for the purposes of binding Management to this Lease Agreement. X _____** | **(Resident's initials)** |

Dated NOVEMBER 25, 20 20    By: _Ryan Moore_                                         (Authorized Agent of Management)

Resident (print clearly) X _Zepherine Miller_          Resident (signature) X _Zepherine Miller_

Other Person(s) Residing in Apartment:

_____          _____

_____          _____

Dated _____, 20____     By: _____          (Authorized Agent of Management)

TCG CO 150 1119

DR 04/03/2023 (00MS10) 75.156125.04029308

| | |
|---|---|
| DISTRICT COURT, CITY AND COUNTY OF DENVER, STATE OF COLORADO<br><br>Court Address:   1437 Bannock Street, Denver, Colorado 80202 | DATE FILED: March 30, 2022 7:02 PM<br>FILING ID: C5726D00C3A5F<br>CASE NUMBER: 2021CV34094 |
| ZEPHERINE MILLER, an individual, on behalf of herself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE CONNOR GROUP, A REAL ESTATE INVESTMENT FIRM, LLC d/b/a THE CONNOR GROUP, an Ohio limited liability company,<br><br>Defendant. | ▲ Court Use Only ▲<br><br>Case Number:<br>2021CV34094<br><br>Division 275 |
| **Attorneys for Plaintiff**<br>Daniel J. Vedra, Atty. Reg. #43596<br>Vedra Law LLC<br>1444 Blake Street<br>Denver, CO 80202<br>Phone Number:   (303) 937-6540<br>Fax Number:   (303) 937-6547<br>Email:   dan@vedralaw.com<br><br>Phillip Robinson, Md. Atty. Reg. #0006210356<br>*Admitted Pro Hac Vice*<br>Consumer Law Center LLC<br>10125 Colesville Road, Suite 378<br>Silver Spring, MD 20901<br>Phone Number: (301) 448-1304<br>Email: phillip@marylandconsumer.com | |
| **AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND** | |

Plaintiff Zepherine Miller, an individual ("**Plaintiff**"), on behalf of herself and all others similarly situated, files her Class Action Complaint and Jury Demand against The Connor Group,

00070960. 1

**NCS-055**

DR 04/03/2023 (00MS10) 76.156125.04029308

A Real Estate Investment Firm, LLC d/b/a The Connor Group, an Ohio limited liability company (the "**Defendant**").

## I.     INTRODUCTION

1.     Plaintiff brings this action on behalf of herself and all others similarly situated for redress under the Colorado Rental Application Fairness Act, C.R.S. § 38-12-901 *et seq.* ("**RAFA**"). In 2019, the Colorado legislature enacted RAFA to prohibit residential landlords from charging rental application fees in excess of the landlord's actual cost. C.R.S. § 38-12-903(1). RAFA also requires residential landlords to provide disclosure of the basis for the fees charged. C.R.S. § 38-12-903(3)(a).

2.     The Defendant is a residential property manager who manages over a thousand residential units in the Denver metro area.   The Defendant does not comply with either RAFA's limitations on costs or RAFA's disclosure obligations.  Instead, the Defendant routinely charges a total of $427.00 in rental application fees per application.  These fees exceed or greatly exceed RAFA's limitation on rental application fees.  Moreover, Defendant conceals and does not disclose its anticipated expenses for the rental application fees or an itemization of its actual expenses incurred, contrary to RAFA's disclosure requirements. Plaintiff is one among many residential tenants who the Defendant has illegally charged an excessive rental application fee without proper disclosure while concealing the true rental application fees as part of the transaction.

## II.    PARTIES, JURISDICTION, AND VENUE

3.     Plaintiff is an individual who resides in the City and County of Denver, State of Colorado.

4.     The Defendant is an Ohio limited liability company.

5.     The Defendant has a principal place of business located at 10510 Springboro Pike, Miamisburg, OH 45342.

00070960. 1

2

**NCS-056**

DR 04/03/2023 (OOMS1O) 77.156125.04029308

6.    The Defendant maintains a registered agent in Colorado located at 7700 E. Arapahoe Road, Suite 220, Centennial, Colorado 80112.

7.    This Court has jurisdiction over these claims pursuant to Article VI, Section 9 of the Colorado Constitution.

8.    Venue is proper pursuant to C.R.C.P. 98(c)(1) because the Defendant is a non-resident of this state and the City and County of Denver, State of Colorado is the county designated in this Complaint.

## III.   FACTUAL ALLEGATIONS

### A.    Background Facts

9.    Defendant is a residential rental property manager.

10.   Defendant manages four different properties in the Denver metro area: Alas Over Lowry, Gardens at Cherry Creek, Outlook DTC, and Terracina.

11.   Alas Over Lowry is a 300-unit residential apartment complex located at 82 N. Uinta Way, Denver, Colorado 80230.

12.   Defendant began managing Alas Over Lowry in approximately October of 2020.

13.   Gardens at Cherry Creek is a 191-unit residential apartment complex located at 225 S. Harrison Street, Denver, Colorado 80209.

14.   Defendant began managing Gardens at Cherry Creek in approximately July of 2017.

15.   Outlook DTC is a 242-unit residential apartment complex located at 5301 S. Ulster Street, Denver, Colorado 80237.

16.   Defendant began managing Outlook DTC in approximately October of 2021.

17.   Terracina is a 386-unit residential apartment complex located at 13620 Via Varra Way, Broomfield, Colorado 80020.

18.   Defendant began managing Terracina in approximately November of 2018.

00070960. 1

3

**NCS-057**

19.    Alas Over Lowry, Gardens at Cherry Creek, Outlook DTC, and Terracina are referred to hereinafter as the "Class Apartment Complexes".

**B.    Facts Specific to Plaintiff**

20.    Plaintiff applied to become a tenant at Alas Over Lowry.

21.    The Defendant initially charged Plaintiff a $28.00 application fee and $399.00 administrative fee.

22.    After Plaintiff paid the $28.00 application fee and $399.00 administrative fee, Defendant did not provide to Plaintiff either a disclosure of the Defendant's anticipated expenses for which the fees will be used or an itemization of the Defendant's actual expenses incurred.  As of the date of this filing, Defendant still has not made the disclosure required by C.R.S. § 38-12-903(3).

23.    After Plaintiff paid the $28.00 application fee and $399.00 administrative fee, Plaintiff signed a lease to rent a unit at Alas Over Lowry.

24.    The lease the Plaintiff signed was a form lease prepared by the Defendant containing substantially similar terms for each residential tenant at Alas Over Lowry.

25.    The lease that Plaintiff signed contained a blank section for a security deposit.

26.    The authorized representative of Defendant and also the Plaintiff both signed the lease with the security deposit section in blank.

27.    Neither Plaintiff nor Defendant agreed, orally or otherwise, that the amount of the security deposit would be agreed upon after the execution of the lease.

28.    After signing the lease and leaving the property, a representative of Defendant contacted Plaintiff and told her that she must pay a $1,000.00 security deposit.

29.    Plaintiff did not agree to pay the $1,000.00 security deposit.

30.    Defendant refused to deliver possession of the leased premises to Plaintiff without first paying a $1,000.00 security deposit that Plaintiff never agreed to pay as part of the lease terms.

00070960. 1

4

**NCS-058**

DR 04/03/2023 (00MS10) 79.156125.04029308

31.      After Plaintiff did not agree to pay the $1,000.00 security deposit, Defendant began treating Plaintiff as though she were in breach of their agreement for failing to comply with a term of the lease that Plaintiff did not agree to.

32.      After Plaintiff did not pay the $1,000.00 security deposit that she never agreed to pay, Defendant assigned the lease, less than one year before the commencement of this action, to a collection agency.

33.      When Defendant assigned Plaintiff's alleged obligation to this collection agency, Defendant unfairly, falsely, and/or deceptively claimed that Plaintiff was entitled to the balance of the entire lease term as liquidated damages for Plaintiff's alleged breach of the lease.

34.      On or about October 30, 2021, Plaintiff sent a written demand that Defendant refund the application fee and administrative fee.

35.      This demand was made on behalf of the Plaintiff and all others similarly situated. Plaintiff demanded Defendant refund the fees at issue to others as well.

36.      On or about November 3, 2021, Defendant received Plaintiff's written demand.

37.      Within seven days of receiving Plaintiff's written demand and also as of this filing, Defendant did not refund any amount to Plaintiff and has not otherwise responded by curing its non-disclosure and other violations.

38.      On December 29, 2021, Plaintiff commenced this action.

39.      On or about January 12, 2021, Plaintiff served Defendant with the original complaint in this action.

40.      The original complaint sought damages for Defendant's violations of RAFA.

41.      The original complaint notified Defendant of the relief that Plaintiff intended to seek under RAFA for herself and on behalf of the class.

42.      Within seven days of being served with the complaint, Defendant did not refund any amount to Plaintiff or the unnamed members of the class described herein.

00070960. 1

5

**NCS-059**

DR 04/03/2023 (00MS10) 80.156125.04029308

43.     Defendant claims or may claim that it did not receive Plaintiff's October 30, 2021, written demand.

44.     On January 31, 2022, Plaintiff sent the October 30, 2021, written demand to Defendant's counsel.  Defendant's counsel received this written demand as agent for the Defendant.

45.     On January 31, 2022, Defendant received the October 30, 2021, written demand again through its authorized agents—i.e. Defendant's counsel.

46.     On January 31, 2022, Defendant also had in its possession both the original demand and the original complaint.

47.     Within seven days of January 31, 2022, Defendant still did not refund any amount to Plaintiff and has not otherwise responded by curing its non-disclosure and other violations.

48.     Defendant has had three opportunities to cure its violations of RAFA and has knowingly and recklessly not cured its violations of the RAFA.

49.     Defendant has failed to cure its violations of RAFA at all times through this filing.

**D.      Facts Common to the Class.**

50.     Defendant manages each of the Class Apartment Complexes.

51.     Defendant uses the same or substantially similar form lease at each of the Class Apartment Complexes.

52.     Defendant charges the same or similar $28.00 "application fee" (referred to hereinafter as the **"Credit Application Fee"**) and $399.00 "administrative fee" (referred to hereinafter as the **"Admin Fee"**) at each of the Class Apartment Complexes.

53.     Both the Credit Application Fee and the Admin Fee are charged at the same time as and in connection with a prospective tenant applying to rent an apartment at one of the Class Apartment Complexes.

00070960. I

DR 04/03/2023 (OOMS10) 81.156125.04029308

54.     Both the Credit Application Fee and the Admin Fee are charged and accepted before a prospective tenant signs a lease to rent an apartment at one of the Class Apartment Complexes.

55.     Both the Credit Application Fee and the Admin Fee are charged and accepted before a prospective tenant commences the term of the tenant's lease to rent an apartment at one of the Class Apartment Complexes.

