# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-2620-NYW-MEH

ZEPHERINE MILLER, an individual,

     Plaintiff,

v.

NATIONAL CREDIT SYSTEMS INC.,

     Defendant.

---

## RESPONSE TO MOTION FOR SUMMARY JUDGMENT

---

Plaintiff Zepherine Miller, an individual ("**Plaintiff**" or "**Ms. Miller**"), hereby responds to National Credit Systems, Inc., a Georgia corporation's (the "**NCS**") Motion for Summary Judgment.

## I.    INTRODUCTION

In 2020, Zepherine Miller moved to Denver for a better life for herself and her family.  She applied to lease an apartment at Alas Over Lowry, an apartment complex managed by The Connor Group, A Real Estate Investment Company, LLC ("**TCG**").  She signed a lease with no security deposit, but TCG later added one—with no notice to Ms. Miller—and refused to provide the keys to the apartment without Ms. Miller paying the deposit TCG unilaterally added.  Then, TCG claimed that Ms. Miller defaulted and owed the full balance of the lease.  TCG then sent this alleged debt NCS for review and potential collection.

NCS accepted the assignment and began reporting this alleged debt to the three national consumer reporting agencies, Equifax, Experian, and Trans Union (the "**Consumer Reporting Agencies**" or "**CRAs**").  Ms. Miller persistently disputed the debt,

but NCS failed to correct or stop reporting that Ms. Miller owed money on a lease that TCG altered after she signed it.  NCS kept this negative trade line on Ms. Miller's credit.

Unable to resolve this problem on her own, Ms. Miller hired legal counsel to assist her.  Consistent with what Judge Domenico instructed the consumer to do in *Daniels v. Nat'l Credit Sys., Inc.*, No. 1:22-cv-01048-DDD-JPO, 2024 U.S. Dist. LEXIS 100336, at *9 (D. Colo. Feb. 23, 2024), Ms. Miller sued TCG and obtained a judgment that established that Ms. Miller did not owe TCG anything.  The Denver District Court ordered:

> 3.    The Court declares that Plaintiff is not obligated to Defendant under the subject lease agreement and the lease agreement is void.

(Doc. 46-2, Page 158) (the "**Order**").[1]

After obtaining the Order from the Denver District Court stating that Ms. Miller was not obligated to TCG under the lease and the lease was void, Ms. Miller followed the requirements of the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. ("**FCRA**") to dispute the credit tradeline from NCS.[2] She sent her dispute directly to the CRAs to invoke the requirement that the debt collector/furnisher investigate.  15 U.S.C. § 1681s-2(b). Specifically, Ms. Miller sent dispute letters to each of the three CRAs and gave a detailed explanation as to why she did not owe money to NCS, as collection agent for TCG.

NCS received the Order declaring that Ms. Miller was not obligated to TCG, but that did not matter to NCS.  Rather than accept Ms. Miller's statements or contact any of the people listed in the dispute letter who could confirm that Ms. Miller did not owe TCG anything, NCS sent an automated, unsigned, generic e-mail to a generic e-mail address

---

[1] In contravention of the Court's practice standards, NCS attached its exhibits as two compilations and not individual exhibits.  To assist the Court with reference to NCS's exhibits, Plaintiff refers to NCS's exhibits by docket number and the page of the document as reflected in the CM/ECF filing i.e. Docket 46-2 and 46-3.
[2] Defendant is subject to the FCRA as a furnisher (15 U.S.C. § 1681s-2(b) and the FDCPA as a debt collector (15 U.S.C. § 1692, et. seq.)

for TCG.  Notwithstanding the court Order establishing that Ms. Miller did not owe TCG anything under the lease, NCS continued reporting the void balance as accurate.

## II.    RESPONSE TO STATEMENT OF UNDISPUTED FACTS

Under Civ. Practice Standard 7.1D(b), NCS was required to set forth a statement of undisputed material facts in "simple, declarative sentences, separately numbered and paragraphed, each material fact that the movant believes is not in dispute . . . ."  Further, "[e]ach material fact must be accompanied by a specific reference to material in the record that establishes that fact" and "[g]eneral references to pleadings, depositions, or documents are insufficient if the document is more than one page in length."  Civ. Practice Standard 7.1D(c).  Moreover, all exhibits are required to be filed as separate attachments and labeled correspondingly.  Civ. Practice Standard 7.1A(a)(3).  NCS has failed to comply with any of these requirements making Plaintiff's response exceedingly difficult. Accordingly, Plaintiff responds to NCS's statement of undisputed facts as follows:

1.    Admit.

2.    Admit.

3.    Admit.

4.    Admit in part.  NCS has general procedures for handling credit disputes but has failed to come up with procedures specific to court-declared invalid accounts or establish any applicable, reasonable procedure for Ms. Miller's dispute type.  (Ex. 1 at 28).[3]

5.    Admit.

6.    Admit in part.  First, the referenced material contains characterization of facts and legal conclusions i.e. calling the investigation and procedures "reasonable" when that is a disputed issue for the fact-finder to decide.  Second, NCS has general procedures for handling credit disputes but has failed to come up with procedures specific

---

[3] As explained in greater detail below, NCS attached another debt collector's procedures to the motion.  Plaintiff attaches the correct procedures here as Exhibit 1.

to court-declared invalid accounts or information rendering reporting misleading.  (Ex. 1 at 28).

7.      Admit.

8.      Admit.

9.      Admit that NCS updated the reporting with the XB code.  The balance of this factual allegation is a legal opinion i.e. that NCS complied with 15 U.S.C. § 1692e(8) because it reported that an invalid debt was disputed.  Moreover, the statement that this account was excluded from scoring models is not an opinion that Mr. Sapp is qualified or disclosed as an expert to give.