56.     Defendant will not consider a rental application to rent an apartment at one of the Class Apartment Complexes unless and until a prospective tenant pays both the Credit Application Fee and the Admin Fee.

57.     Defendant unfairly conceals and otherwise does not provide to any prospective tenant who has paid the Credit Application Fee or the Admin Fee either a disclosure of the Defendant's anticipated expenses for which the fee will be used or an itemization of the Defendant's actual expenses incurred. Without the proper statutory disclosure the Plaintiff and putative class members cannot know of the facts necessary to understand their rights for the claims presented herein.

58.     On information and belief, the Credit Application Fee exceeds the Defendant's actual costs in processing a tenant's rental application. This belief is based on the representations of the Defendant's agents that it does "everything in house" and from the experience of the Plaintiff does very little review to determine whether an applicant is qualified.

59.     On information and belief, the Admin Fee exceeds the Defendant's actual costs in processing a tenant's rental application. In Defendant's agent's words, Defendant does everything in house and it took only a few minutes to process the application.

60.     The Defendant does not use any amount of the Admin Fee to cover the Defendant's costs in processing a tenant's rental application.

00070960. 1

7

**NCS-061**

DR 04/03/2023 (00MS10) 82.156125.04029308

**E.    Class Allegations.**

61.    This action is brought on behalf of a class of individuals defined as:

(i) all persons; (ii) who in the time since 12:01 a.m. on August 2, 2019, to the present; (iii) paid an "application fee" and/or "administrative fee" to the Defendant; (iv) to rent a residential property at one of the Class Apartment Complexes.

Excluded from the class are: (i) any officers, directors, or employees of Defendant; (ii) the legal representatives, heirs, successors, or assigns of Defendant; (iii) any judicial officer assigned to this matter and his or her immediate family; (iv) Plaintiffs' counsel and (v) any agent or employee of Plaintiff's counsel.

62.    Members of the class may be ascertained from the Defendant's records.  Whether a person was charged the Credit Application Fee and/or Admin Fee may be determined by reference to the Defendant's records.  Whether the Defendant disclosed the actual or anticipated expenses for the Credit Application Fee and Admin Fee may be determined by reference to the Defendant's records.

63.    There are more than 100 persons who are members of the proposed class.  As a matter of public record, Defendant manages approximately 1,119 units at the Class Apartment Complexes.  Defendant charges each new tenant the Credit Application Fee and $399.00 Admin Fee, and has charged these fees since at least August of 2019.

64.    There are questions of law or fact common to the class, which common issues predominate over any issues involving only individual class members.  These common issues to the class include:

(i)    whether Defendant provided the class members with the C.R.S. § 38-12-903(3) disclosure, and if not, what is the consequence for its concealment under the RAFA;

(ii)    whether class members paid a Credit Application Fee and/or Admin Fee;

(iii)    whether the Credit Application Fee and/or Admin Fee exceed the Defendant's costs in processing a rental application;

**NCS-062**

DR 04/03/2023 (00MS10) 83.156125.04029308

> (iv)    whether Defendant provided to any prospective tenant who paid the Credit Application Fee and/or Admin Fee a disclosure of the Defendant's anticipated expenses for which the fee will be used or an itemization of the Defendant's actual expenses incurred;
>
> (v)    whether the Credit Application Fee is a "rental application fee", as that term is defined by C.R.S. § 38-12-902(5);
>
> (vi)    whether the Admin Fee is a "rental application fee", as that term is defined by C.R.S. § 38-12-902(5); and
>
> (vii)    whether the Defendant is liable to any person who paid the Credit Application Fee, Admin Fee, or both, for three times the amount so charged in accordance with C.R.S. § 38-12-905(1).

65.    Plaintiff's claims are typical of those of the class members.  All are based on the same facts and legal theories.

66.    Plaintiff will fairly and adequately protect the interests of the class.  Plaintiff has retained counsel experienced in handling class actions and actions involving unfair and deceptive business practices.  Neither Plaintiff nor her counsel have any interest which might cause them not to pursue this action vigorously.

67.    Certification of the class under Rule 23(b)(3) of the Colorado Rules of Civil Procedure is also appropriate in that:

> a.    The questions of law or fact common to the members of the class predominate over any questions affecting an individual member; and
>
> b.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

68.    Certification of each class under Rule 23(b)(2) of the Colorado Rules of Civil Procedure is also appropriate in that each defendant has acted on grounds generally applicable to

00070960.1

**NCS-063**

DR 04/03/2023 (00MS10) 84.156125.04029308

the class thereby making injunctive and declaratory relief appropriate with respect to the class as a whole.

69.     Plaintiff requests certification of a hybrid class of Rule 23(b)(3) for monetary damages and Rule 23(b)(2) for equitable relief.

### FIRST CLAIM FOR RELIEF
**(Violation of RAFA – On Behalf of Plaintiff and the Class)**

70.     Plaintiff incorporates by reference the allegations of paragraphs 1-69 as though fully set forth herein.

71.     Defendant is a "landlord", as that term is defined by C.R.S. § 38-12-902(2).

72.     Plaintiff and all members of the class are each "tenants", as that term is defined by C.R.S. § 38-12-902(6).

73.     The Credit Application Fee is a "rental application fee", as that term is defined by C.R.S. § 38-12-902(5).

74.     The Admin Fee is a "rental application fee", as that term is defined by C.R.S. § 38-12-902(5).

75.     The Credit Application Fee and the Admin Fee, individually and/or in aggregate, exceed the landlord's actual costs in processing a rental application for which they are associated.

76.     The Defendant has failed to provide to prospective tenants who have paid the Credit Application Fee and/or the Admin Fee the mandatory C.R.S. § 38-12-903(3) disclosure of the Defendant's anticipated expenses for which the fee will be used or an itemization of the Defendant's actual expenses incurred. Without the required statutory disclosure, Plaintiff and the Class members cannot reasonably know the facts necessary to understand their rights under RAFA.

77.     Defendant has violated RAFA and continues to violate RAFA.

78.     Defendant has received multiple notices of its violations of RAFA.

00070960. 1

**NCS-064**

DR 04/03/2023 (00MS10) 85.156125.04029308

79.     At least seven days have passed since Defendant received each of the notices of its violations of RAFA, and Defendant has not corrected or cured its violations of RAFA whatsoever.

80.     Defendant is liable to each member of the class for three times the amount of the Credit Application Fee and the Admin Fee.  C.R.S. § 38-12-905(1).

81.     Defendant is liable for Plaintiff's reasonable attorney fees and costs.  C.R.S. § 38-12-905(1).

82.     Plaintiff and the class are entitled to a declaration that the Credit Application Fee and Admin Fee violate the limitations for rental application fees imposed by RAFA.

83.     Plaintiff and the class are entitled to a declaration that the failure to provide disclosure of the actual or anticipated costs for processing a rental application while charging the Credit Application Fee and Admin Fee violates the disclosure requirements imposed by RAFA.

84.     Plaintiff and the class are entitled to an injunction prohibiting the Defendant from charging rental application fees in excess of the amounts imposed by RAFA.

85.     Plaintiff and the class are entitled to an injunction prohibiting the Defendant from charging the Credit Application Fee and Admin Fee without appropriate disclosure in accordance with RAFA.

## SECOND CLAIM FOR RELIEF
### (Declaratory Judgment – Individually Only)

86.     Plaintiff incorporates by reference the allegations of paragraphs 1-85 as though fully set forth herein.

87.     A dispute has arisen as to whether Plaintiff is obligated to Defendant under the terms of a certain lease.

88.     There is uncertainty over whether the lease is effective.

89.     An actual and justiciable controversy exists as to whether the lease is effective.

00070960. 1

11

**NCS-065**

DR 04/03/2023 (OOMS10) 86.156125.04029308

90.    A declaration of Plaintiff and Defendant's respective obligations would terminate the controversy.

91.    Plaintiff is entitled to a declaration that Plaintiff is not obligated to Defendant under the lease.

92.    Plaintiff is entitled to a declaration that Defendant was not permitted to alter the terms of the lease without Plaintiff's written consent.

### THIRD CLAIM FOR RELIEF
#### (Violations of the CCPA – Individually Only)

93.    Plaintiff incorporates by reference the allegations of paragraphs 1-92 as though fully set forth herein.

94.    Defendant is in the business of leasing residential real property to individuals.

95.    In the course of leasing a residential apartment to Plaintiff, and in violation of C.R.S. § 6-1-105(1)(u), Defendant failed to disclose material information concerning the apartment to Plaintiff, including, but not limited to, the requirement that Plaintiff pay a security deposit and the basis of its rental application fees.

96.    The information that Defendant failed to disclose was known to Defendant at the time of sale to Plaintiff.

97.    In reliance to Defendant's representations to her, Plaintiff paid money to the Defendant.

98.    When Defendant failed to disclose that Plaintiff was required to pay a security deposit, the failure to disclose such information was intended to induce Plaintiff to enter into a transaction.

99.    When Defendant failed to disclose the basis of its rental application fees, the failure to disclose such information was intended to induce Plaintiff to enter into a transaction.

00070960.1

**NCS-066**

DR 04/03/2023 (00MS10) 87.156125.04029308

100.    Defendant has failed to disclose the same or similar information to multiple actual and potential tenants.

101.    Defendant's failure to disclose material information concerning the apartments it rents to consumers significantly impacts the public as actual or potential consumers of the Defendant's goods, services, and property.

102.    Defendant's failure to disclose is done in bad faith and violation of Colorado law.

103.    Plaintiff has been damaged as a result of Defendant's acts and omissions and Plaintiff's reasonable reliance that she was dealing with a honest company acting within the law.

104.    Plaintiff is entitled to her actual damages in a minimum amount of $500.00, trebled for willfulness, and her reasonable attorney fees and costs. C.R.S. § 6-1-113.

<div align="center">**JURY DEMAND**</div>

Plaintiff demands a trial by jury as to all claims so triable. Plaintiff has submitted a jury fee concurrently with this Complaint.