10.     Admit in part.   Although NCS attached the full dispute letter with attachments, NCS omits from this statement of facts that the dispute letter itself connected The Connor Group to the tradename "Alas of Lowry," as did the lease which was provided with Ms. Miller's dispute.  (Doc. 46-2 at 139-60).

11.     Admit in part.  First, the referenced material contains characterization of facts and legal conclusions i.e. calling the investigation and procedures "reasonable" when that is a disputed issue for the fact-finder to decide.  Second, NCS has general procedures for handling credit disputes but has failed to come up with procedures specific to court-declared invalid accounts or information rendering the reporting misleading.  (Ex. 1 at 28).   Third, NCS is mischaracterizing the evidence.   The Dispute included an explanation letter and a complaint that connected the account, lease, and judgment to TCG and its tradename.  NCS claims that it does not, but the documents attached to the motion show that it does.  Moreover, although NCS claims that the dispute "included legal documents that did not reference the Account or specific Lease" NCS was able to connect the dispute to the one and only tradeline that NCS was reporting concerning Ms. Miller, which is the Account.

12.     Admit in part.  First, the referenced material contains characterization of facts and legal conclusions i.e. describing its procedures as meeting the requirements of

15 U.S.C. § 1692k(c).    Second, NCS claims that TCG was "active in providing documentation and information to ensure account accuracy" but this is not proven in the documents attached and does not reflect that for the disputes at issue, TCG did not provide a response including information regarding the lawsuit where a court declared the obligation void.  Indeed, NCS claims it was TCG's error in failing to provide the information that would have assisted NCS in its investigation.  (Mot. at 17).

    13.    Admit.

## III.  ADDITIONAL UNDISPUTED FACTS

    1.    NCS's policies and procedures for handling credit disputes are general in nature despite NCS's awareness of specific types of disputes.  (Ex. 1 at 28).

    2.    NCS claimed it was too busy to come up with specific procedures for specific types of disputes of which it is and was aware. (Id.).

    3.    NCS does not have a policy or procedure for handling disputes when a court of competent jurisdiction has declared that the underlying debt is void.  (Id.).

    4.    NCS does not have a policy or procedure for handling disputes when a court of competent jurisdiction has declared that the consumer does not owe any money to the original creditor.  (Id.).

    5.    NCS continued to attempt to collect the lease by reporting it to the consumer reporting agencies after receiving a copy of the judgment declaring that the lease was void and Ms. Miller did not owe any amount to the TCG.  (Ex. 2 at 11).

    6.    TCG did not report the debt to consumer reporting agencies, but NCS did.

    7.    NCS has reported others with judicially-declared-void debts to consumer reporting agencies.  (Ex. 3).

## IV.  STANDARD OF REVIEW

    The purpose of a summary judgment motion is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).  Summary judgment is appropriate when the moving party can demonstrate that there is no genuine

issue of material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if its determination might affect the outcome of the suit under the governing law. *Roberts v. Jackson Hole Mountain Resort Corp.*, 884 F.3d 967, 972 (10th Cir. 2018). Evidence and any reasonable inferences drawn therefrom are viewed in the light most favorable to the nonmoving party. *T.D. v. Patton*, 868 F.3d 1209, 1219 (10th Cir. 2017).

## V.    ARGUMENT

NCS is not entitled to summary judgment because it is wrong on the law and the facts. First, NCS is not entitled to summary judgment on Plaintiff's FCRA claims because NCS: (a) did not conduct a reasonable investigation; (b) was not required to resolve a legal dispute; and (c) acted willfully. Second, NCS violated the FDCPA by: (a) continuing to report a debt to the CRA's when it was illegal to do so; (b) made false, deceptive, and misleading representations to collect a debt; and (3) acted unfairly and unconscionably. Third, NCS is not entitled to judgment as a matter of law on its affirmative defenses because those defenses are either not pleaded, not supported, or not applicable. For these reasons, Ms. Miller respectfully requests that the Court deny the motion.

### A.    NCS Is Not Entitled To Judgment As A Matter Of Law On Plaintiff's FCRA Claims.

The FCRA "is undeniably a remedial statute that must be read in a liberal manner in order to effectuate the congressional intent underlying it." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 722 (3d Cir. 2010). "The purpose of FCRA is to ensure accuracy and fairness in credit reporting and to require that such reporting is confidential, accurate, relevant, and proper." *Matthiesen v. Banc One Mortg. Corp.*, 173 F.3d 1242, 1245 (10th Cir. 1999). "FCRA enables consumers to protect their reputations and to protect themselves against the dissemination of false or misleading credit information." *Id.*

(citations omitted). 15 U.S.C. § 1681s-2(b) governs a data furnisher's (like NCS) obligations to investigate disputes of credit information.[4]  The Tenth Circuit has held:

> Under this section, a furnisher of information who has received notice of a dispute from a CRA is required to:  (1) investigate the disputed information; (2) review all relevant information provided by the CRA; (3) report the results of the investigation to the CRA; (4) report the results of the investigation to all other CRAs if the investigation reveals that the information is incomplete or inaccurate; and (5) modify, delete, or permanently block the reporting of the disputed information if it is determined to be inaccurate, incomplete,  or unverifiable.

*Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1178-79 (10th Cir. 2013).  "A consumer is entitled to actual damages for a negligent violation of the FCRA."  *Id.* (citing 15 U.S.C. § 1681o(a)).

Here, NCS admits that it received notice of credit disputes from the CRAs concerning NCS's tradeline and after processing the disputes, NCS did not modify, delete, or permanently block the reporting of the alleged lease obligation to Ms. Miller's credit file.  Now, NCS insists that it conducted a reasonable investigation, that Ms. Miller's disputes were over a legal inaccuracy that NCS is not required to resolve, and that NCS did not willfully violate the FCRA.  NCS is wrong on all accounts.