WHEREFORE, Plaintiff Zepherine Miller, individually, and on behalf of all others similarly situated, prays for relief and judgment in her favor and in favor of the class against The Connor Group, A Real Investment Firm, LLC d/b/a The Connor Group, as follows:

A.    Certifying this action as a class action;

B.    Awarding Plaintiff and members of the class damages in an amount equal to three times the amount of rental application fees charged;

C.    Awarding Plaintiffs' and members of the class their reasonable attorney fees and costs;

D.    Declaring that the Defendant's practices of charging a rental application fee in excess of its actual costs of processing the application is illegal and enjoining Defendant from such unlawful action;

E.    Declaring that Plaintiff has no obligations to Defendant under that certain lease agreement;

00070960. 1

<div align="center">**NCS-067**</div>

DR 04/03/2023 (OOMS10) 88.156125.04029308

F.     Declaring Defendant was not permitted to alter the lease with the Plaintiff without Plaintiff's written consent;

G.     Awarding Plaintiff and members of the class pre-judgment and post-judgment interest as may be allowed under the law;

H.     Awarding Plaintiff damages for Defendant's violations of the Colorado Consumer Protection Act, trebled for willfulness, together with her reasonable attorney fees and costs; and

I.     Awarding such other and further relief as the Court may deem just and proper.

Dated: March 30, 2022

**Vedra Law LLC**

By:    /s/ Daniel J. Vedra
       Daniel J. Vedra
       *Attorneys for Plaintiff*

00070960. 1

**NCS-068**

DR 04/03/2023 (OOMS10) 89.156125.04029308

| DISTRICT COURT, CITY AND COUNTY OF DENVER, STATE OF COLORADO<br>1437 Bannock Street, Room 256<br>Denver, CO 80202<br>303-606-2300 | DATE FILED: January 30, 2023 6:16 PM<br>CASE NUMBER: 2021CV34094 |
|---|---|
| ZEPHERINE MILLER, an individual, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>THE CONNOR GROUP, A REAL ESTATE INVESTMENT FIRM, LLC d/b/a THE CONNOR GROUP, an Ohio limited liability company,<br><br>Defendant. | ▲ COURT USE ONLY ▲<br><br>Case Number: 2021CV34094<br><br>Courtroom: 275 |

## ORDER OF JUDGMENT AGAINST DEFENDANT

On January 4, 2023, Plaintiff Zepherine Miller timely accepted an offer of judgment made by Defendant The Connor Group, A Real Estate Investment Firm, LLC d/b/a The Connor Group pursuant to C.R.S. § 13-17-202 to have judgment entered in favor Plaintiff.   Accordingly, **IT IS ORDERED THAT**:

1.      Judgment is entered in favor of Zepherine Miller and against The Connor Group, A Real Estate Investment Firm, LLC d/b/a The Connor Group in the amount of **One Thousand Seven Hundred and Eighty-One Dollars ($1,781.00)** together with pre-judgment interest in the amount of $308.20;

2.      In accordance with C.R.C.P. 121 § 1-22(2), within 21 days of entry of this Order, Zepherine Miller may submit a bill of costs, and a motion for reasonable attorneys' fees recoverable under C.R.S. § 13-17-202, the Colorado Consumer Protection Act, C.R.S. § 6-1-101 et seq., and the Colorado Rental Application Fairness Act, C.R.S. § 38-12-901 et seq.; and

3.      The Court declares that Plaintiff is not obligated to Defendant under the subject lease agreement and the lease agreement is void.

4.      All future dates in this case are hereby **VACATED.**

DATED AND ORDERED January 30, 2023.          BY THE COURT:

Kandace C. Gerdes
District Court Judge

**NCS-069**

DR 04/03/2023 (00MS10) 90.156125.04029308

Zepherine Miller
14078 NE 4th
Choctaw ok men 20



CERTIFIED MAIL®

0 0003 0664 2182

TransUni

P.O.Bo

Chester



**NCS-070**

DR 04/03/2023 (00MS10) 90.156125.04029308

# EXHIBIT "A-14"

## FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102|

**From:**            legal@nationalcreditsystems.com
**To:**              Alas Over Lowry <alas@connorgroup.com>
**Date:**            Fri, 14 Apr 2023 07:07:24 +0000
**Attachments:**     LD06ORWB.DOC (80.6 kB); 4510687.pdf (1.31 MB)

Hi,

Please see the attached information request regarding your former resident. We are required by law to reply back to the former resident within a narrow timeframe, so your prompt attention to this request would be helpful.

We appreciate your assistance.

Sincerely,

**Client Services Department**





*P.O. Box 672288 Marietta, GA 30006   (800) 459-1539   (404) 629-2728*

04/14/2023

Alas Over Lowery Apts
82 Uinta Way Ofc
Denver,CO 80230

Re: Former Resident Zepherine Miller
Client Account Number: 102 /
NCS Account Number: 4510687
Balance: $9,670.50
Move-out Date: 11/27/2020

# Fair Credit Reporting Act Information Confirmation

Dear Resident Manager,

It is of critical importance that NCS pursue recovery on verifiably correct account balances from the parties who are legally responsible.   As data furnishers to the credit bureaus, we are required by law to conduct an investigation into consumer, or former resident, account disputes

Please understand that it is very important that the information below be reviewed and replied to as soon as possible and **no later than 05/04/2023.** Without this verification, NCS will have to close this account or remove the disputed item.

**1. Issue in question**:   THE FORMER RESIDENT IS DISPUTING THE DEBT. PLEASE REVIEW THE ATTACHED DISPUTE ALONG WITH YOUR RECORDS AND CONFIRM IF THE DEBTOR OWES THE BALANCE. ALSO, PLEASE VERIFY THE BALANCE AND CONFIRM IF THE CHARGES BEING ASSESSED ARE CORRECT OR IF THE BALANCE SHOULD BE REVISED.

**2. See attachment(s) if applicable.**

**3. Please review your records and respond accordingly via email, phone, or fax. (See contact information below)**

In your reply to this request, it is important that you include a copy of this letter if responding via email or fax. This will allow for proper handling and a more timely resolution to this issue.

Thank you in advance for your assistance in this matter.


Sincerely,

Client Services Department
404-629-9595 or   800-367-1050 ext. 802
legal@nationalcreditsystems.com

# FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102| :Second Request

| | |
|---|---|
| **From:** | legal@nationalcreditsystems.com |
| **To:** | Alas Over Lowry <alas@connorgroup.com> |
| **Date:** | Wed, 19 Apr 2023 00:16:00 +0000 |
| **Attachments:** | 6LH17FSXG.DOC (80.6 kB) |

Dear Valued Client,

Please see the attached regarding this time-sensitive matter. We are required by law to reply back to the former resident within a narrow timeframe, so your prompt attention to this request would be helpful.

We appreciate your assistance.

Sincerely,

Your collection team at National Credit Systems, Inc.

404-629-9595 or 800-367-1050



*P.O. Box 672288 Marietta, GA 30006   (800) 459-1539   (404) 629-2728*

04/14/2023

Alas Over Lowery Apts
82 Uinta Way Ofc
Denver,CO 80230

Re: Former Resident Zepherine Miller
Client Account Number: 102 /
NCS Account Number: 4510687
Balance: $9,670.50
Move-out Date: 11/27/2020

# Fair Credit Reporting Act Information Confirmation

Dear Resident Manager,

It is of critical importance that NCS pursue recovery on verifiably correct account balances from the parties who are legally responsible.   As data furnishers to the credit bureaus, we are required by law to conduct an investigation into consumer, or former resident, account disputes

Please understand that it is very important that the information below be reviewed and replied to as soon as possible and **no later than 05/04/2023.** Without this verification, NCS will have to close this account or remove the disputed item.

**1. Issue in question**:   THE FORMER RESIDENT IS DISPUTING THE DEBT. PLEASE REVIEW THE ATTACHED DISPUTE ALONG WITH YOUR RECORDS AND CONFIRM IF THE DEBTOR OWES THE BALANCE. ALSO, PLEASE VERIFY THE BALANCE AND CONFIRM IF THE CHARGES BEING ASSESSED ARE CORRECT OR IF THE BALANCE SHOULD BE REVISED.

**2. See attachment(s) if applicable.**

**3. Please review your records and respond accordingly via email, phone, or fax. (See contact information below)**

In your reply to this request, it is important that you include a copy of this letter if responding via email or fax. This will allow for proper handling and a more timely resolution to this issue.

Thank you in advance for your assistance in this matter.

Sincerely,

Client Services Department
404-629-9595 or   800-367-1050 ext. 802
legal@nationalcreditsystems.com

March 23, 2023

Zepherine Miller
14078 NE 4th Street
Choctaw, OK 73020

Experian
P.O. Box 455
Allen, TX 75013

> Re:  Tradeline Dispute
> *Zepherine Miller*
> *Social Security #:* ▮▮▮▮▮▮▮▮▮
> *DOB:10/24/1979:*
> *Driver's License No: 17-182-6651*
> *14078 NE 4th Choctaw, OK 73020:*
> *Name of Collection Agency: National Credit Systems, Inc.*
> *Original Creditor Name: Alas Over Lowery [sic] Apts*

To Whom It May Concern:

I am writing to dispute information contained in my credit file. I am disputing information furnished by National Credit Systems, Inc, (the "Debt Collector") as collection agency for The Connor Group, A Real Estate Investment Firm, LLC d/b/a The Connor Group d/b/a Alas Over Lowery [sic] Apartments (the "Apartment Complex"). The information provided to you by the Debt Collector is incorrect and misleading. Once you do any investigation (or just look at what I provided), I trust you'll delete the tradeline.

I went to lease an apartment from the Apartment Complex. I filled out an application, paid an application fee, was approved, and signed a lease. After I signed the lease, the Apartment Complex added a deposit to the lease that I never agreed to. I told her that was not doable and that is when Vikki (now Office Manager) became rude and told me that I have to take the apartment, due to signing the lease without the security deposit being disclosed on it. I refused to pay this deposit that was added after I had already signed the lease.

After the Apartment Complex was unwilling to honor the lease that I actually signed, they turned over the lease with the deposit to the Debt Collector. I never agreed to the lease with the deposit. The Debt Collector then reported that I owed money on this lease to you. I don't. The only agreement I ever signed was for an apartment with no deposit. I have never owed any money to the Apartment Complex or the Debt Collector because the Apartment Complex refused to lease the apartment to me based on the lease I agreed to.

After the Debt Collector would not remove this inaccurate information from my credit report and stop reporting it to you, I had to hire an attorney to fight the Apartment Complex in court. I tried to do it as a class action to help other people; I wasn't able to help others in court then, but I'm hoping my dispute here will inform your removal of other National Credit Systems reporting. While I couldn't help others because the judge said that my dispute letter was not enough to put

TCG000049_0002

the Apartment Complex on notice that I was going to sue on behalf of others. Ultimately, the Apartment Complex agreed that the lease they turned over to the Debt Collector was void and of no force or effect. The Court entered a judgment declaring that the lease was void and of no force or effect. In other words, I don't owe any money to the Apartment Complex and I don't owe any money to the Debt Collector.

Even though the Apartment Complex has no right to collect any money from me, and the Debt Collector has no right to collect any money from me, this is still showing up on my credit report. It should not.

I am attaching a copy of the lease, a copy of my complaint against the Apartment Complex, and a copy of the Court's order declaring the lease void. You should also know that the Debt Collector is an unreliable source, as the company has been sued 181 times since January 1, 2020, for violations of consumer protection laws, as shown by PACER. They have 6,878 complaints made against them with the CFPB. 1,949 of these complaints are for attempting to collect debt that is not owed, and 690 of these complaints are about incorrect information on a credit report. They couldn't even get the name of the creditor correct on my report. They even misspelled the name of the Apartment Complex. They rely on the same bad source of information if they even look. The Debt Collector gets paid for collecting money so they have little incentive to do what is right: stop reporting this unfair and improper information.