### 1.    NCS did not conduct a reasonable investigation of Plaintiff's credit disputes.

The FCRA requires data furnishers (including NCS here) to investigate credit disputes.   15 U.S.C. § 1681s-2(b).   "[T]he investigation an information furnisher undertakes must be a reasonable one."  *Maiteki v. Marten Transp. Ltd.*, 828 F.3d 1272, 1275 (10th Cir. 2016) (citations omitted).   "A 'reasonable' investigation is one that a reasonably prudent person would undertake under the circumstances."  *Id.* (quotations

---

[4] The limited exception concerning allegedly legal disputes relied on by NCS does not apply to furnishers, only to CRAs.

omitted). "[T]he reasonableness of the investigation is to be determined by an objective standard, and the burden of showing the investigation was unreasonable is on the plaintiff." *Id.* (quotations omitted). "'[H]ow thorough an investigation must be to be 'reasonable' turns on what relevant information was provided to a furnisher by the CRA giving notice of a dispute.'" *Id.* (quoting *Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 617 (6th Cir. 2012) and citing *Chiang v. Verizon New England Inc.*, 595 F.3d 26, 38 (1st Cir. 2010) ("[A] more limited investigation may be appropriate when CRAs provide the furnisher with vague or cursory information about a consumer's dispute.")). The greater the information, the greater the investigation. *See Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005) "Whether a defendant's investigation is reasonable is a factual question normally reserved for trial; however, summary judgment is proper if the reasonableness of the defendant's procedures is beyond question." *Maiteki*, *supra* (quoting *Westra*, *supra*). NCS failed to meet these requirements and is not entitled to judgment as a matter of law.

> **a.    NCS's investigation was unreasonable and failed to address the information included in Ms. Miller's dispute.**

Whether NCS conducted a reasonable investigation depends on what a reasonably prudent person would do with the information received by NCS from Ms. Miller's credit dispute. This is what NCS received:

- A copy of the lease to rent an apartment at Alas Over Lowry naming The Connor Group as the Manager of the apartment complex

- A copy of Ms. Miller's complaint seeking a declaration that the lease was void

- A detailed letter explaining that Ms. Miller obtained a judgment against TCG, as manager of Alas Over Lowry

- An explanation that the judgment declared the lease void and that Ms. Miller did not owe TCG any money under the lease

- A copy of the judgment

- Contact information for TCG and TCG's attorney who represented TCG in the declaratory judgment action

(Doc. 46-2 at 166-205).  To avoid liability under the FCRA, NCS must have conducted a reasonable investigation, including of this information.

NCS did not conduct a reasonable investigation based on the information contained in Ms. Miller's disputes.  The only purported investigation[5] that NCS conducted was: (1) generating a standardized, generic e-mail to alas@connorgroup.com and (2) attaching a letter to the e-mail stating that "THE FORMER RESIDENT IS DISPUTING THE DEBT. PLEASE REVIEW THE ATTACHED DISPUTE ALONG WITH YOUR RECORDS AND CONFIRM IS THE DEBT OWES THE BALANCE.  ALSO, PLEASE VERIFY THE BALANCE AND CONFIRM IF THE CHARGES BEING ASSESSED ARE CORRECT OR IF THE BALANCE SHOULD BE REVISED." (Doc. 46-2 at 164-65).  NCS did not: (1) confirm that the judgment was authentic (or inauthentic) or (2) contact any of the people listed in the letter.  Instead, NCS put together a form letter to send to TCG, which failed to explain that Ms. Miller had a court order stating that she did not owe TCG any money.  A reasonably prudent person would have read Ms. Miller's letter and confirmed its contents by contacting either the court or the lawyers listed in the letter to verify that what Ms. Miller said was true; that is, if the information is even in dispute. Here, Ms. Miller's evidence of inaccuracy stood uncontradicted.

NCS concedes that contacting the individuals listed in Ms. Miller's letter would have achieved the correct result.  Specifically, NCS argues that Ms. Miller should have disputed NCS's inaccurate credit reporting by contacting TCG's attorneys.  NCS goes as far as to blame Ms. Miller's lawyer, stating: "had Vedra informed TCG of the collection issue, all of Plaintiff's damages could have been prevented as TCG's attorneys would

---

[5] Investigation is both a commonly understood term and defined by courts. As a matter of law, what NCS did was not an investigation. But for purposes of simplicity in this Motion, Ms. Miller will use the term investigation.

have insured [sic] the Account was recalled or risk contempt of the Order of Judgment."
(Mot. at 20).[6]  In short, NCS admits that if someone had contacted TCG's attorneys, NCS
would have stopped collecting the alleged debt and stopped reporting it to CRAs.
Nevertheless, NCS contends it was undersigned counsel who should have contacted
NCS's attorneys, but NCS's position—that a consumer must enlist legal counsel to pursue
the aid of opposing counsel outside of the ambit and procedures of the FCRA—finds no
support in the law. The FCRA does not impose such a requirement or recognize such a
procedure.  NCS is the party obligated to conduct a reasonable investigation, and it failed
to do so—while at the same time conceding that if someone would have undertaken such
a task, the reporting would have been corrected.

> ### b.    NCS was not prohibited from contacting the persons identified in Ms. Miller's disputes.