If you need to know anything about this lease, you can call or write the following people:

*Attorneys for Apartment Complex*
Greg Ostfeld
Greenberg Traurig
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
OstfeldG@gtlaw.com
312-476-5056

Lindsay Aherne
Greenberg Traurig
1144 15th Street, Suite 3300
Denver, CO 80202
ahernel@gtlaw.com
303-572-6500

*Apartment Complex Owner*
The Connor Group
10510 N Springboro Pike
Dayton, OH 45342
937-434-3095

*Apartment Complex Property Manager*
Alas Over Lowery
82 Unita Way
Denver, CO 80230
720-868-9157

I didn't know how to deal with this reporting so I contacted my attorney, who helped me write this letter. But the dispute is coming directly from me. If you need any additional information, or if anything in this letter is unclear, please contact me at ladyinnursing@yahoo.com or 405-590-6390. Please send the results of the dispute, and a copy of my file, to me at the address listed above.

Sincerely,

Zepherine Miller

TCG000049_0003

TCG000049_0004

ZEPHERINE MILLER ("Resident") agrees to lease from The Censor Group ("Management"), Apt. No. 102 of the ALAS OVER LOWRY Apartment Community located at 8489 E LOWRY BLVD DENVER, CO 80230 ("Apartment"), upon the following terms and conditions:

1. RENT: Resident agrees to pay as rent for said Apartment the sum of TWENTY FIVE THOUSAND SEVEN HUNDRED EIGHTY EIGHT dollars ($25788) payable in 12 monthly installments of TWO THOUSAND ONE HUNDRED FORTY NINE dollars ($2149) each, payable on or before the first day of each month (THE DUE DATE). Resident shall pay rent without demand at the Apartment Community manager's office or by placing it in the Community's 24-hour rent drop. Rent unpaid after the due date is delinquent. If rent is not paid before the 2nd of the month (THE LATE CHARGE DATE), resident agrees to pay an initial late charge of $150.00 plus an additional late charge of $125.00 on the 7th of the month if all monies have not been paid in full. In addition, if Resident pays by check and said check is not honored on presentation for any reason whatsoever, Resident agrees to pay Management an additional fee of $100.00 as a returned check penalty charge, in addition to a $100.00 late charge. This penalty provision shall not be considered a waiver or relinquishment of any of the other rights or remedies of Management. Failure to pay rent in a timely fashion is grounds for eviction. Management reserves the right to reject late rent.

| | |
|---|---|
| Rent | $ 2149 |
| Pet Rent | $ |
| Garage/Carport Rent | $ |
| W/D Rent | $ |
| Other | $ |
| TOTAL MONTHLY | $ 2149 |

2. PET ADDENDUM: (1) Resident agrees that only the pet approved and accepted will occupy premises. No additional or different pet is authorized under this agreement. (2) Resident agrees that pet will be kept inside at all times, except when on a leash and accompanied by, and under the control of, the Resident. (3) Resident agrees to clean all pet droppings of their pet on the property each time the pet is walked. Persons not complying with this policy will be charged a clean-up fee. (4) Resident agrees that if a pet becomes annoying, bothersome, or in any way a nuisance to other residents or to the apartment operation, Resident will immediately, upon notice from Management, remove the pet from the premises or vacate the apartment. (5) Resident agrees to pay the Management the additional sum of $_____ for one pet and $_____ for two pets. This pet fee is non-refundable and is for the privilege of keeping a pet in the Apartment. (6) Resident agrees to pay $_____ per month as additional pet rent. (7) Residents agrees to pay for any extermination caused by the pet, such as flea infestation. (8) Only approved dogs are accepted. Cats must be de-clawed and neutered.

3. CARPORT OR GARAGE ADDENDUM: Resident has leased carport/garage number _____ located at PARKING LOWRY and agrees to pay as rent monthly installments of $_____ beginning with _____ rental payment. Resident understands and agrees that the leasing of the carport/garage shall be for a period of 12 MONTHS, beginning NOVEMBER 21, 20 20. Resident agrees to each of the following conditions: (1) At no time maintain within the storage facility any article dangerous or detrimental to life or health of the occupants of the apartment community; nor may there be stored straw, excelsior, cotton, paper stock, rags, junk or other flammable material that may create a fire hazard. (2) No other locks, keys or other security devices may be added to storage facility. (3) No improvements or alterations shall be made without the prior written consent of Management and Resident agrees to protect the walls of said storage facility and not to place any nails, screws, or hooks upon the doors, floors, cabinets and walls. (4) Any stored goods are not insured by the Management, and Resident does not undertake or arrange to obtain insurance on the goods stored. (5) Management has no liability whatsoever for loss or damage to Resident's property whether by fire, theft, vandalism, mysterious disappearance or otherwise while the goods are stored within the storage facility. (6) Any stored items shall be deemed abandoned if not removed within ten (10) days after termination of Resident's occupancy of the apartment described in said lease. Upon such abandonment Management may remove all personal property therein and sell it at public sale and the proceeds from the sale thereof may be applied to the expense for removal notice and advertisement of sale, and for lost rental revenue.

4. WASHER & DRYER ADDENDUM: Resident agrees to rent a washer & dryer from ALAS OVER LOWRY for the term of said lease agreement for 12 MONTHS at the amount of INCLUDED ($ 0 ) per month. Resident understands that any damage that may result from the said appliance will be the responsibility of the Resident. Any mechanical repairs made to the washer and/or dryer within reason will be repaired by ALAS. The stated appliances are not to be removed from the unit of 13-102, at any time during the course of the completion of the lease agreement. If stated appliances are not left in the apartment in good working condition, the Resident agrees to pay all costs to repair or replace the equipment. This lease addendum will renew with Resident's unit lease renewal.

5. TERM: The initial term of this Agreement shall begin at 12 noon NOVEMBER 27, 2020, and end at 12 noon NOVEMBER 21 2021. This Agreement will be automatically renewed on a month-to-month basis unless written notification of termination is given by either party at least sixty (60) days before the end of the lease term or renewal period or unless another lease is signed by both parties. The month-to-month rate will be at the market rent rate plus $300 per month for the duration.

6. USE: The Apartment shall be used for residential purposes only. Neither the Apartment nor the Apartment Community shall be used in violation of applicable laws or ordinances, or so as to interfere with other residents' quiet enjoyment of their apartment.

7. POSSESSION: If there is a delay in delivery of possession of the Apartment, rent shall be abated on a daily basis. If possession is not granted within ten (10) days after the beginning date of the lease term, Resident may cancel this Agreement by written notice, and have full refund of any monies paid Management, less 26.25 dollars for the credit check/processing fee. Management shall not be liable for damages caused by the delay in possession.

8. SECURITY DEPOSIT: Resident agrees to deposit $_____ with Management before taking possession of the Apartment as a security deposit for Resident's fulfillment of the conditions of this Agreement. The deposit will be returned to Resident within thirty (30) days after Resident vacates the Apartment if: (a) the lease term has been terminated by both parties; and (b) all monies due Management from Resident have been paid; and (c) the Apartment is not damaged and is left in its original condition, normal wear and tear expected. Resident shall provide Management with a forwarding address to which this deposit refund may be sent. The deposit may be applied by Management to satisfy all or part of the Resident's obligations and such act shall not prohibit Management from claiming damages in excess of the deposit. Resident agrees not to apply the deposit to any rent payment, charges, or fees permitted by this Agreement.

9. ADMINISTRATIVE FEE: Resident agrees to pay $ 399 to Management before taking possession of the Apartment as an administrative fee which is non-refundable. This fee pays Management for the administrative costs in connection with the Resident's use of the Apartment including, but not limited to, the cost of processing lease documents and all other documents related to the Resident's possession of the Apartment.

10. MOVE-OUT: Resident must provide Management with written notice to move out at least sixty (60) days before the date of move-out. Verbal notice of intent to move out is not sufficient under any circumstances. If Resident fails to give Management the 60-day written notice as provided above, or if Resident moves out without rent being paid in full for the entire lease term or renewal period, Resident will be liable for actual damages including, but not limited to, Management's expenses for re-renting, advertising, and any other incidental costs, plus continued liability for future rentals and other damages or charges to which Management is entitled. Resident also agrees to pay Management thirty-five dollars ($35) for re-keying if all keys are not returned.

11. SUBLET: Resident shall not sublet the Apartment or assign this Agreement without the written consent of Management. Any subletting shall not relieve Resident of his/her obligations under this Agreement. Subletting without Management's permission is grounds for eviction.

12. UTILITIES: Resident is responsible for all utilities including utilities described in the utility addendum. Management reserves the right to change utilities charged and fees with a thirty (30) day notice. Management can also change utility provider at any time. Management owns and retains control of all wiring including, but not limited to, telephone, cablevision, and computer cable installed in the Apartment Community. Residents shall obtain specific written approval from Management before using wiring.

13. DESTRUCTION OF THE APARTMENT: If the Apartment is made uninhabitable for ten (10) days by fire or other casualty, Resident or Management may terminate this Agreement, provided that such destruction is not due in whole or part to any negligence of Resident, his/her dependents, guests or visitors. If the Apartment Community is taken or conveyed to a governmental authority in whole or part, Management may, at its option, terminate this Agreement. In the event of such a taking or conveyance in connection with a threatened taking, Resident releases to Management all rights to any compensation paid by a governmental authority. Resident also agrees to purchase renter's insurance, under the terms of Section 22 of this Agreement.

14. RIGHT TO ENTER: Management may enter Apartment at any reasonable time to inspect, repair or maintain it, or to show the property to a prospective purchaser, lender or insurance agent. If Resident or Management has provided notice to terminate the Lease Agreement, Management may enter the Apartment at any reasonable time to show it to prospective tenants. Management may enter at any time to protect life or to prevent damage to the property. Resident shall not install, or permit to be installed, any device which interferes with Management's ability to enter the Apartment. If Resident changes any lock on the door to or in the Apartment, he/she shall provide a key to Management within 24 hours of installation of the new lock.

15. DRAPES AND SHADES: All drapes and shades installed by Resident must be lined in white to present a uniform exterior appearance.

16. ANTENNAS: Radio antennas or any other type antenna shall not be placed or erected on any part of the building and/or premises.

17. SATELLITE DISHES: Satellite dishes may only be installed under the following criteria: (a) So that they are not affixed to any part of the building up to and including roof, gutters, siding, balconies, fences or other exterior surface areas; and (b) All dishes must be freestanding and remain inside the domain you rent. This can include the patio area or balcony area, so long as it does not violate item "a" listed above; and (c) Prior to erecting the dish, Resident must receive written approval from Management. Should any component of this Section 17 be violated, Management shall be entitled to void this lease and recover all damages and expenses up to and including legal fees associated with said violation.