As justification for not conducting a reasonable investigation based upon the
information received in the dispute, NCS contends that it would have been illegal for it to
contact the people who Ms. Miller directed it to contact to investigate the dispute.  (Mot.
at 4 fn 1).  Specifically, NCS claims that contacting TCG, the property manager, or TCG's
attorney would violate Section 1692c(b) of the FDCPA.  This, too, is wrong.  That section
provides: "without the prior consent of the consumer given directly to the debt collector, .
. . a debt collector may not communicate, in connection with the collection of any debt,
with any person other than the consumer, his attorney, a consumer reporting agency if
otherwise permitted by law, *the creditor, the attorney of the creditor*, or the attorney of the
debt collector."  15 U.S.C. § 1692c(b) (emphasis added).  Contacting the individuals listed
in Ms. Miller's dispute would not have violated this section. *Id.*

---

[6] For reasons unclear to Ms. Miller, NCS repeatedly references Ms. Miller filing a
satisfaction of judgment.  Ms. Miller assumes that NCS is overlooking that TCG was
ordered to pay Ms. Miller damages plus attorney fees and costs, and filing a satisfaction
of judgment is required after a judgment debtor, like TCG, pays the judgment.  C.R.C.P.
58(b).

First, NCS was expressly permitted to contact these individuals pursuant to Ms. Miller's written consent and the express terms of the statute.  In her dispute letter, Ms. Miller gave NCS express permission to contact each of the individuals listed in the letter. (Doc. 46-2 at 139-40).  If that was not enough, each of the individuals listed in the letter were either the creditor or the creditor's attorney, so NCS did not need permission from Ms. Miller.  Second, investigating a credit dispute is not a communication "in connection with the collection of any debt" because it is not an attempt to collect money.  Instead, it is an attempt to correct inaccurate credit reporting.  Therefore, there was no prohibition against communicating with the people listed in Ms. Miller's letter.

### c.    NCS's procedures for resolving credit disputes were not 'reasonable beyond question.'

NCS asserts that it conducted a reasonable investigation because it allegedly followed its policies and procedures to conduct the investigation. NCS's alleged evidence that it followed its own procedures is insufficient to meet its burden.  "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  In the FCRA context, that means that the person who actually processed the dispute must aver as to what he or she did to investigate the dispute.   "[A]lthough information regarding Defendant's policies may be obtained through a 30(b)(6) deposition or other discovery, only the ACDV Agents themselves can attest to their own training, actions, and experiences in reference to those policies, and whether they actually adhered to those policies while investigating Plaintiff's disputes."  *Sherman v. Sheffield Fin.*, 338 F.R.D. 247, 253 (D. Minn. 2021).  Despite having access to its ACDV operators, and having the benefit of Ms. Miller's deposition of one of those operators, NCS does not offer any evidence from the individuals who actually conducted the purported investigation. Instead, NCS offers only the testimony of its compliance officer, Ronald Sapp.  While Mr.

Sapp may be qualified to testify about the existence, nature, and purpose of NCS's dispute investigation procedures, he cannot testify as to whether the investigation complied with the policies and procedures because he indisputably did not conduct any investigation concerning Ms. Miller's disputes.   Mr. Sapp's after-the-fact opinion is unhelpful and inadmissible.

### 2.      Ms. Miller's dispute was not a legal dispute.

NCS argues that it cannot be liable for failing to delete its credit reporting because "NCS does not, and is not required under the framework of the FCRA, to train its investigators to attempt to resolve legal or contractual disputes that are not objectively and readily verifiable."  (Mot. at 6).  Further, NCS asserts that a "legal dispute of a debt" is not an inaccuracy that a furnisher like NCS is required to resolve in a dispute investigation.  (Mot. at 8).   Even if NCS's argument were a correct recitation of the law as it pertains to furnishers, it proves irrelevant in this case.

Ms. Miller's dispute was not a legal dispute.   The Denver District Court already resolved the legal dispute over the validity of the debt.   "[A] consumer's defense to a debt is a question for a court to resolve in a suit against the [creditor,] not a job imposed upon consumer reporting agencies by the FCRA." *Denan v. Trans Union LLC*, 959 F.3d 290, 296 (7th Cir. 2020).  While this procedure applies to liability for CRAs, not furnishers like NCS, Ms. Miller sued the original creditor and obtained a declaratory judgment that the lease was "void" and she was "not obligated to [the landlord] under the subject lease agreement . . . ."  (Doc. 46-2 at 158).  This is exactly what both the Seventh Circuit in *Denan* and Judge Domenico suggested that consumers, like Ms. Miller, do when debt collectors report "a debt that the creditor insists is valid but that the debtor disputes." *Daniels v. Nat'l Credit Sys., Inc.*, No. 1:22-cv-01048-DDD-JPO, 2024 U.S. Dist. LEXIS 100336, at *9 (D. Colo. Feb. 23, 2024).  The debtor should "file a declaratory judgment or other appropriate action in the proper venue for litigating claims about the validity of apartment leases" and if the consumer prevails, "'then the consumer would have grounds

for a potential FCRA claim.'"  *Id.* at *10 (citing *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 891 (9th Cir. 2010)).  Ms. Miller did exactly this.

Even after the legal dispute was resolved, NCS contends that there is still a legal dispute because Ms. Miller's dispute "was a legal question regarding the effect" of the Denver District Court's Order declaring the lease was "void" and Ms. Miller "is not obligated" under the lease.  (Mot. at 10). This novel argument creates an impossible standard for consumers to correct fraudulent reporting by debt collectors.  Any reasonable person understands that a court declaring that Ms. Miller is not obligated under a lease means that she does not owe any money.  The same is true when the Court states "[Ms. Miller] is not obligated to [TCG] under the subject lease . . . ."  (Id.).  Whether trained in law or not, any person of ordinary intelligence can understand that Ms. Miller did not owe any money. Moreover, if debt collectors or other furnishers truly cannot decipher the legal effect of legal rulings affecting their business, they should get out of the business or at a minimum, stop availing themselves to the benefits of credit reporting.