TCG CO 150 1119

is limited to a maximum of two (2).

**19. INDEMNIFICATION FOR USE OF RECREATIONAL FACILITIES:** (Applicable only if Apartment Community is equipped with corresponding facilities.) (A) In consideration of making fitness and swimming facilities available to Resident without additional charge, the Resident, his/her spouse, family members, dependants, guests, visitors and anyone else in the Apartment or on the premises of the Apartment Community with Resident's permission, shall save harmless the owner of the Apartment Community, Management and their respective partners, members, officers, agents, and employees, from any and all liability imposed by law arising out of any injury, illness, or death of any person or the damaging, theft or destruction of any property arising out of the Resident's use of the fitness and swimming facilities located on the Premises. Such facilities include but are not limited to the racquetball court, sauna, whirlpool, hot tub, swimming pool, tennis court, volleyball court, weight room, and exercise machines. (B) Resident acknowledges the potential hazards of using facilities, but not limited to: skin cancer, burns, photosensitivity, cataracts, premature skin aging, blood vessel damage and reduced immunity. Further, Resident expressly assumes the risk of such potential hazards (whether known or unknown). Resident agrees to (i) use the tanning bed only during regular office hours; (ii) to use the timer on the bed; (iii) start the bed is to increments no greater than twenty (20) minutes at a time and for not more than twenty cumulative minutes in a single 24-hour period; (iv) not to permit any guests to use the bed; (v) only permit dependants 18 years or older residing with the Resident to use the bed; and (vi) to comply with such other rules and regulations as Management may from time to time require regarding usage of the tanning bed. The Resident and the Resident's spouse agree to hold the owners of the Apartment Community, Management and their respective partners, members, officers, agents, employees and assigns harmless from any liability arising out of an injury or illness arising out of Resident's, Resident's spouse, or dependant's use of the tanning bed located on the Premises. (C) Resident acknowledges and agrees that he/she is responsible for the behavior of his/her spouse, dependants, and guests when they use any recreational facility provided by Management. Resident shall require his/her spouse, dependants, guests and visitors to follow any and all rules contained in this Lease Agreement, posted in or around the facility, or otherwise provided to him/her by Management, concerning the use of recreational facilities, and shall hold Management and its respective partners, members, officers, agents, employees and assigns harmless for any liability or injury resulting from the intentional and negligent use of Apartment Community's recreational facilities by his/her spouse, family members, dependants, guests, or visitors.

**20. WATER SOFTENERS:** Resident agrees not to install, or cause to be installed, any type of water softening device until Resident obtains prior written approval from management. The illegal installation of any type of water softening device shall constitute immediate grounds for termination of this Lease Agreement.

**21. HALLWAYS AND OTHER COMMON AREAS:** No bicycles, motorcycles, or toys shall be stored or parked in any hallway or entryway of the Apartment Community and Resident shall not place or store any item (except doormats) in any hallway, entryway, or common area of the Apartment Community. No motorcycles are allowed inside any apartment.

**22. INSURANCE:** (A) Resident is required, at his/her sole cost and expense, to procure and maintain, throughout the term of this Lease Agreement and any renewal period, Renter's Insurance including fire coverage and covering claims for bodily injury and/or personal injury, including death and property damage occurring in or upon or resulting from the Apartment, in standard form and with an insurance carrier rated "A-" or better by A.M. Best or equivalent with said insurance carrier licensed to do business in the state where the Apartment is located. (B) Coverage with a minimum of $100,000 Combined Single Limit in respect to any one accident or occurrence is required. Each policy provided for in this section shall contain an agreement by the insurer that the policy cannot be canceled without at least thirty (30) days prior written notice to Management. Insurer and/or its agent may charge a late fee for any payments not received on a timely basis. Said late fee shall be considered the same as unpaid rent and grounds for not accepting future rental payments. (C) A Certificate of Insurance evidencing Comprehensive Personal Liability Insurance shall be required and kept on file in the Apartment Community Manager's office at the time the Lease Agreement is executed. Waterbeds are permitted with proof of insurance and a copy of the Declaration page submitted to the Rental Office.

**23. DAMAGE TO PROPERTY:** Resident shall personally refrain, and shall forbid his/her spouse, family members, dependants, guests, visitors, and anyone else in the Apartment or on the premises of the Apartment Community with Resident's permission, from intentionally or negligently altering, destroying, defacing, damaging or removing any part of the Apartment or Apartment Community including, but not limited to, structure, walls, flooring, glass, plumbing, wiring, fixtures, and appliances. Resident shall reimburse Management within five (5) days of demand for the cost of repairs for damage beyond ordinary wear and tear, caused intentionally or negligently by Resident, his/her family, dependants, guests, or visitors.

**24. HOLDING OVER:** (A) If Resident or an approved sub lessee remains in or continues to be in possession of the Apartment or any part thereof after the termination of this Agreement, Management shall, at its option, have the right to charge Resident or sub lessee, as liquidated damages for the time that he/she remains or remains in possession, a sum equal to twice the amount of rent, or to treat such holder over as a renewal by Resident or sub lessee of the same duration at covered hereby, upon the same terms and conditions, except that Management may charge the highest renewal rate being charged for a like apartment at the time of the hold over. In the event Management elects to treat such holding over as a renewal of this Agreement, each and all terms of this Agreements, excepting only the rent charge as provided above, shall be and remain in full force and effect for the renewal term. (B) In the event no renewal is desired or if it is refused by Management, Management shall proceed to let the Apartment to another and charge Resident for any damages resulting from his/her failure to deliver possession on the date of termination, in addition to any other rights accruing to Management under law and the terms of this Agreement.

**25. NONWAIVER:** Failure of Management to insist upon strict compliance with the terms of this Agreement shall not constitute a waiver of Management's right to act on any violation.

**26. REMEDIES CUMULATIVE:** All remedies under this Agreement or in law or equity shall be cumulative.

**27. ATTORNEY'S FEES:** In the event of (i) the employment of an attorney by Management because of a violation by Resident of any terms or conditions of this Agreement, or (ii) should Management commence an attorney and prevail in the defense of any legal action brought by Resident, Resident shall pay such attorney's fees and other costs or expenses incurred by Management in connection therewith, which shall be considered an additional fee and shall be secured hereunder.

**28. REPAIRS:** Resident acknowledges and agrees that he/she accepts the Apartment "as is" and that the Apartment is in a tenantable condition. Resident agrees to keep and, at the end of the term, return the Apartment and fixtures therein in a clean and sanitary condition and in good repair. Management will make repairs to the Apartment, as required by law, with reasonable promptness after receipt of written notice from Resident. Resident agrees to immediately notify Management of any condition (a) that requires repair or maintenance, or (b) that diminishes or interferes with the habitability or Resident's quiet enjoyment of the Apartment. Time is of the essence with respect to Resident's obligation to provide notice to Management under this Section 28. Failure to provide notice to Management as required under this Section 28 is grounds for eviction.

**29. NOTICES:** All notices shall be in writing and given personally, mailed by registered or certified mail, or in the case of notice given by Management to Resident, tacked to Resident's Apartment.

**30. ABANDONMENT:** Resident shall not abandon the Apartment. "Abandonment" is defined as the desertion of the Apartment by Resident for more than ten (10) days without payment of the rent due under the terms of this Agreement. If Resident vacates or abandons the Apartment in violation of this Agreement, any property Resident leaves on the premises shall be deemed to have been abandoned and may either be retained by Management as Management's property or sold at public or private sale as Management sees fit. The proceeds of any such sale or the fair market value of property of Resident retained by Management under this section shall be applied by Management against (1) Management's expenses for removal, storage or sale of Resident's personal property; (2) the arrears of rent and fees or future rent and fees throughout this Agreement; (3) any other damages to which Management may be entitled hereunder. The remaining balance, if any, shall be given to Resident upon written demand with forwarding address, without interest.

**31. SUBORDINATION:** Resident's rights under this Agreement shall at all times be junior and subject to any deed to secure debt which is now or is later placed on the premises of which the Apartment is a part; and if requested, Resident shall execute promptly any certificate that Management may request to specifically implement the subordination provision of this section.

**32. DEFAULT:** Any breach or violation of any provision of this Agreement, or any untrue information in Resident's application to rent, shall give Management the right to terminate this Agreement upon thirty (30) days' notice for non-rent defaults and three (3) days' notice for rent default. In the event of termination, Management shall have the right to sue for possession, damages, and all past and future rent due under this Agreement. Management shall have the further right to re-let the Apartment, and Resident shall be liable to Management for the difference, if any, between all rent due hereunder and the rent received under this Agreement upon such re-letting.

**33. SEVERABILITY:** If any provision of this Agreement is invalid under applicable law, such provision shall be ineffective to the extent of the invalidity only, without invalidating the remainder of this Agreement.

**34. RULES AND REGULATIONS:** Resident, his/her family, guests, and visitors shall comply with all governmental laws and regulations, and all rules and regulations issued by Management which may be changed during the term of this Agreement. The Rules and Regulations attached hereto are deemed a part of this Lease Agreement.

**35. ENTIRE AGREEMENT:** This Agreement constitutes the entire Agreement between the parties, and no modification of this Agreement is valid unless in writing signed by Resident and an authorized agent of Management as identified in Section 37 of this Agreement.

**36. LIMITATION ON CLAIMS AGAINST MANAGEMENT:** Notwithstanding any statute of limitations available at law to claims by Resident against Management arising from this Lease Agreement, Resident agrees not to commence any action or lawsuit against Management relating to this Lease Agreement or Resident's occupancy of the Apartment more than six (6) months after the termination of this Lease Agreement.