Moreover, the FCRA contemplates the situation NCS complains of here. When a disputed item of information cannot be verified, the furnisher of credit information must delete the information. 15 U.S.C. § 1681s-2(b)(1)(E). Credit reporting is about accuracy. Were there any doubt in the disputed information, the furnisher was duty-bound to cease reporting it because it cannot be verified. *Id.* Any argument that this was a dispute about the effect of the judgment is disingenuous.

### 3.    NCS's violations were willful.

A willful violation is one committed in "reckless disregard of [its] statutory duty." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57, 127 S. Ct. 2201, 167 L. Ed. 2d 1045 (2007). See also 15 U.S.C. § 1681n(a)(1)(2) ("Any person who willfully fails to comply with any requirement imposed [by FCRA] with respect to any consumer is liable to that consumer [for] . . . punitive damages.") "A 'willful' violation is either an intentional violation or a violation committed by an agency in reckless disregard of its duties under

the FCRA." *Birmingham v. Experian Info. Sols., Inc.*, 633 F.3d 1006, 1009 (10th Cir. 2011) (citations omitted). "Recklessness is measured by 'an objective standard: action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Id.* (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68 (2007).

Here, NCS's violations of the FCRA were reckless—and therefore, willful— because NCS knew that its actions entailed an unjustifiably high risk of harm. Throughout its motion, NCS relies on its policies and procedures for investigating credit disputes to justify its failure and refusal to remove the judicially decreed invalid debt from Ms. Miller's credit report. But rather than attach its own policies and procedures for investigating credit disputes to the motion, NCS attaches the policies and procedures *from another debt collector altogether*. (Doc. 46-2 at 207). That's right: NCS attached a different debt collector's policies and procedures (ProCollect, Inc.) to its motion for summary judgment and then asks the Court to enter judgment against Plaintiff and determine NCS did nothing wrong because it followed its policies and procedures. Failing to attach the policies and procedures it allegedly followed is reason alone to deny NCS's motion, regardless of whether the failure to attach its own procedures was intentional or merely negligent.

NCS may have felt compelled to attach the wrong procedures because its own procedures are exceptionally bad and acknowledge that NCS *does not have a policy or procedure for investigating disputes concerning judicially-declared invalid debts.* (Ex. 1 at 28). NCS's policies and procedures are general in nature. Specifically, NCS's policies and procedures for investigating credit disputes are for document requests and balance verifications. (Id.). Within these policies and procedures, NCS acknowledges that there are many types of disputes, but so far, NCS has established procedures only for general disputes i.e. document requests and balance verifications. (Id.). And after NCS acknowledges that there are many types of disputes beyond just document requests and balance verifications, NCS states that it will come up with a write up for all the known disputes when it has "more time". (Id.).

14

NCS here has long been on notice that it may not utilize a largely automated process that ignores an obligation to contact individuals with actual knowledge of the disputes. *Bumpus v. Nat'l Credit Sys.*, No. 16-cv-1209-TWT-JFK 2017 U.S. Dist. LEXIS 216542 (N.D. Ga. Nov. 27, 2017) (denying NCS summary judgment because it "did not communicate with Plaintiff or her co-tenant when conducting the reinvestigations."). Ignoring court orders and continuing to report invalid debts to the CRAs is not limited to just Ms. Miller. (Ex. 3). And failing to conduct a reasonable investigation in response to a dispute is nothing new to NCS. *Ward v. National Credit Sys., Inc.*, No. 21-cv-2597-NYW (D. Colo. June 21, 2024) (judgment for $500,000.00). Yet despite being on notice of these problems, NCS continues down the wrong road.

### B. NCS Is Not Entitled To Judgment As A Matter Of Law On Plaintiff's FDCPA Claims.

"Because the FDCPA, like the Truth in Lending Act (TILA), 15 U.S.C. § 1601 et seq., is a remedial statute, it should be construed liberally in favor of the consumer." *Johnson v. Riddle*, 305 F.3d 1107, 1117 (10th Cir. 2002). "Congress enacted the FDCPA 'to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses.'" *Tavernaro v. Pioneer Credit Recovery, Inc.*, 43 F.4th 1062, 1067 (10th Cir. 2022) (quoting 15 U.S.C. § 1692(e)). "To prevail on a FDCPA claim, a plaintiff must prove four elements: (1) the plaintiff is a "consumer" under [15 U.S.C.] § 1692a(3); (2) the debt at issue arose out of a transaction entered into primarily for personal, family, or household purposes; (3) the defendant is a debt collector under id. § 1692a(6); and (4) through its acts or omissions, the defendant violated the FDCPA." *Id.* For determining whether a debt collector violated one of the substantive prohibitions under the FDCPA (i.e. 1692c(b), 1692e, and 1692f), it is well established that communicating credit information to the Consumer Reporting Agencies is debt collection and covered by the

FDCPA.  *e.g. Irvine v. I.C. Sys.*, 176 F. Supp. 3d 1054, 1063-64 (D. Colo. 2016); *Smith v. Encore Capital Grp.*, Inc., 966 F. Supp. 2d 817, 829 (E.D. Wis. 2013) ("[C]redit reporting constitutes collection of a debt.").

NCS does not contest the first three requirements to prove a claim under the FDCPA.  Indeed, NCS admits: (1) Ms. Miller is a "consumer"; (2) the residential lease it was attempting to collect is a "debt; and (3) NCS is a "debt collector".  (*See generally* Statement of Undisputed Facts and supporting affidavit).  NCS disputes, however, that it violated the substantive prohibitions Ms. Miller alleges: 15 U.S.C. §§ 1692c(b), 1692e, and 1692f.  NCS violated each of these prohibitions.