**37.** This Lease Agreement is valid and binding only when signed by an authorized representative of Management. Only a Property Manager or a member of the Senior Management Team is an authorized agent of Management for the purposes of binding Management to this Lease Agreement. **X** _____ (Resident's initials)

Dated **NOVEMBER 25**, 20 **20**   By: _Ryan Moore_ _____ (Authorized Agent of Management)

Resident (print clearly) X _Zepherine Miller_   Resident (signature) X _Catherine Nelson_

**Other Person(s) Residing in Apartment:**

_____

_____

_____

Dated _____, 20___   By: _____ (Authorized Agent of Management)

TCG000049_0007

TCG000049_0008

<table>
<tr><td colspan="2">

DISTRICT COURT, CITY AND COUNTY OF DENVER STATE OF COLORADO

Court Address:    1437 Bannock Street, Denver, Colorado
                  80202

</td></tr>
</table>

DATE FILED: March 30, 2022 7:02 PM
FILING ID: C5726D00C3A5F
CASE NUMBER: 2021CV34094

|  |  |
|---|---|
| ZEPHERINE MILLER, an individual, on behalf of herself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE CONNOR GROUP, A REAL ESTATE INVESTMENT FIRM, LLC d/b/a THE CONNOR GROUP, an Ohio limited liability company,<br><br>Defendant. | ▲ Court Use Only ▲<br><br>Case Number:<br>2021CV34094<br><br>Division 275 |
| ***Attorneys for Plaintiff***<br>Daniel J. Vedra, Atty. Reg. #43596<br>Vedra Law LLC<br>1444 Blake Street<br>Denver, CO 80202<br>Phone Number:    (303) 937-6540<br>Fax Number:    (303) 937-6547<br>Email:    dan@vedralaw.com<br><br>Phillip Robinson, Md. Atty. Reg. #0006210356<br>*Admitted Pro Hac Vice*<br>Consumer Law Center LLC<br>10125 Colesville Road, Suite 378<br>Silver Spring, MD 20901<br>Phone Number: (301) 448-1304<br>Email: phillip@marylandconsumer.com | |

### AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiff Zepherine Miller, an individual ("**Plaintiff**"), on behalf of herself and all others

similarly situated, files her Class Action Complaint and Jury Demand against The Connor Group,

00070960. 1

A Real Estate Investment Firm, LLC d/b/a The Connor Group, an Ohio limited liability company (the "**Defendant**").

## I.      INTRODUCTION

1.      Plaintiff brings this action on behalf of herself and all others similarly situated for redress under the Colorado Rental Application Fairness Act, C.R.S. § 38-12-901 *et seq.* ("**RAFA**"). In 2019, the Colorado legislature enacted RAFA to prohibit residential landlords from charging rental application fees in excess of the landlord's actual cost. C.R.S. § 38-12-903(1). RAFA also requires residential landlords to provide disclosure of the basis for the fees charged. C.R.S. § 38-12-903(3)(a).

2.      The Defendant is a residential property manager who manages over a thousand residential units in the Denver metro area.   The Defendant does not comply with either RAFA's limitations on costs or RAFA's disclosure obligations.  Instead, the Defendant routinely charges a total of $427.00 in rental application fees per application.  These fees exceed or greatly exceed RAFA's limitation on rental application fees.  Moreover, Defendant conceals and does not disclose its anticipated expenses for the rental application fees or an itemization of its actual expenses incurred, contrary to RAFA's disclosure requirements. Plaintiff is one among many residential tenants who the Defendant has illegally charged an excessive rental application fee without proper disclosure while concealing the true rental application fees as part of the transaction.

## II.     PARTIES, JURISDICTION, AND VENUE

3.      Plaintiff is an individual who resides in the City and County of Denver, State of Colorado.

4.      The Defendant is an Ohio limited liability company.

5.      The Defendant has a principal place of business located at 10510 Springboro Pike, Miamisburg, OH 45342.

00070960. I

2

TCG000049_0011

TCG000049_0012

6.     The Defendant maintains a registered agent in Colorado located at 7700 E. Arapahoe Road, Suite 220, Centennial, Colorado 80112.

7.     This Court has jurisdiction over these claims pursuant to Article VI, Section 9 of the Colorado Constitution.

8.     Venue is proper pursuant to C.R.C.P. 98(c)(1) because the Defendant is a non-resident of this state and the City and County of Denver, State of Colorado is the county designated in this Complaint.

## III.    FACTUAL ALLEGATIONS

### A.    Background Facts

9.     Defendant is a residential rental property manager.

10.     Defendant manages four different properties in the Denver metro area: Alas Over Lowry, Gardens at Cherry Creek, Outlook DTC, and Terracina.

11.     Alas Over Lowry is a 300-unit residential apartment complex located at 82 N. Uinta Way, Denver, Colorado 80230.

12.     Defendant began managing Alas Over Lowry in approximately October of 2020.

13.     Gardens at Cherry Creek is a 191-unit residential apartment complex located at 225 S. Harrison Street, Denver, Colorado 80209.

14.     Defendant began managing Gardens at Cherry Creek in approximately July of 2017.

15.     Outlook DTC is a 242-unit residential apartment complex located at 5301 S. Ulster Street, Denver, Colorado 80237.

16.     Defendant began managing Outlook DTC in approximately October of 2021.

17.     Terracina is a 386-unit residential apartment complex located at 13620 Via Varra Way, Broomfield, Colorado 80020.

18.     Defendant began managing Terracina in approximately November of 2018.

TCG000049_0013

TCG000049_0014

19.     Alas Over Lowry, Gardens at Cherry Creek, Outlook DTC, and Terracina are referred to hereinafter as the "Class Apartment Complexes".

**B.      Facts Specific to Plaintiff**

20.     Plaintiff applied to become a tenant at Alas Over Lowry.

21.     The Defendant initially charged Plaintiff a $28.00 application fee and $399.00 administrative fee.

22.     After Plaintiff paid the $28.00 application fee and $399.00 administrative fee, Defendant did not provide to Plaintiff either a disclosure of the Defendant's anticipated expenses for which the fees will be used or an itemization of the Defendant's actual expenses incurred.  As of the date of this filing, Defendant still has not made the disclosure required by C.R.S. § 38-12-903(3).

23.     After Plaintiff paid the $28.00 application fee and $399.00 administrative fee, Plaintiff signed a lease to rent a unit at Alas Over Lowry.

24.     The lease the Plaintiff signed was a form lease prepared by the Defendant containing substantially similar terms for each residential tenant at Alas Over Lowry.

25.     The lease that Plaintiff signed contained a blank section for a security deposit.

26.     The authorized representative of Defendant and also the Plaintiff both signed the lease with the security deposit section in blank.

27.     Neither Plaintiff nor Defendant agreed, orally or otherwise, that the amount of the security deposit would be agreed upon after the execution of the lease.

28.     After signing the lease and leaving the property, a representative of Defendant contacted Plaintiff and told her that she must pay a $1,000.00 security deposit.

29.     Plaintiff did not agree to pay the $1,000.00 security deposit.

30.     Defendant refused to deliver possession of the leased premises to Plaintiff without first paying a $1,000.00 security deposit that Plaintiff never agreed to pay as part of the lease terms.

00070960. 1

4

TCG000049_0015

TCG000049_0016

31.     After Plaintiff did not agree to pay the $1,000.00 security deposit, Defendant began treating Plaintiff as though she were in breach of their agreement for failing to comply with a term of the lease that Plaintiff did not agree to.

32.     After Plaintiff did not pay the $1,000.00 security deposit that she never agreed to pay, Defendant assigned the lease, less than one year before the commencement of this action, to a collection agency.

33.     When Defendant assigned Plaintiff's alleged obligation to this collection agency, Defendant unfairly, falsely, and/or deceptively claimed that Plaintiff was entitled to the balance of the entire lease term as liquidated damages for Plaintiff's alleged breach of the lease.

34.     On or about October 30, 2021, Plaintiff sent a written demand that Defendant refund the application fee and administrative fee.

35.     This demand was made on behalf of the Plaintiff and all others similarly situated. Plaintiff demanded Defendant refund the fees at issue to others as well.

36.     On or about November 3, 2021, Defendant received Plaintiff's written demand.

37.     Within seven days of receiving Plaintiff's written demand and also as of this filing, Defendant did not refund any amount to Plaintiff and has not otherwise responded by curing its non-disclosure and other violations.

38.     On December 29, 2021, Plaintiff commenced this action.

39.     On or about January 12, 2021, Plaintiff served Defendant with the original complaint in this action.

40.     The original complaint sought damages for Defendant's violations of RAFA.

41.     The original complaint notified Defendant of the relief that Plaintiff intended to seek under RAFA for herself and on behalf of the class.

42.     Within seven days of being served with the complaint, Defendant did not refund any amount to Plaintiff or the unnamed members of the class described herein.

00070960. 1

5

TCG000049_0017

TCG000049_0018

43.     Defendant claims or may claim that it did not receive Plaintiff's October 30, 2021, written demand.

44.     On January 31, 2022, Plaintiff sent the October 30, 2021, written demand to Defendant's counsel.   Defendant's counsel received this written demand as agent for the Defendant.

45.     On January 31, 2022, Defendant received the October 30, 2021, written demand again through its authorized agents—i.e. Defendant's counsel.

46.     On January 31, 2022, Defendant also had in its possession both the original demand and the original complaint.

47.     Within seven days of January 31, 2022, Defendant still did not refund any amount to Plaintiff and has not otherwise responded by curing its non-disclosure and other violations.

48.     Defendant has had three opportunities to cure its violations of RAFA and has knowingly and recklessly not cured its violations of the RAFA.

49.     Defendant has failed to cure its violations of RAFA at all times through this filing.

**D.     Facts Common to the Class.**

50.     Defendant manages each of the Class Apartment Complexes.

51.     Defendant uses the same or substantially similar form lease at each of the Class Apartment Complexes.

52.     Defendant charges the same or similar $28.00 "application fee" (referred to hereinafter as the "**Credit Application Fee**") and $399.00 "administrative fee" (referred to hereinafter as the "**Admin Fee**") at each of the Class Apartment Complexes.

53.     Both the Credit Application Fee and the Admin Fee are charged at the same time as and in connection with a prospective tenant applying to rent an apartment at one of the Class Apartment Complexes.

TCG000049_0019

TCG000049_0020

54.     Both the Credit Application Fee and the Admin Fee are charged and accepted before a prospective tenant signs a lease to rent an apartment at one of the Class Apartment Complexes.

55.     Both the Credit Application Fee and the Admin Fee are charged and accepted before a prospective tenant commences the term of the tenant's lease to rent an apartment at one of the Class Apartment Complexes.

56.     Defendant will not consider a rental application to rent an apartment at one of the Class Apartment Complexes unless and until a prospective tenant pays both the Credit Application Fee and the Admin Fee.

57.     Defendant unfairly conceals and otherwise does not provide to any prospective tenant who has paid the Credit Application Fee or the Admin Fee either a disclosure of the Defendant's anticipated expenses for which the fee will be used or an itemization of the Defendant's actual expenses incurred.  Without the proper statutory disclosure the Plaintiff and putative class members cannot know of the facts necessary to understand their rights for the claims presented herein.

58.     On information and belief, the Credit Application Fee exceeds the Defendant's actual costs in processing a tenant's rental application.  This belief is based on the representations of the Defendant's agents that it does "everything in house" and from the experience of the Plaintiff does very little review to determine whether an applicant is qualified.

59.     On information and belief, the Admin Fee exceeds the Defendant's actual costs in processing a tenant's rental application.  In Defendant's agent's words, Defendant does everything in house and it took only a few minutes to process the application.

60.     The Defendant does not use any amount of the Admin Fee to cover the Defendant's costs in processing a tenant's rental application.