### 1.    NCS violated 15 U.S.C. § 1692c(b).

NCS violated the FDCPA when it communicated credit information when such communication was prohibited by the FCRA.  A debt collector may only communicate credit information to a consumer reporting agency if that communication is permitted by law.  15 U.S.C. § 1692c(b).  The FCRA—the law that governs the transmission of credit information to consumer reporting agencies—prohibits everyone from communicating credit information that the person knows or should reasonably know to be false.  15 U.S.C. § 1681s-2(a)(1)(A) ("A person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate.")  In sum, communicating credit information to a consumer reporting agency that is either known to be inaccurate or should be known to be inaccurate is not permitted by law, and therefore, violates the FDCPA.

This is exactly what NCS did here.  After NCS received a copy of the Order stating that Ms. Miller was not obligated under the lease, NCS nevertheless reported to the CRAs that Ms. Miller was obligated under the lease.  Upon receiving the order, NCS knew or should have known that reporting that reporting that Ms. Miller owed money under a void lease was false.  Because furnishing false information to a consumer reporting agency

violates the FCRA—and therefore, not permitted by law—communicating this information concerning Ms. Miller to the Consumer Reporting Agencies violated the FDCPA.

### 2.    NCS violated 15 U.S.C. § 1692e.

NCS violated the FDCPA by using false, deceptive, and misleading representation and means to collect the lease.  The FDCPA prohibits a debt collector from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt."  15 U.S.C. § 1692e.  The statute then gives a list of examples of conduct that violates 15 U.S.C. § 1692e.  *Id.*; *Tavernaro*, *supra*.   This includes making "false representations as to the character, amount, or legal status of any debt", 15 U.S.C. § 1692e(2)(A); "[c]ommunicating or threatening to communicate to any person credit information which is known or which should be known to be false," 15 U.S.C. § 1692e(5) (threat to take action—or taking action—which cannot be legally taken); 15 U.S.C. § 1692e(8); and "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt . . . ."  15 U.S.C. § 1692e(10).  In sum, a debt collector may not misrepresent whether a consumer owes a debt or the amount the consumer owes, and the debt collector cannot falsely represent the legal status of the debt.

Here, NCS violated 15 U.S.C. § 1692e by falsely representing that Ms. Miller owed any amount to NCS based on the lease.  After receiving the order declaring the lease void and that Ms. Miller did not have any obligation to Landord TCG, NCS violated Section 1692e each time it reported the lease to the Consumer Reporting Agencies.  Each time NCS reported, NCS misrepresented that Ms. Miller owed money because she did not.

To avoid this conclusion, NCS attempts to cast Ms. Miller's claims as a dispute over the enforceability of the lease.  Had Ms. Miller not obtained a judgment, this argument might not be frivolous.  But she did obtain a judgment, and that judgment had the legal effect of declaring that she did not owe any money on the lease.  Any argument to the contrary would deny effect to the Denver District Court's order that the lease was void and Ms. Miller did not owe any money.

### 3.    NCS violated 15 U.S.C. § 1692f.

NCS violated the FDCPA using unfair and unconscionable means to attempt to collect the lease.  The FDCPA prohibits a debt collector from using "unfair or unconscionable means to collect or attempt to collect any debt."  15 U.S.C. § 1692f.  The statute then gives a list of examples of conduct that violates 15 U.S.C. § 1692e.  *Id.*; *Taverno*, *supra*.  This includes "[t]he collection of any amount" that is not "expressly authorized by the agreement creating the debt or permitted by law."  15 U.S.C. § 1692f(1).  Here, NCS continued to report to the Consumer Reporting Agencies that Ms. Miller owed money on account of a lease with TCG.  But that lease was declared void and there is no law that permits a landlord to collect any amount on a non-existent contract.  Accordingly, reporting this alleged obligation to the Consumer Reporting Agencies was an unfair and unconscionable debt collection practice in violation of 15 U.S.C. §§ 1692f and 1692f(1)

### C.    NCS Is Not Entitled To Judgment As A Matter Of Law On Its Affirmative Defenses.

NCS argues that it is entitled to summary judgment on its affirmative defenses of bona fide error, contributory negligence, and failure to mitigate.  NCS has not met its burden on each of these affirmative defenses.

### 1.    NCS is not entitled to summary judgment on its bona fide error defense.

A debt collector may escape liability for violating the FDCPA "if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error."  15 U.S.C. § 1692k.  "[T]he procedures component of the bona fide error defense involves a two-step inquiry: first, whether the debt collector 'maintained'--i.e., actually employed or implemented--procedures to avoid errors; and, second, whether the procedures were 'reasonably adapted' to avoid the specific error at issue."  *Johnson v. Riddle*, 443 F.3d 723, 729 (10th Cir. 2006).  The first step in this process, however, is identifying the error.  *Id.*; (Mot. at 18).

NCS identifies its reliance on the creditor TCG as the basis committing an error. As stated by the 9th Circuit—to NCS—a collector may not simply rely on its creditor to provide reliable information.  The collector has an affirmative duty to avoid charging for illegitimate items:

> When we spoke in *Clark* of the nonliability of a debt collector who 'reasonably relies' on the reported debt, we were referring to a reliance on the basis of procedures maintained to avoid mistakes. A debt collector is not entitled under the FDCPA to sit back and wait until a creditor makes a mistake and then institute procedures to prevent a recurrence. To qualify for the bona fide error defense under the FDCPA, the debt collector has an affirmative obligation to maintain procedures designed to avoid discoverable errors, including, but not limited to, errors in calculation and itemization. The latter would include errors in claiming collection expenses of the creditor that could not legitimately be part of the debt owed by the debtor.

*Reichert v. Nat'l Credit Sys.*, 531 F.3d 1002, 1007 (9th Cir. 2008).  Simply put, blind reliance on a creditor is not a procedure.