00070960. 1

7

TCG000049_0021

TCG000049_0022

**E.     Class Allegations.**

61.     This action is brought on behalf of a class of individuals defined as:

> (i) all persons; (ii) who in the time since 12:01 a.m. on August 2, 2019, to the present; (iii) paid an "application fee" and/or "administrative fee" to the Defendant; (iv) to rent a residential property at one of the Class Apartment Complexes.

> Excluded from the class are: (i) any officers, directors, or employees of Defendant; (ii) the legal representatives, heirs, successors, or assigns of Defendant; (iii) any judicial officer assigned to this matter and his or her immediate family; (iv) Plaintiffs' counsel and (v) any agent or employee of Plaintiff's counsel.

62.     Members of the class may be ascertained from the Defendant's records. Whether a person was charged the Credit Application Fee and/or Admin Fee may be determined by reference to the Defendant's records. Whether the Defendant disclosed the actual or anticipated expenses for the Credit Application Fee and Admin Fee may be determined by reference to the Defendant's records.

63.     There are more than 100 persons who are members of the proposed class. As a matter of public record, Defendant manages approximately 1,119 units at the Class Apartment Complexes. Defendant charges each new tenant the Credit Application Fee and $399.00 Admin Fee, and has charged these fees since at least August of 2019.

64.     There are questions of law or fact common to the class, which common issues predominate over any issues involving only individual class members. These common issues to the class include:

(i)     whether Defendant provided the class members with the C.R.S. § 38-12-903(3) disclosure, and if not, what is the consequence for its concealment under the RAFA;

(ii)    whether class members paid a Credit Application Fee and/or Admin Fee;

(iii)   whether the Credit Application Fee and/or Admin Fee exceed the Defendant's costs in processing a rental application;

00070960. 1

8

TCG000049_0023

TCG000049_0024

(iv) whether Defendant provided to any prospective tenant who paid the Credit Application Fee and/or Admin Fee a disclosure of the Defendant's anticipated expenses for which the fee will be used or an itemization of the Defendant's actual expenses incurred;

(v) whether the Credit Application Fee is a "rental application fee", as that term is defined by C.R.S. § 38-12-902(5);

(vi) whether the Admin Fee is a "rental application fee", as that term is defined by C.R.S. § 38-12-902(5); and

(vii) whether the Defendant is liable to any person who paid the Credit Application Fee, Admin Fee, or both, for three times the amount so charged in accordance with C.R.S. § 38-12-905(1).

65. Plaintiff's claims are typical of those of the class members. All are based on the same facts and legal theories.

66. Plaintiff will fairly and adequately protect the interests of the class. Plaintiff has retained counsel experienced in handling class actions and actions involving unfair and deceptive business practices. Neither Plaintiff nor her counsel have any interest which might cause them not to pursue this action vigorously.

67. Certification of the class under Rule 23(b)(3) of the Colorado Rules of Civil Procedure is also appropriate in that:

a. The questions of law or fact common to the members of the class predominate over any questions affecting an individual member; and

b. A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

68. Certification of each class under Rule 23(b)(2) of the Colorado Rules of Civil Procedure is also appropriate in that each defendant has acted on grounds generally applicable to

00070960. 1

9

TCG000049_0025

TCG000049_0026

the class thereby making injunctive and declaratory relief appropriate with respect to the class as a whole.

69.     Plaintiff requests certification of a hybrid class of Rule 23(b)(3) for monetary damages and Rule 23(b)(2) for equitable relief.

## FIRST CLAIM FOR RELIEF
### (Violation of RAFA – On Behalf of Plaintiff and the Class)

70.     Plaintiff incorporates by reference the allegations of paragraphs 1-69 as though fully set forth herein.

71.     Defendant is a "landlord", as that term is defined by C.R.S. § 38-12-902(2).

72.     Plaintiff and all members of the class are each "tenants", as that term is defined by C.R.S. § 38-12-902(6).

73.     The Credit Application Fee is a "rental application fee", as that term is defined by C.R.S. § 38-12-902(5).

74.     The Admin Fee is a "rental application fee", as that term is defined by C.R.S. § 38-12-902(5).

75.     The Credit Application Fee and the Admin Fee, individually and/or in aggregate, exceed the landlord's actual costs in processing a rental application for which they are associated.

76.     The Defendant has failed to provide to prospective tenants who have paid the Credit Application Fee and/or the Admin Fee the mandatory C.R.S. § 38-12-903(3) disclosure of the Defendant's anticipated expenses for which the fee will be used or an itemization of the Defendant's actual expenses incurred.  Without the required statutory disclosure, Plaintiff and the Class members cannot reasonably know the facts necessary to understand their rights under RAFA.

77.     Defendant has violated RAFA and continues to violate RAFA.

78.     Defendant has received multiple notices of its violations of RAFA.

00070960. 1

TCG000049_0027

TCG000049_0028

79.     At least seven days have passed since Defendant received each of the notices of its violations of RAFA, and Defendant has not corrected or cured its violations of RAFA whatsoever.

80.     Defendant is liable to each member of the class for three times the amount of the Credit Application Fee and the Admin Fee.  C.R.S. § 38-12-905(1).

81.     Defendant is liable for Plaintiff's reasonable attorney fees and costs.  C.R.S. § 38-12-905(1).

82.     Plaintiff and the class are entitled to a declaration that the Credit Application Fee and Admin Fee violate the limitations for rental application fees imposed by RAFA.

83.     Plaintiff and the class are entitled to a declaration that the failure to provide disclosure of the actual or anticipated costs for processing a rental application while charging the Credit Application Fee and Admin Fee violates the disclosure requirements imposed by RAFA.

84.     Plaintiff and the class are entitled to an injunction prohibiting the Defendant from charging rental application fees in excess of the amounts imposed by RAFA.

85.     Plaintiff and the class are entitled to an injunction prohibiting the Defendant from charging the Credit Application Fee and Admin Fee without appropriate disclosure in accordance with RAFA.

## SECOND CLAIM FOR RELIEF
### (Declaratory Judgment – Individually Only)

86.     Plaintiff incorporates by reference the allegations of paragraphs 1-85 as though fully set forth herein.

87.     A dispute has arisen as to whether Plaintiff is obligated to Defendant under the terms of a certain lease.

88.     There is uncertainty over whether the lease is effective.

89.     An actual and justiciable controversy exists as to whether the lease is effective.

TCG000049_0029

TCG000049_0030

90.     A declaration of Plaintiff and Defendant's respective obligations would terminate the controversy.

91.     Plaintiff is entitled to a declaration that Plaintiff is not obligated to Defendant under the lease.

92.     Plaintiff is entitled to a declaration that Defendant was not permitted to alter the terms of the lease without Plaintiff's written consent.

### THIRD CLAIM FOR RELIEF
### (Violations of the CCPA – Individually Only)

93.     Plaintiff incorporates by reference the allegations of paragraphs 1-92 as though fully set forth herein.

94.     Defendant is in the business of leasing residential real property to individuals.

95.     In the course of leasing a residential apartment to Plaintiff, and in violation of C.R.S. § 6-1-105(1)(u), Defendant failed to disclose material information concerning the apartment to Plaintiff, including, but not limited to, the requirement that Plaintiff pay a security deposit and the basis of its rental application fees.

96.     The information that Defendant failed to disclose was known to Defendant at the time of sale to Plaintiff.

97.     In reliance to Defendant's representations to her, Plaintiff paid money to the Defendant.

98.     When Defendant failed to disclose that Plaintiff was required to pay a security deposit, the failure to disclose such information was intended to induce Plaintiff to enter into a transaction.

99.     When Defendant failed to disclose the basis of its rental application fees, the failure to disclose such information was intended to induce Plaintiff to enter into a transaction.

00070960. 1

12

TCG000049_0031

TCG000049_0032

100.    Defendant has failed to disclose the same or similar information to multiple actual and potential tenants.

101.    Defendant's failure to disclose material information concerning the apartments it rents to consumers significantly impacts the public as actual or potential consumers of the Defendant's goods, services, and property.

102.    Defendant's failure to disclose is done in bad faith and violation of Colorado law.

103.    Plaintiff has been damaged as a result of Defendant's acts and omissions and Plaintiff's reasonable reliance that she was dealing with a honest company acting within the law.

104.    Plaintiff is entitled to her actual damages in a minimum amount of $500.00, trebled for willfulness, and her reasonable attorney fees and costs.  C.R.S. § 6-1-113.

<div align="center">**JURY DEMAND**</div>

Plaintiff demands a trial by jury as to all claims so triable.  Plaintiff has submitted a jury fee concurrently with this Complaint.

WHEREFORE, Plaintiff Zepherine Miller, individually, and on behalf of all others similarly situated, prays for relief and judgment in her favor and in favor of the class against The Connor Group, A Real Investment Firm, LLC d/b/a The Connor Group, as follows:

A.    Certifying this action as a class action;

B.    Awarding Plaintiff and members of the class damages in an amount equal to three times the amount of rental application fees charged;

C.    Awarding Plaintiffs' and members of the class their reasonable attorney fees and costs;

D.    Declaring that the Defendant's practices of charging a rental application fee in excess of its actual costs of processing the application is illegal and enjoining Defendant from such unlawful action;

E.    Declaring that Plaintiff has no obligations to Defendant under that certain lease agreement;

00070960. 1

<div align="center">13</div>

TCG000049_0033

TCG000049_0034

F.  Declaring Defendant was not permitted to alter the lease with the Plaintiff without Plaintiff's written consent;

G.  Awarding Plaintiff and members of the class pre-judgment and post-judgment interest as may be allowed under the law;

H.  Awarding Plaintiff damages for Defendant's violations of the Colorado Consumer Protection Act, trebled for willfulness, together with her reasonable attorney fees and costs; and

I.  Awarding such other and further relief as the Court may deem just and proper.

Dated: March 30, 2022

**Vedra Law LLC**

By:  /s/ Daniel J. Vedra _____
Daniel J. Vedra
*Attorneys for Plaintiff*

00070960. 1

14

TCG000049_0036

| | |
|---|---|
| DISTRICT COURT, CITY AND COUNTY OF DENVER, STATE OF COLORADO<br>1437 Bannock Street, Room 256<br>Denver, CO 80202<br>303-606-2300 | DATE FILED: January 30, 2023 6:16 PM<br>CASE NUMBER: 2021CV34094 |
| ZEPHERINE MILLER, an individual, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>THE CONNOR GROUP, A REAL ESTATE INVESTMENT FIRM, LLC d/b/a THE CONNOR GROUP, an Ohio limited liability company,<br><br>Defendant. | ▲ COURT USE ONLY ▲<br><br>Case Number: 2021CV34094<br><br>Courtroom: 275 |

## ORDER OF JUDGMENT AGAINST DEFENDANT

On January 4, 2023, Plaintiff Zepherine Miller timely accepted an offer of judgment made by Defendant The Connor Group, A Real Estate Investment Firm, LLC d/b/a The Connor Group pursuant to C.R.S. § 13-17-202 to have judgment entered in favor Plaintiff.   Accordingly, **IT IS ORDERED THAT**:

1.      Judgment is entered in favor of Zepherine Miller and against The Connor Group, A Real Estate Investment Firm, LLC d/b/a The Connor Group in the amount of **One Thousand Seven Hundred and Eighty-One Dollars ($1,781.00)** together with pre-judgment interest in the amount of $308.20;

2.      In accordance with C.R.C.P. 121 § 1-22(2), within 21 days of entry of this Order, Zepherine Miller may submit a bill of costs, and a motion for reasonable attorneys' fees recoverable under C.R.S. § 13-17-202, the Colorado Consumer Protection Act, C.R.S. § 6-1-101 et seq., and the Colorado Rental Application Fairness Act, C.R.S. § 38-12-901 et seq.; and

3.      The Court declares that Plaintiff is not obligated to Defendant under the subject lease agreement and the lease agreement is void.