For reliance on the creditor to be permitted to rely on the creditor as the basis for committing an error, that reliance must be reasonable.  *Clark v. Capital Credit & Collection Servs.*, 460 F.3d 1162, 1177 (9th Cir. 2006).  "On the other hand, the bona fide error defense will not shield a debt collector whose reliance on the creditor's representation is unreasonable or who represents to the consumer a debt amount that is different from the creditor's report."  *Id.*  Here, NCS has failed to identify why relying on TCG was reasonable.  NCS has not identified any evidence suggesting that TCG has been a reliable source of information in the past.  Instead, NCS points out that TCG is bound to indemnify NCS in the event of an error.  This suggests that NCS cannot trust the Landlord since NCS's agreement anticipates TCG will make mistakes and makes TCG liable for them.  Moreover, TCG's response to NCS provides evidence that TCG was not a reliable source of information.  As NCS points out in its brief, TCG did not respond to the

substance of the dispute or provide documentation (such as the underlying pleadings) to assist NCS in understanding the nature and result of the dispute.  Instead, TCG simply sent a short confirmation that did not meet the substance of the dispute.  One sentence answers to detailed disputes are not reliable.

In addition to its failure to identify why it was reasonable to rely on TCG's response when the landlord provided no information to meet the substance of the dispute, NCS fails on both factors identified in *Johnson.*  First, NCS has failed to demonstrate that it actually employed or implemented procedures to avoid errors.  Putting aside that NCS attached another business's procedures to its motion instead of its own, NCS must demonstrate that it actually followed its procedures.  *Johnson*, 443 F.3d at 732.  The affiant who claims that NCS followed its procedures, Mr. Sapp, is not competent to testify to these facts because he is not the person who processed Ms. Miller's dispute and then determined whether to continue reporting a debt a court had declared void. Consequently, there is no evidence to support an allegation or inference that NCS followed its procedures.

Second, NCS does not have a procedure for handling disputes where a court has declared the underlying obligation void and declared that the consumer does not owe the obligation.  Although NCS did not attach its procedures to the motion, this is what the policy manual says:

### ***Dispute Process***

The explanation below is for a general dispute - such as doc request or balance verification

There are many types of disputes everything below will be the steps for all disputes, however depending on what the dispute is, you will send different documents to validate the accounts.

I will type something up like this for all the disptues I can think of when I have more time

(Ex. 1 at 28).  There is no specific procedure for when a court has declared the consumer does not owe the account balance.  In sum, there is no policy or procedure in place for

disputes like Ms. Miller's.  Accordingly, NCS has not established that it has a reasonably adapted a procedure to avoid the specific error at issue.

## 2.    NCS has not pleaded or proved contributory negligence.

NCS contends that it is entitled to summary judgment because Ms. Miller was contributorily negligent.  In addition to these types of defenses requiring a jury's sound deliberation, there are two reasons this is wrong.

First, to the extent contributory negligence is a defense to an FCRA action, NCS failed to raise it as an affirmative defense.  Under Rule 8, "a party must affirmatively state any avoidance or affirmative defense, including [. . .] contributory negligence . . . ."  Fed. R. Civ. P. 8(c)(1).  "This rule requires a party pleading to a preceding pleading to set forth affirmatively all matters which the pleading party intends to use as an avoidance or affirmative defense."  *Radio Corp. of Am. v. Radio Station KYFM, Inc.*, 424 F.2d 14, 17 (10th Cir. 1970).  "If such defenses are not affirmatively pleaded, asserted with a motion under Rule 12(b) or tried by the express or implied consent of the parties, such defenses are deemed to have been waived and may not thereafter be considered as triable issues in the case."  *Id.*

Here, NCS has waived any claim of contributory negligence.  In response to Ms. Miller's amended complaint, NCS initially asserted every single defense under Rule 8. (Doc. 20 at 13).  After conferring with Plaintiff's counsel regarding the impropriety of indiscriminately asserting eighteen affirmative defenses, NCS filed an amended answer that did not assert every defense under Rule 8 and did not specifically list contributory negligence as an affirmative defense.  (Doc. 21 at 11-13).  This was not mere oversight— NCS intentionally omitted it.  Consequently, NCS waived this purported defense.

Second, NCS has not established the elements of contributory negligence or even described what those are.  Contributory negligence is premised on negligence.  *Dare v. Sobule*, 674 P.2d 960, 962 (Colo. 1984).  At minimum, a defendant must show that a plaintiff had a "legally imposed duty or a standard of conduct to which he must adhere."

*Id.* at 963.  Additionally, the defendant must show that the injuries resulted as a result of the plaintiff's breach of the legally imposed duty.  *Id.*  In any event, contributory negligence "should not diminish the consequences of [the defendant's] negligence by the failure of the injured party to anticipate defendant's negligence in causing the accident itself" or "result in a windfall to tortfeasors who pay only partially for the harm their negligence caused."

Here, NCS has not shown the existence of a duty or causation.  First, NCS has not cited any legal authority for the proposition that a consumer has a duty to contact the original creditor to dispute a debt.  This duty does not exist because it would contradict the scheme for resolving disputes under the FCRA.  To have any rights against a furnisher under the FCRA, Congress required consumers to dispute credit information through a consumer reporting agency.   15 U.S.C. § 1681s-2(b)(1) (referencing 15 U.S.C. § 1681i(a)(2).  For a consumer to have any rights under the FCRA, the dispute must go to the consumer reporting agency and then the furnisher, such as NCS.  *Id.*  Nevertheless, NCS claims that Ms. Miller should have ignored this congressionally enacted scheme and insisted that the original creditor—who was not reporting the debt or even attempting to collect it—delete the negative information.  There is no such duty to ignore the law and the specific dispute scheme contained in the FCRA.  In short, NCS's argument is that Ms. Miller should have ignored the congressional created scheme for the resolution of credit disputes by something on her credit report with someone who was not even reporting the debt.  But following the law cannot be considered negligence, and NCS cites no law to support this proposition.  Indeed, the law is likely the opposite.  *See e.g. Brim v. Midland Credit Mgmt.*, 795 F. Supp. 2d 1255, 1268 (N.D. Ala. 2011) ("Additionally, this argument is really one that the plaintiff had an obligation under the FCRA beyond making his disputes to the credit reporting agencies.  The plaintiff had no such duties under the law . . . .").