4.      All future dates in this case are hereby **VACATED**.

DATED AND ORDERED January 30, 2023.          BY THE COURT:

Kandace C. Gerdes
District Court Judge

TCG000049_0038



U.S. POSTAGE PAID
DEL CITY, OK
7516 S
MAR 28, 23
**$9.72**
AMOUNT
R2305K137898-8

75013

RDC 21

CERTIFIED MAIL®

7022 0410 0003 0664 2168

Experian

P.O. Box 455

Allen, Tx 75013

Zepherine Miller

14078 NE 4th

Choctaw, OK 73020

TCG000049_0039



TCG000049_0040

# EXHIBIT "A-15"



## POLICIES & PROCEDURES TO INVESTIGATE APARTMENT/LEASING DEBTS

For verification of tenant apartment/leasing debts following a written dispute received from an alleged debtor or ACDV, ProCollect requires that you perform a reasonable investigation to determine whether the information being reported to the Consumer Reporting Agencies is incomplete or inaccurate <u>prior to further collection efforts</u>. If the information reported is incomplete or inaccurate, ProCollect must update the information reported.

If, after your investigation, the information and documents available from the alleged Debtor, the Creditor (and TLO if used), are in conflict, you are not required to resolve that conflict. You are entitled to rely on the Creditor's documents and representations when reporting the debt. In completing the investigation, you must follow these steps:

### <u>If the alleged debtor disputes the account (either amount or proper party):</u>

Regardless of the investigation results and regardless of the method of receipt (oral, in writing, through ACDV), any dispute by an alleged Debtor regarding the amount of the debt or whether they are a proper person liable for the debt requires that the account is marked as <u>disputed</u>. If the investigation also reveals that information being reported is inaccurate or incomplete, you must also update the account information so that it is reported correctly.

### <u>PROPER PARTY DISPUTE</u>

- Move the account to the suspend category (SUP) during the investigation.

- Mark the account as disputed.

- Request the alleged Debtor to supply whatever proof supports the dispute to ProCollect in writing so that it can reviewed, and provided to the Creditor, if necessary.

- Confirm whether a final account statement (FAS) and signed signature page from the Lease exists in the batch file from the Creditor. If those documents are not included in ProCollect's files, you must request them from the property manager. If both documents cannot be obtained, you must cancel the account and request deletion (CL3) as the account cannot be properly verified. If ProCollect has both documents and the name of the alleged Debtor matches a name on the Lease, proceed to the next step. For name variations, such as a/k/a names, maiden or married names, use TLO to assist in the verification. If the alleged Debtor cannot be matched to the Lease, move the account to CL3 and have a cancellation letter issued to the alleged Debtor.

- If the alleged debtor is matched to the Lease, then review the documents provided by the alleged debtor to dispute the account, if any. Compare the information provided by the alleged debtor to those received from the Creditor, such as the Lease, FAS, and Lease Application, if available. Check to confirm personal identifiers (DoB and SSN) and compare signatures, if available. Again, for verification of addresses, or other identifying information, use TLO to assist in the investigation. If it appears that the alleged debtor may not the person named on the lease, present the matter to your supervisor for review to determine whether the account will be verified or cancelled.

- If the account is verified, issue the LT4 letter with batch file or FAS.

### <u>DISPUTE REGADING THE AMOUNT OF THE DEBT</u>
(If the alleged debtor makes any statement that they do
not owe the debt, dispute the amount, claims it is paid, etc.)

- Move the account to the suspend category (SUP) during the investigation.

- Mark the account as disputed.

- Request the alleged Debtor to supply whatever proof supports the dispute to ProCollect in writing so that it can reviewed, and provided to the Creditor, if necessary.

- Confirm the amount on the final account statement (FAS). If the FAS is not included in ProCollect's files, you must request it from the property manager. If it cannot be obtained, cancel the account and request deletion (CL3).

- If ProCollect has the FAS, then contact the Property Manager to confirm the debt is still owed, and the amount sought. Make any changes necessary to the account so that the amount reported is accurate as claimed by the Creditor.

- If the account is verified, issue the LT4 letter with batch file or FAS.

### REMEMBER FOR BOTH DISPUTES OF PROPER PARTY OR AMOUNT

- If the account is not being cancelled (CL3), you must issue an LT4 letter to the alleged debtor containing the batch file or FAS. If the dispute is received in writing, you must issue that LT4 before resuming collection activity.

- Again, if there is no verifiable information in the client's documents (and TLO if used) to the alleged debtor, <u>CL3</u>.

- You must change the reporting to <u>disputed</u>, if not already being reported as disputed.

## RE: FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102|

**From:**      Alas Over Lowry <alas@connorgroup.com>
**To:**        legal@nationalcreditsystems.com
**Date:**      Wed, 19 Apr 2023 18:49:38 +0000

Hello,

This amount is owed per our records.

Thank you,

Caiti Kopp
Alas Over Lowry
Property Manager

---

**From:** legal@nationalcreditsystems.com <legal@nationalcreditsystems.com>
**Sent:** Friday, April 14, 2023 1:07 AM
**To:** Alas Over Lowry <alas@connorgroup.com>
**Subject:** FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102|

Hi,

Please see the attached information request regarding your former resident. We are required by law to reply back to the former resident within a narrow timeframe, so your prompt attention to this request would be helpful.

We appreciate your assistance.

Sincerely,

**Client Services Department**



# EXHIBIT "A-16"

# RE: FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102|

| | |
|---|---|
| **From:** | legal@nationalcreditsystems.com |
| **To:** | Alas Over Lowry <alas@connorgroup.com> |
| **Date:** | Thu, 20 Apr 2023 18:11:52 +0000 |

Good Morning,

Thank you for the update. Please send the complete ledger .

Thank you!

---

**From:** Alas Over Lowry <alas@connorgroup.com>
**Sent:** Wednesday, April 19, 2023 2:50 PM
**To:** legal@nationalcreditsystems.com
**Subject:** RE: FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102|

Hello,

This amount is owed per our records.

Thank you,

Caiti Kopp
Alas Over Lowry
Property Manager

---

**From:** legal@nationalcreditsystems.com <legal@nationalcreditsystems.com>
**Sent:** Friday, April 14, 2023 1:07 AM
**To:** Alas Over Lowry <alas@connorgroup.com>
**Subject:** FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102|

Hi,

Please see the attached information request regarding your former resident. We are required by law to reply back to the former resident within a narrow timeframe, so your prompt attention to this request would be helpful.

We appreciate your assistance.

Sincerely,

**Client Services Department**

TCG000010_0001



# RE: FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102|

| | |
|---|---|
| **From:** | Alas Over Lowry <alas@connorgroup.com> |
| **To:** | legal@nationalcreditsystems.com |
| **Date:** | Thu, 20 Apr 2023 19:25:39 +0000 |
| **Attachments:** | Miller Final Account Statement.pdf (71.37 kB) |

Hello,

Here is the ledger from our records.

Thank you,

Caiti Kopp
Alas Over Lowry
Property Manager

---

**From:** legal@nationalcreditsystems.com <legal@nationalcreditsystems.com>
**Sent:** Thursday, April 20, 2023 12:12 PM
**To:** Alas Over Lowry <alas@connorgroup.com>
**Subject:** RE: FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102|

Good Morning,

Thank you for the update. Please send the complete ledger .

Thank you!

---

**From:** Alas Over Lowry <alas@connorgroup.com>
**Sent:** Wednesday, April 19, 2023 2:50 PM
**To:** legal@nationalcreditsystems.com
**Subject:** RE: FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102|

Hello,

This amount is owed per our records.

Thank you,

Caiti Kopp
Alas Over Lowry
Property Manager

TCG000045_0001

**From:** legal@nationalcreditsystems.com <legal@nationalcreditsystems.com>
**Sent:** Friday, April 14, 2023 1:07 AM
**To:** Alas Over Lowry <alas@connorgroup.com>
**Subject:** FCRA Info Request|4510687|ALAS OVER LOWERY APTS / CONNOR|Zepherine Miller|102|

Hi,

Please see the attached information request regarding your former resident. We are required by law to reply back to the former resident within a narrow timeframe, so your prompt attention to this request would be helpful.

We appreciate your assistance.

Sincerely,

**Client Services Department**



Alas Over Lowry
82 Uinta Way
Denver, CO  80230-7327




Miller, Zepherine
82 Uinta Way
Denver, CO  80230-7327


## Final account statement - Revised

**Ledger Account at move-out**

| Balance at move-out | **0.00** |
|---|---|

**Deposit Activities**

| Total Deposits on hand | **0.00** |
|---|---|

**Additional charges/credits/payments after move-out**

| Lease | **9,670.50** |
|---|---|
| Total additional charges / credits / payments | **9,670.50** |

**Final Account balance**

| Balance at move-out | 0.00 |
|---|---|
| Total Deposits | 0.00 |
| Total additional charges / credits / payments | 9,670.50 |
| Total account balance due | 9,670.50 |

**FAS Prepared**

| Date | 09/28/2021 |
|---|---|
| User | Little, Ben |

**Pay to**

Miller, Zepherine

**Lease information  - Unit  13-102**

| Move-in | |
|---|---|
| Notice given | |
| Lease expires | 11/21/2021 |
| Move-out | |
| Move-out reason | |

**Lease information  - Unit  13-102**

| Cancel/Deny date | 12/15/2020 |
|---|---|
| Lease expires | 11/21/2021 |
| Cancel/Deny reason | Cancelled |

---

**Please contact us within 30 days of receiving this notice to make satisfactory payment arrangements. If arrangements are not made within 30 days your account will be fowarded to collections.**

---

Manager



Onesite - Final account statement : Zepherine Miller

TCG000046_0001

Onesite - Final account statement : Zepherine Miller                                    Page 2 of 2

TCG000046_0002