### 3.    Plaintiff did not fail to mitigate her damages.

NCS's assertion that Ms. Miller failed to mitigate her damages misunderstands or misstates the affirmative defense of mitigation of damages.  "A plaintiff has the duty to take such steps as are reasonable under the circumstances to mitigate the damages sustained."  *Lascano v. Vowell*, 940 P.2d 977, 983 (Colo. App. 1996).    The duty to mitigate damages arises after the injury, not before.  Id.  "[A] plaintiff has no duty to anticipate a defendant's negligence and has no duty to mitigate damages until after the original injury has occurred."  Id.; *Burt v. Beautiful Savior Lutheran Church*, 809 P.2d 1064, 1068 (Colo. App. 1990).  Consequently, NCS must show that Ms. Miller failed to take reasonable steps to mitigate her damages after the injury occurred.

Here, NCS incorrectly contends that Ms. Miller failed to mitigate her damages based on events that occurred *before* NCS violated the FCRA.  Indeed, NCS's argument is based on the premise that Ms. Miller had an extra-statutory duty to dispute the debt that NCS was reporting with someone other than the Consumer Reporting Agencies. Even if this duty existed, that would not mean Ms. Miller failed to mitigate her damages because the duty to mitigate only arises *after* an injury, not before.

## VI.    CONCLUSION

Federal laws and court orders matter.  The FDCPA and FCRA are real laws, and violating them causes real harm, like hindering Ms. Miller's efforts to obtain suitable housing for her children.  Saying that someone owes money when they don't and then repeating that falsehood every single month on a person's credit is humiliating.  It is doubly humiliating when a debt collector continues to report falsely that a person owes money after a court declares she doesn't.  The FDCPA and FCRA prohibit continuing to collect and report invalid debts.  That is why a Colorado jury awarded five-hundred thousand dollars in damages against NCS just a few months ago.  *Ward v. National Credit Systems, Inc.*, No. 1:21-CV-2597 (D. Colo. June 21, 2024).  None of this matters to NCS.

NCS filed its motion for summary judgment and asked this Court to ignore the plain and understandable language of a court order stating that Ms. Miller didn't owe any money.   And NCS contends that Ms. Miller should not have followed the procedures set forth in the FCRA and instead, followed a different procedure to get NCS to remove its illegal tradeline.  In short, NCS claims Ms. Miller should have done what NCS was legally obligated to do, and NCS confesses that if Ms. Miller had done what NCS was obligated to do, none of this would have happened.  NCS's contentions find no support in the law. Indeed, they disregard the law altogether.

At bottom, NCS's motion for summary judgment is an improper attempt to try out as many arguments as possible to see what works.  Courts have grown increasingly tired of this approach.  *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("When reading ITOW's brief, one wonders if ITOW, in its own version of the 'spaghetti approach,' has heaved the entire contents of a pot against the wall in hopes that something would stick.  We decline, however, to sort though the noodles in search of ITOW's claim.").  "Neither [the opposing party] nor the court can or should be forced to sift through the noodles to determine whether" any of the arguments have merit.  *Brooks v. Oba*, No. 1:13-cv-02894-CBS, 2016 U.S. Dist. LEXIS 199555, at *15 (D. Colo. Nov. 21, 2016); *United States ex rel. Morgan v. Champion Fitness, Inc.*, 368 F. Supp. 3d 1198, 1216 (C.D. Ill. 2019) ("This Court will not countenance the so-called 'spaghetti approach' to litigation whereby the parties heave[] the entire contents of a pot against the wall in hopes that something [will] stick . . . .") (quotations omitted).  Ms. Miller respectfully submits that NCS's motion is an improper attempt to escape liability by making multiple unfounded arguments that border on frivolous.   But liability is reasonably clear—a reasonable investigation of Ms. Miller's dispute would have confirmed that she did not owe the debt and debt collectors are forbidden from collecting void accounts.  Continuing to report that Ms. Miller owed money on the lease after receiving the dispute violated the FDCPA and FCRA.

WHEREFORE, Plaintiff Zepherine Miller, an individual, respectfully requests that the Court deny Defendant National Credit Systems, Inc.'s motion for summary judgment. Given that much of the tedious elements are undisputed, this Court also has the option to provide NCS with notice sufficient to enter partial summary judgment in favor of Ms. Miller establishing that: NCS, as a debt collector, violated the FDCPA; received notice of disputes from CRAs and thereafter continued to communicate inaccurate data. The issues of damages and whether NCS conducted reasonable investigations under the FCRA remain the only triable issues.

Dated: October 17, 2024

**Vedra Law LLC**

By:    /s/ Daniel J. Vedra
Daniel J. Vedra
1444 Blake Street
Denver, Colorado 80202
303-937-6540
dan@vedralaw.com

**Keller Law**

/s/ *Duran L. Keller*

Duran L. Keller (#31743-79)
8 N. Third St., Suite 403
Lafayette, IN 47902
Telephone: (765) 444-9202
Facsimile: (765) 807-3388
Email: duran@keller.law
*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on the date first written above the foregoing was served by CM/ECF on:

John W. Bowdich
BOWDICH & ASSOCIATES, PLLC
8150 N. Central Expy., Suite 500
Dallas, Texas 75206
jbowdich@bowdichlaw.com

/s/ Daniel J. Vedra
Daniel J. Vedra